IN THE UNITED STATES DISTRICT
FOR THE WESTERN DISTRICT OF MICHIGAN
_____

HLV, LLC, a Michigan limited liability
company, LANDWORTHY CONTAINER,
LLC, a Michigan limited liability company,
and ROBERT BAKER, an individual,

      Plaintiffs,        Case No.  1:13cv1366PLM

v                HON:   Paul L. Maloney

VAN BUREN COUNTY, a municipal
corporation, VILLAGE OF PAW PAW,
a municipal corporation,
PAGE & STEWART, an ad hoc
professional partnership, KELLY PAGE,
an individual, GARY STEWART, JR., an
individual, PAUL HAMRE, an individual,
PEGGY GROTE, an individual,
MICHAEL MCKAY, an individual, and
MICHAEL BEDFORD, an individual,

      Defendants.

## FIRST AMENDED AND PARTIALLY VERIFIED COMPLAINT AND JURY DEMAND

      Plaintiffs, HLV, LLC, Robert Baker, and Landworthy Container, LLC, for its First Amended and Partially Verified Complaint and Jury Demand against Defendants, Kelly Page, Gary Stewart, Jr., Paul Hamre, Michael Bedford, Michael McKay, Peggy Grote, Page & Stewart Law Firm, Van Buren County, and the Village of Paw Paw verify by the attached affidavits of Donald Visser (s*ee* **Exhibit 15**) and Robert Baker (*see* **Exhibit 31**) and otherwise allege as follows:

### Introduction

      1. This case is about several members of an esteemed profession who consistently and unabashedly abuse their badges of authority.

      2. This case involves State's Attorneys, Village Attorneys, a Circuit Court Judge, and his secretary, who purposefully misused their government stations for pecuniary gain and

revenge.

3.      Defendants, by and through the municipalities of Van Buren County and the Village of Paw Paw, used their powers and procedures as a weapon to the detriment of many people, including, but not limited to the Plaintiffs.

4.      Plaintiffs have been harmed emotionally and monetarily.

## Venue and Jurisdiction

5.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.

6.      Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because all Defendants are residents of the State of Michigan and many, if not all, Defendants reside, were found in, have an agent in and conduct affairs in the Western District of Michigan.   Further, a substantial part of the events or omissions of this Complaint occurred within the Western District of Michigan.

## Parties

7.      Plaintiff HLV, LLC is a Michigan limited liability company with its registered office located at 4695 Helena Drive, Grandville, MI 49418.

8.      Plaintiff LANDWORTHY CONTAINER, LLC ("Landworthy") is a Michigan limited liability company with its registered office located at 2480 44th Street, Suite 150, Kentwood, MI 49512.

9.      Landworthy is an affiliate of HLV, LLC to which HLV, LLC assigned its rights under the settlement agreement between HLV, LLC and ELC Leasing regarding the case *HLV, LLC v. ELC Leasing, et al.*, Case No. 11-61-558-CH.   For convenience, HLV, LLC and Landworthy shall be referred to as "HLV."

10.     Robert Baker ("Baker") is a Michigan resident.  He is the manager of Landworthy and an agent and representative of HLV.

11.     Defendant Van Buren County ("Van Buren") is a municipal corporation with its registered office located at 219 East Paw Paw Street, Suite 302, Paw Paw, MI 49079.

12.     Defendant Village of Paw Paw ("Paw Paw Village") is a municipal entity with its registered office located at 11 East Michigan Avenue, P.O. Box 179, Paw Paw, MI 49079.

13.     Defendant Kelly Page ("Page") is an individual who resides at 36451 Mill Lake Road, Gobles, MI 49055.

14.     Defendant Gary Stewart, J. ("Stewart") is an individual who resides at 114 North Brown Street, Paw Paw, MI 49079.

15.     Defendant Paul Hamre ("Hamre") is an individual who resides at 37538 Rolling Pines Court, Lawton, MI 49065.

16.     Defendant Michael Bedford ("Bedford") is an individual who resides at 403 Harris Street, Paw Paw, MI 49079.

17.     Defendant Michael McKay ("McKay") is an individual who resides at 49144 Meadow Oak Trail, Mattawan, MI 49071.

18.     Defendant Peggy Grote ("Grote") is an individual who resides at 05450 38½ Street, Bloomingdale, MI 49026.

19.     Defendant Page & Stewart is a law firm, which is not a registered Michigan business entity, but is operated as a partnership in fact by Page and Stewart.  Page & Stewart's principal place of business 203 South Niles Street, Paw Paw, MI 49079.

**Factual Background**

**Original Action And Settlement Agreement.**

20.     Through their attorneys, Visser and Associates, HLV filed a collection action against ELC Leasing ("ELC"), and its many affiliates and d/b/a's, including its owner, William Engel ("Engel"), to collect more than $600,000 owed from the ELC defendants to HLV.  The case was filed in Van Buren County and assigned to Judge Paul Hamre.  The case is *HLV, LLC v. ELC Leasing, et al.*, Case No. 11-61-558-CH (the "Collection Action").

21.     At a hearing on September 19, 2012, before the Honorable Kathleen Brickley, the parties stipulated to a settlement agreement on the record.  The terms of the September 19, 2012, settlement agreement were:

a.   Engel would transfer the assets of a trailer and container business to HLV, which consisted of approximately 600 trailers and containers;

b.   Engel would give HLV the book of business that went along with the trailers and containers, including his rights to future rent payments from third-parties in possession and/or use of the trailers and/or containers; and

c.   Engel would immediately sign the Bill of Sale and Assignment of Leases for the transfer of all assets, but would hold all assets for a 90-day period during which he could redeem the assets by paying the debt owed to HLV; upon expiration of 90-days, all assets not redeemed would belong to HLV and Engel would cooperate in locating all such assets.

22.     Prior to October 11, 2012, the parties amended the settlement agreement. (Amended Settlement attached as **Exhibit 1**.)

23.     The amended settlement agreement did not replace the September 19, 2012 settlement agreement, but included the following additional terms:

a.   If Engel was unable to provide 600 trailers and containers by the deadline, he

4

would provide HLV with cash or other machinery or equipment "in a value equal to $2,500 per trailer/container unit less than 600, as necessary to make [HLV] whole on its loan to [ELC]";

b. Engel and ELC could not sell, transfer, remove, secrete, or in any manner dispose of the assets of the trailer and container business; and

c. HLV was entitled to review all records, books and the like relating to the trailer and container business during regular business days and hours upon 24-hour notice.

24.     The Amended Settlement was signed by Judge Hamre and entered as an Order of the Van Buren County Circuit Court on October 11, 2012.

25.     After some delay, ELC executed the required Bill of Sale and Assignment of Leases on November 27, 2012. (Bill of Sale attached as **Exhibit 2**; Assignment of Lease attached as **Exhibit 3**.)

26.     The 90-day redemption period during which ELC and Engel were entitled to redeem the assets described in the settlement agreement expired on December 19, 2012.   Engel failed to tender any portion of the amount owed to HLV in order to redeem his property.  Thus, he was required to hand over the 600 trailers named in the settlement agreement.

27.     In January 2013, HLV attorney, Donovan Visser and ELC attorney, David Haywood exchanged emails about HLV's recovery of ELC's and Engel's assets pursuant to the settlement agreement, after which, Baker took possession of approximately 25 of the 600 trailers owed to HLV.

28.     Sometime before March 2013, Engel and ELC retained Defendants Page and Stewart, and Attorney William Donovan to represent all of the defendants in the Collection

Action.

## Baker Finds A Buyer For The Trailers.

29.     In February 2013, Baker located a buyer who was willing to purchase each of the 600 trailers that ELC was required to transfer to HLV.

30.     Engel and ELC refused to cooperate with HLV's efforts to locate its assets and recover the trailers.  Engel and ELC were thus in breach of the settlement agreement.

31.     Upon information and belief, when Engel learned that Baker had found a buyer for the trailers, Engel began to frustrate HLV's collection and sale of the trailers and containers by removing identification information and VIN numbers from the trailers still in his possession and withholding titles for the trailers HLV already possessed.

## March 6, 2013 *Ex Parte* Temporary Restraining Order.

32.     On March 6, 2013, while still working diligently to procure ELC and Engel's performance under the settlement agreement, Visser and Associates, HLV's legal counsel, was surprisingly served with an *ex parte* order enjoining HLV from collecting any more of its assets from Engel or ELC.

33.     Counsel for HLV was never served with a motion, nor contacted by phone or otherwise, prior to the Order being entered.  What is more, the *ex parte* order contradicted HLV's rights under the stipulated settlement agreement.

34.     The *ex parte* order was signed by Judge Hamre.

35.     On March 20, 2013, Judge Hamre presided over a hearing on Engel and ELC's motion for an order further enjoining HLV from any collection actions under the settlement agreement – and also on a Motion for Contempt, which HLV and its counsel had filed against Engel and ELC for their violation of the parties' binding settlement agreement.

36.     Judge Hamre heard oral arguments from both parties and took them under advisement.  He did not rule from the bench.

37.     Judge Hamre did not extend the temporary restraining order at the hearing.

38.     Thus, the *ex parte* temporary restraining order expired on March 20, 2013.

**March 22, 2013 *Ex Parte* Order Extending Temporary Restraining Order.**

39.     On March 21, 2013, because the TRO had expired, HLV renewed its attempts to recover its containers and trailers from ELC and Engel.

40.      Then, out of nowhere, HLV's counsel was served with yet another *ex parte* order purportedly signed by Judge Hamre, which extended the temporary restraining order issued March 6, 2013 (March 22 Order attached as **Exhibit 4**).

41.     The March 22 Order extended the expired temporary restraining order "until further order of the court."

42.     The same day they were served, Attorney Donald Visser phoned Defendant Stewart to inquire why Visser and Associates was not contacted regarding the requested extension of the temporary restraining order.

43.     Defendant Stewart's response was that Engel was calling 20 times an hour about the matter and so they had to do something.

44.     After speaking with Defendant Stewart, Attorney Donald Visser also phoned Judge Hamre's secretary in an effort to secure a time to discuss this new *ex parte* order, its issuance, and whether a bond would be posted in the event that the temporary restraining order was entered in error.

45.     Judge Hamre's secretary informed Attorney Donald Visser that Judge Hamre was out of town, which raised the question how Judge Hamre could have signed the order if he was

not present.

46.     Based on an expert comparison of the Order and other examples of Judge Hamre's signature, it is now clear that someone forged Judge Hamre's signature on the March 22, 2013, *ex parte* order – presumably with the Judge's blessing.  (*See* comparison of Judge Hamre's signatures on the March 22 Order, **Exhibit 4**, and the March 26 Order After Hearing, **Exhibit 5**.)

47.     A handwriting expert reviewed the March 22 Order and compared it to other samples of Judge Hamre's authentic signature.  The expert concluded that the March 22 Order did not match the handwriting of the authentic signature samples.

48.     The March 22 Order touched on and was transmitted over interstate wires.

49.     Defendant Stewart and other Defendants knew that the March 22 Order was not signed by Judge Hamre and directly or indirectly caused that document to be forged.

### March 26, 2013 Order After Hearing.

50.     On March 26, 2013, Judge Hamre entered an "Order After Hearing," which purportedly ruled on the motions argued before the court on March 20, 2013 (March 26 Order attached as **Exhibit 5**.)

51.     Shockingly, in the Order After Hearing, and without justification, Judge Hamre revised the October 11, 2012, Order and Amended Settlement Agreement and ordered that ELC and Engel were only required to provide 347 trailers or containers, rather than the 600 originally *agreed upon by the parties* and to which they stipulated to in open court in September and which the court incorporated in an Order in October of 2012.

52.     Judge Hamre had no power or jurisdiction over the parties' settlement agreement. He was acting outside of his judicial authority and without justification when he essentially "re-

wrote" the parties binding agreement.   What is more, the relief granted went above and beyond what was requested by either party.

53.     What Plaintiffs would later learn is that Judge Hamre entered this order as a result of *ex parte* communication with Defendants Page and Stewart.

54.     Upon information and belief, the Order After Hearing was entered in exchange for promises and items of value.

55.     It is noteworthy that Judge Dodge, the Cass County Circuit Judge later assigned by the State Court Administrator's Office to the Collection Action, vacated Judge Hamre's Order After Hearing as wholly without basis.  (Judge Dodge Order attached as **Exhibit 6**).

56.     In the Order After Hearing, Judge Hamre failed to rule on HLV's contempt motions against ELC and Engel.

57.     On April 12, 2013, HLV filed a motion for reconsideration of the Order After Hearing, which was entered *sua sponte* and for no official purpose.

58.     On April 24, 2013, Judge Hamre denied HLV's motion for reconsideration without holding a hearing.

### April 9, 2013 Confrontation.

59.     Although unwarranted, Judge Hamre's Order After Hearing did not extinguish HLV's right, given to it under the Settlement agreement, to inspect ELC's and Engel's books and records.

60.     Although mystified and frustrated by Judge Hamre's unlawful interference with the parties' settlement agreement, HLV began, once again, its efforts to recover the trailers and containers from ELC and Engel, albeit in an unjustifiably reduced quantity.

61.     Unable to find all of the trailers and containers, HLV traveled to ELC to review

the books and records relating to the trailer business, which HLV had a right to do under the remaining portions of the settlement agreement.

62.     On April 8, 2013, HLV sent Engel 24-hour notice that it planned to review ELC's records the following day and asked Engel's counsel to tell them immediately if ELC would refuse access to the books and records.

63.     Defendant Stewart responded on behalf of ELC by stating that he believed the Order After Hearing superseded the October 11, 2012 order and that HLV was no longer entitled access to ELC's books and records.  There was absolutely no basis for this position, as made clear from the documents themselves.

64.     During several emails and voicemails that followed between Attorney Donald Visser and Defendant Stewart on April 8 and April 9, Defendant Stewart never explicitly said that ELC would deny HLV access to the books and records.  Attorney Donald Visser specifically requested that Defendant Stewart explicitly state whether access would be denied because it was necessary to know that fact to determine if additional contempt grounds needed to be brought to the trial court's attention. Despite Donald Visser's request, Defendant Stewart refused to do so.

65.     Therefore, on April 9, 2013, Attorney Donovan Visser, Rebecca Baker, and HLV representative Baker, traveled to ELC's office to inspect the books and records.  They arrived at approximately 10:00 am.

66.      Engel was not present when HLV and its attorneys arrived.

67.     Upon the arrival of Donovan Visser, Rebecca Baker and Robert Baker, ELC employees insisted that the HLV representatives do nothing and wait until Engel returned.

68.     Attorney Donovan Visser specifically asked ELC's representatives if they were telling them to leave or denying them access to the books and records as allowed under the

settlement agreement.

69. ELC's representatives did not answer, but instead repeated that they should wait for Engel.

70. Therefore, Attorney Donovan Visser began picking up boxes that contained ELC's records for inspection. However, Brad Engel and other ELC employees physically interfered with his efforts. Every time Donovan Visser would pick up a box, they would forcibly take the box from him.

71. ELC employees also unplugged a computer and took it into another room so that Donovan Visser could not have access to it to view records maintained on it.

72. Further, ELC employees blocked access to the vehicle in which the HLV representatives had traveled so that they could not leave. The ELC employees trapped Visser, Baker and Baker on their premises, in an effort to concoct phony trespassing charges against them.

73. While all of this was going on, Baker was recording the events on his iPhone.

74. Soon after, Sheriff's Deputy Dan Perkins arrived.

75. ELC employee, Ms. Bell, provided Deputy Perkins with the March 26, 2013, order, claiming that Attorney Donovan Visser had no right to be on the property per that order.

76. Attorney Donovan Visser then presented Deputy Perkins with the October 11, 2012, order that allowed HLV to be on the property.

77. Confused as to which order prevailed, Deputy Perkins phoned Judge Hamre.

78. Judge Hamre told Deputy Perkins that he felt Donovan Visser was being deceptive by presenting the October order and advised that in the event criminal charges were brought, he would have "no input on that side of the proceedings." (April 9, 2013 Incident

Report attached as **Exhibit 7**.)

79.     Deputy Perkins began interviewing the people present so that he could get to the bottom of things.  He spoke first with ELC employees, Brenda Turner and Amber Sonicksen.

80.     Ms. Turner told Deputy Perkins that Attorney Donovan Visser had pushed her. Ms. Sonickson reiterated Ms. Turner's story, stating that Attorney Donovan Visser had put his hand on Ms. Turner's shoulder and pushed her aside.

81.     Ms. Turner complained of no pain.  Notably though, *Engel* called Deputy Perkins several days later stating that Ms. Turner had developed a limp since the April 9 confrontation, even though Ms. Turner and Ms. Sonickson had told him Attorney Donovan Visser had touched only Ms. Turner's shoulder.

82.     Deputy Perkins then learned that Baker had recorded the events and asked to see Baker's phone so that he could search it and view the videos of the incident.

83.     Attorney Donovan Visser, acting as his attorney, advised Baker not to consent to the search of his phone.

84.     Deputy Perkins then confiscated the phone and returned to the police department to obtain a search warrant.

85.     Deputy Perkins completed a search warrant and prosecutor, Defendant Michael Bedford, reviewed and approved the request.  The Honorable Robert Hentchel signed the search warrant on April 9, 2013.

86.     Sergeant McCulfor later extracted the videos, which Deputy Perkins viewed directly from the phone while still at ELC.  After reviewing the videos, Deputy Perkins found that nothing criminal in nature had occurred.  (*See* **Exhibit 7**).

87.     Interestingly, in an email to reporter David Bailey, Defendant Bedford claimed

that the criminal charges later brought against Attorney Donovan Visser and Baker were "requested by the Van Buren County Sheriff Department."   (June 26, 2013 Bedford Email, attached as **Exhibit 8**.)

88.     Deputy Perkins did note that several people from ELC had their hands on Attorney Donovan Visser, but found no evidence that Donovan Visser had assaulted anyone. Indeed, the video showed that Ms. Turner's daughter, also an ELC employee, yelled "get your hands off my mother" at a time when Donovan Visser was nowhere near Ms. Turner in an effort to concoct a false accusation.

89.     At that time, no charges were brought against Donovan Visser or anyone else involved in the April 9, 2013 confrontation.

90.     However, Defendant Page, with the assistance of Hamre and Bedford, did eventually influence the Prosecutor's Office to press charges against Baker and Donovan Visser.

**Judge Hamre's Order To Show Cause.**

91.     On April 10, 2013, Defendant Hamre issued a Show Cause for Contempt against HLV and Visser and Associates.  (Show Cause Notice attached as **Exhibit 9**.)

92.     There was no basis for the issuance of the Order.  No conduct occurred before the trial court that could have given rise to a contempt order.  Additionally, no pleadings had been filed with the court demanding a show cause order, although it is believed that *ex parte* communications with other Defendants did occur that gave rise to Judge Hamre's unwarranted intrusion.

93.     Upon information and belief, Judge Hamre issued such order to give weight to the criminal charges that would later be brought against Attorney Donovan Visser and Baker.

**HLV's Renewed Motion For Contempt Against Engel And ELC**

13

94.     Due to Engel and ELC's continuous, contemptible conduct, which Hamre refused to address, and because ELC refused HLV access to its books and records on April 9, 2013, HLV renewed its motion for contempt against Engel and ELC.  (Renewed Contempt Motion attached as **Exhibit 10**.)

95.     HLV scheduled a hearing on its renewed motion for contempt for May 6, 2013.

96.     At the hearing, Judge Hamre stated that HLV and its counsel must make a *prima facie* showing of contempt – and, if they failed to do so, there would be no evidentiary hearing on the alleged contempt.  HLV had clearly made a *prima facie* showing in its affidavit.  Defendant Hamre did not accept that the testimony presented to the court met the threshold for a *prima facie* showing.   In place of conducting a contempt hearing, he instead tried to negotiate a new settlement agreement with HLV on behalf of the ELC defendants.  Then, implicitly holding that HLV did not make a *prima facie* case, Judge Hamre refused to hold an evidentiary hearing on whether ELC and Engel had violated the settlement agreement.  The court would not even consider, or hold a hearing on whether, the ELC defendants violated Judge Hamre's March 26, 2013 Order After Hearing, which unlawfully re-wrote the settlement agreement.

97.     At this point, Judge Hamre had already ignored the parties' settlement agreement, halved the amount from ELC to HLV and refused to rule on HLV's motion for contempt.

98.     Rather than arguing in defense of contempt, ELC counsel, Defendant Page argued that ELC should be let out of the settlement agreement and subsequent court orders, because they had found their own potential buyer for the trailers and containers.  Therefore, they argued that they should be allowed extra time to sell the containers themselves and then pay the proceeds to HLV, but not at the rate agreed to by the parties ($2,500 per container) but instead capped at $694,000.

99.     Hamre gave ELC and Engel the requested additional time to try to sell the trailers and containers themselves – a right ELC had long since lost – and outrageously enjoined HLV from selling any trailers (trailers that HLV owned) until after May 10, 2013.

100.     Further, Judge Hamre ruled to enjoin Engel from contacting any former client whose payments and leases had been assigned to HLV.

101.     Visser and Associates was told to draft a proposed order on the May 6, 2013, bench ruling.

102.     The court also set a telephone status conference for Friday, May 10, 2013, at 4:00 p.m. and it ordered Visser and Associates to submit a detailed report regarding the location, condition and ownership of the specific trailers and containers that HLV had recovered from ELC – presumably to confirm the amount owed from ELC to HLV.

103.      On May 7, 2013, Visser and Associates drafted and submitted the requested 7-Day Proposed Order.  (7-Day Proposed Order attached as **Exhibit 11**.)

104.     Despite the fact that seven days passed with no objection from Defendants Page or Stewart, Judge Hamre failed to sign the order on May 14 or any day thereafter.

**The Status Conference And The Discovery Of Unlawful *Ex Parte* Communications**

105.     As ordered, Judge Hamre held the telephonic status conference on May 10, 2013, at 4:00 p.m.  Judge Hamre, and Defendants Page and Stewart participated from Judge Hamre's office.

106.     Donovan Visser, Donald Visser, Rebecca Baker, and HLV representative Robert Baker participated from Visser and Associates' office in Kentwood, Michigan.

107.     Mr. William Donovan, an additional attorney representing ELC, participated via telephone from his Detroit, Michigan office.

108.    During the status conference, Donald Visser was to provide the court with the report regarding the trailers HLV possessed and their locations.  Donald Visser and staff had spent many hours attempting to track and record the whereabouts, condition and ownership of the trailers and containers – a task made most difficult by ELC's interference and failure to provide records or allow inspection of records.

109.    Also, Defendants Page and Stewart were to report to the court about the alleged buyer for the trailers and containers still (albeit unlawfully) in ELC's possession.

110.    Visser and Associates faxed its report to Judge Hamre's chambers just before the status conference call.  Defendant Grote confirmed a faxed receipt of the report at 4:10 p.m. on May 10 – during the telephonic conference.

111.    While on the conference call, Judge Hamre, appeared to want to redraft the entire settlement and became upset when HLV refused to do so.  Judge Hamre's efforts were not based on any pending motions, but appeared to have been based solely on a desire to assist ELC or Defendants Page and Stewart.

112.    Attorney Donald Visser raised his concerns about returning the trailers and Judge Hamre pushed him to accept partial payment, which Hamre described as a good result that HLV should be happy with.

113.    Unhappy that HLV would not succumb, Judge Hamre ordered that all of the parties should return to Court the following Monday, May 13, 2013, at 9:00 a.m. to work out the details of Judge Hamre's decision to eviscerate the binding settlement agreement and enjoin HLV from selling its assets.  Yet again, he did not rule on the pending contempt motion or sign the 7-day order submitted by Visser and Associates.

114.    Instead, Hamre set a hearing on his *sua sponte* decision to enjoin HLV and vacate

a court order – despite the fact that no motion was pending before the court.

115.    At the end of the call, Attorney Donald Visser voiced his objection to the scheduled hearing on the parties' settlement agreement, because there was no motion pending. **Judge Hamre responded that "I am the Court, so that makes it proper."** Requiring a party to appear on a motion that has not been filed or properly noticed violates MCR 2.119. After Donald Visser's objection, the call ended.

116.    Then, HLV's counsel heard a click – presumably because Attorney William Donovan hung up his phone in Detroit.

117.    Almost immediately, and before Visser and Associates could hang up the conference call, HLV's counsel heard further conversation between Judge Hamre and Defendants Page and Stewart.

118.    With the court and Defendants Page, Stewart and Grote unaware that Visser and Associates was still on the line, the following occurred:

    a.    One of the persons in Judge Hamre's chambers called Donald Visser a f**ing d**khead. Then one of the persons called Donovan Visser a f***ing d***. Judge Hamre agreed that "his son is even worse."

    b.    Next, the three discussed the case amongst themselves, which, in and of itself, is a substantial ethical violation of the Michigan Code of Judicial Conduct and the Michigan Rules of Professional Conduct.

    c.    The Judge then stated that the original order and settlement agreement gave HLV a right to 600 trailers, but that Defendant Stewart (in yet another *ex parte* conversation) told the Judge that despite the binding court order to that effect, the parties had not really agreed to that.

    d.   Judge Hamre then stated that because of ELC's discontent with the settlement agreement and subsequent order, Hamre "looked again" at the original order and decided that – despite the plain meaning of the settlement agreement and subsequent orders – ELC was not required to provide 600 trailers.

    e.   One of the attorneys then agreed that "[HLV] ain't gonna get 'em."

    f.   Defendant Page said "conference call Sunday at your house if I can get Visser on it."

    g.   There was laughter amongst Judge Hamre, and Defendants Page and Stewart during the *ex parte* conversation.

119.    With the call still live, Judge Hamre's secretary, Defendant Peggy Grote, entered his office.  She had in her hand the detailed report that Visser and Associates had faxed to chambers, stating that it arrived at 4:10 p.m.  She asked Judge Hamre what he wanted her to do with it.

120.    Judge Hamre told her to "throw it in the garbage.  I don't want it. I don't need it."

121.    Defendant Grote also stated that she almost "fell off her chair" when she heard that Judge Hamre had set another hearing on Monday morning because she "figured Visser won't be quiet."  To which Hamre replied:  "Well, I'll just cut him off and say 'it's the courts intention to extend [the injunction], tell me why I shouldn't'"

122.    Based on the recording, it was clear that on the following Monday, Judge Hamre intended to continue the injunction prohibiting any collection efforts and decide nothing else.  The hearing was nothing more than a charade to give the impression of fairness.  Clearly, Judge Hamre had already made up his mind in favor of the defendants.

123.    The phone call then ended.

124.    Unbeknownst to Defendants Page, Stewart, Judge Hamre and Peggy Grote, the conversation was recorded.  (Call Transcript attached as **Exhibit 12**.)

### HLV's Motion To Disqualify Judge Hamre.

125.    HLV and its counsel were shocked and disappointed to learn that Defendants Page, Stewart, and Judge Hamre had been discussing the case at length, that Defendants Page and Stewart were socializing improperly with Judge Hamre at his residence, and, worst of all, that Judge Hamre was crafting ways to help his friends, Defendants Page and Stewart by vacating the parties' settlement agreement and the binding order on that agreement based on an *ex parte* request from Defendant Page or Stewart.

126.    At this point, the only question was what Defendants Page and Stewart had done to exert such control and influence over Judge Hamre.

127.    HLV's counsel moved swiftly to disqualify Judge Hamre.  Thus, HLV filed a motion on May 13, 2013.  HLV did not mention or attach the recording to their motion to disqualify, but instead based their claims about Judge Hamre's, and Defendants Page and Stewart's, unethical conduct on their own sworn affidavits.

128.    Because the parties were already scheduled to return to court on May 13, Judge Hamre could not avoid hearing HLV's motion to disqualify on that day.

129.    At the beginning of the hearing, Judge Hamre stated that he could not make any decisions in the case until the motion to disqualify was decided.  Judge Hamre stated that he would issue his decision within 24 hours.

130.    Judge Hamre failed to issue a decision on HLV's motion to disqualify within 24 hours of the hearing despite his statement otherwise.  Instead, he waited to issue an opinion on the Motion to Disqualify until May 24, 2013.

131.    Judge Hamre's response, dated May 24, 2013, contained a number of blatant lies, along with several inconsistencies:  (Hamre Answer attached as **Exhibit 13**.)

a.  He denied having any social relationship with either Defendant Page or Stewart.

b.  He denied that the conversation with Defendant Page and Stewart ever took place after the May 10, 2013 phone conference – a lie.

c.  He stated that when he spoke with Deputy Perkins on April 9, 2013, concerning Donovan Visser, Rebecca Baker and Bob Baker being on ELC's property, Deputy Perkins told him that he had been called to ELC to investigate various events that included "ripping a computer out of a wall, removing personal property and assaulting employees."  This is in direct contradiction to the police report and later statements by Deputy Perkins that the conversation between himself and Judge Hamre revolved solely around which court order was in effect.

d.  He stated that the court had limited time to hear HLV's renewed motion for contempt on May 6, 2013, and the purpose of the May 13, 2013 hearing was to conclude the renewed contempt motion.  When in actuality, the May 13th hearing was arbitrarily set by Judge Hamre to renegotiate the already agreed upon settlement agreement.

e.  What is more, Hamre scolded Visser and Associates for not informing him of the criminal charges being brought against Donovan Visser when they petitioned for Hamre's recusal.  At the time Visser filed its motion to disqualify, the criminal charges were unknown to them.

f.  Further, Hamre stated that he "had no knowledge or participation in the prosecutor's decision to seek a warrant" and that his only knowledge of the

investigation was supplied by the prosecuting attorney that an arrest warrant had

been filed.  No claims that Hamre had been involved in the prosecution had been

raised by that point.

132.   Judge Hamre refused to disqualify himself claiming he did not "have a clue" what

HLV was complaining about.

## HLV's Motion To Disqualify Page And Stewart.

133.   In their responses to the motion to disqualify counsel, Defendants Stewart and

Page fraudulently stated that neither played a role in Bedford or McKay issuing charges against

Donovan Visser, or even discussing the charges with the prosecutor's office.

134.   Defendants Stewart and Page made the denials to cover up Page and Stewart's

wrongful involvement with Defendants McKay and Bedford.

## Defendant Peggy Grote Commits Perjury.

135.   Following HLV's motion to disqualify, Defendants Page & Stewart, Defendants

Page and Stewart drafted an affidavit on behalf of Defendant Grote in which she disclaimed that

any conversation took place after the May 10, 2013, telephonic conference.  (Grote Affidavit

attached as **Exhibit 14**.)

136.   Defendant Grote signed the affidavit at the behest of Defendants Page and

Stewart.

137.   Defendant Grote stated that Judge Hamre's office door remained open throughout

the telephonic status conference and that she did not recall hearing any inappropriate language

coming from Judge Hamre, Defendant Page or Stewart.

138.   Defendant Grote also swore that "after the phone conference was over [she] heard

no further conversation about the case or conversation discussing anyone's social plans."  She

also denied that there was any laughter.

139.    In doing so, Defendant Grote perjured herself, as the recording of the May 10, 2013, conversations proves that conversations about the case and social plans did occur, and that laughter occurred – including her own laughter.

140.    Defendant Grote's affidavit was first used to support a grievance filed against HLV attorney, Donald Visser, by Defendant Bedford, upon information and belief, at the behest of Page and Stewart, in an attempt to hide the Defendants' wrongdoing and lie about the May 10, 2013 *ex parte* communications.   It was then subsequently used to in Defendants Page and Stewart's response to the grievance filed against them by Baker.

**Donovan Visser And Robert Baker Face Criminal Charges.**

141.    On May 20, 2013, Visser and Associates received a phone call from Deputy Perkins.

142.    Deputy Perkins informed them that the prosecutor had issued a warrant for Attorney Donovan Visser and Baker's arrest based on the events of April 9, 2013, at ELC. Donovan Visser was charged with Assault and Trespassing and Baker was charged with Trespassing.   The indictments were surprising given that Deputy Perkins himself stated in his report that no criminal activity had occurred.

143.    The filing date for the arrest warrants is asserted to be May 8, 2013.   That date suggests the warrant was issued before the status conference, *ex parte* communications, and Motion to Disqualify and two days after the May 6 hearing in which HLV set forth a clear *prima facie* case of contempt by Page and Stewart's clients.   Yet, no action was taken on the warrant until after the Motion to Disqualify had been filed.

144.    Despite the fact that Defendant Bedford, and the documents themselves, claim

that the arrest warrants were issued on May 8, 2013, when Donovan Visser's defense attorney called the court on May 21, 2013 to schedule an arraignment, he was informed that the court did not have anything on record yet.

145.    Attorney Donovan Visser was arraigned on May 22, 2013.   Baker was arraigned on June 5, 2013.

146.    The charges against Baker were dropped on June 19, 2013.  Defendants Bedford and McKay maintained the charges against Donovan Visser, and proceeded to trial on December 6, 2013.

147.    The trespass charges against Donovan Visser were dismissed by directed verdict, while the assault charges proceeded to the jury.  After trial, there was a hung jury.

148.    Although not the prosecuting attorney on the case, Bedford was present while the jury was in deliberation.  While speaking with McKay and other assistant prosecutors, Bedford stated , "who would have thought we could get so much entertainment value out of a misdemeanor trial."

**Judge Hamre Recuses Himself From The Case.**

149.    Conveniently, on May 24, 2013, Judge Hamre entered an order of recusal simultaneously with his answer to HLV's motion to disqualify, voluntarily recusing himself from the case, not because of his unethical affiliation with Defendants Page and Stewart or his unethical and unlawful actions on May 10, 2013, but instead, because he claimed that he might be a witness in the criminal case against Donovan Visser – a shameful and inaccurate pretext.

150.    Interestingly, in the order of recusal, Judge Hamre claimed that he had no involvement in the instigation of the extraneous legal proceedings against Donovan Visser, thus denying an accusation that no one had made.

**Reassignment Of The Case.**

151.     On June 11, 2013, the Collection Case was reassigned to Judge Brickley.

152.     Shortly thereafter, Judge Brickley recused herself because of her personal relationships with Defendants Page and Stewart.

153.     The case was then reassigned by the Supreme Court Administrators Office to the Honorable Michael Dodge of Cass County.

154.     On August 12, 2013, Judge Dodge vacated all orders issued by Judge Hamre subsequent to the October 11, 2012 order as wholly without basis.  (*See* **Exhibit 6**.)

**ELC Emails Get Deleted By A Van Buren County Official.**

155.     Van Buren County employs an IT official.

156.     The IT official provides information technology and computer services to the Van Buren County Health Department.

157.     Van Buren County knows that its IT official does work for private parties.

158.     On or about July 19, 2013, Plaintiffs in this case sent a preservation letter to Defendants, as well as ELC and William Engel.

159.     ELC's documents and information, which were the subject of their preservation duties in this lawsuit, were stored in part at Belco, a company created by William Engel's girlfriend, Susan Bell.

160.     Ms. Bell admitted in her deposition taken on February 27, 2014, in the underlying Collection Action that she was aware of ELC's preservation duties.  (*See* **Exhibit 20**.)

161.     A forensic examiner hired by HLV in the Collection Action concluded emails that were saved to a "Kingston" brand thumb drive and then deleted from Belco's computers on August 24, 2013.

162. A cash payment was made from Belco on that same date.

163. Susan Bell claims ignorance as to whom the payment was made.

164. The IT official admits that he performs "defragmentation" and other work for Belco.

165. He stated that he keeps no records for when he performed the work at Belco, but that he did work for them at a time consistent with August 26, 2013, and that the work included moving files from a Belco computer to a flash drive.

166. When asked if the August 26 $1,200 cash payment was made from Belco to the IT official, Susan Bell claimed not to know.

167. Later, when plaintiffs in the Collection Action subpoenaed Belco for the documents deleted from their computer on August 26, 2013, Belco again hired the IT professional to deliver the documents to Grand Rapids.

168. However, the documents Belco produced were not the documents from the thumb drive on to which the ELC emails were transferred on August 26, 2013.

**Page & Stewart Is A Partnership In Fact.**

169. Defendants Page and Stewart hold themselves out to be members of the law firm Page & Stewart, and are also city attorneys, sometimes.

170. More importantly, Defendants Page and Stewart held themselves out as part of the same law partnership in the underlying Collection Action. (Aff. Of D. Visser attached as **Exhibit 15**.)

171. On Defendant Stewart's wedding website, he acknowledges that he is "a member of Page and Stewart, Attorneys at Law." (Zygaldo & Stewart Wedding attached **Exhibit 16**.)

172. The "Page & Stewart Law Office" was a Gold Sponsor for the 2013 Annual Golf

Outting Fundraiser for the Van Buren County Drug Treatment Foundation.  (VBCDTF Golf Fundraiser Summary attached as **Exhibit 17**.)

173.     Bedford asked Stewart whether  "Gary Stewart & Kelly Page, Attorneys at Law" would be suitable for the Gold Sponsor sign for the golf outing, to which Stewart responded "[t]hat will work!"  (Sponsor Sign Email attached as **Exhibit 18**.)

174.     When the Almena Township Board was asked about using Defendants Page and Stewart as township attorneys, they responded that such use was based upon the understanding that the two attorneys were partners.

175.     Martindale Hubbell, Lawyer Central, Laweet, Lawyer Compass and Lawyers.com all list Page & Stewart as a law firm in Paw Paw, Michigan.  (Legal Websites attached as **Exhibit 19**.)

176.     On pleadings filed in the underlying circuit court case, Defendants Page and Stewart's names appear together as counsel for ELC while Attorney William Donovan appears separately, as does Attorney David Haywood.  (HLV v. ELC Pleading attached as **Exhibit 20**.)

177.     Clients of Defendant Page & Stewart also understood Defendants Page and Stewart were associated with each other in a professional capacity.  (Susan Bell Dep. Trans attached as **Exhibit 21.**)

### The Relationship Between Page, Stewart, McKay And Bedford.

178.     Defendant Page was instrumental in Bedford's campaign to become Prosecutor, in both financial and non-financial ways.

179.     Defendant McKay was highly involved in Bedford's campaign to become Prosecutor.

180.     Defendant McKay and Defendant Page had a business relationship prior to

Bedford hiring McKay as an Assistant Prosecutor.

181.   There was at least one instance where a criminal defendant retained Defendant Page as his attorney, but because of conflict issues arising out of Defendant Page's status as village attorney, McKay instead appeared in the case.  McKay used Defendant Page & Stewart's address as his own on the appearance.  (Buskirk Appearance attached as **Exhibit 22**.)

182.   Page had a client that was put in jail and charged with domestic violence after four separate incidents occurred within a month.

183.   Without informing or consulting with the victim, which is standard protocol for domestic violence cases, McKay dismissed the domestic violence charges against Page's client.

184.   Defendant Bedford and Stewart are close, personal friends.

185.   Defendant Bedford and Defendant Stewart have exchanged cash payments through Stewart's wife.  (Ann Deposit Check Email attached as **Exhibit 23**.)

186.   Defendant Bedford and Defendant Stewart are members of a golf league and, in fact, golf together on a team.  (Golf League Website attached as **Exhibit 24**.)

187.   On top of the golf league, Bedford and Stewart golf together on a weekly basis when the weather allows.  (April 29, 2013 Email attached as **Exhibit 25**.)

188.   Defendant Bedford refers criminal defendants to Defendant Stewart, and uses his position as prosecutor to help Defendant Stewart with the cases he refers.   (Nicole Hassle Referral attached as **Exhibit 26**.)

189.   Defendant Bedford owns a company named Treadlok Security, Inc.

190.   Defendant Page filed the Articles of Incorporation for Treadlok Security, Inc. in 1999.

191.   Defendant Bedford and Defendant Page had a business relationship through

which they, directly and indirectly, exchanged cash payments.

192.    Defendant Bedford received a speeding ticket in January of 2011, in the Village of Paw Paw.

193.    The speeding ticket "was dismissed in short order by his friend and Paw Paw Village attorney Kelly Page."  (MLive.com article attached as **Exhibit 27**.)

194.    Defendant Bedford said that "I went to the village prosecutor … provided him with my explanation and I left it in his discretion as far as whether he would agree that I had mitigating circumstances or not."  (*See* **Exhibit 27**.)

195.    The Village of Paw Paw's Chief of Police, Eric Marshall, said, "Somehow … Page got wind of [Bedford] getting a citation and took it upon himself to dismiss it without any knowledge of the police chief.  I was very frustrated with the fact that he took it upon himself to do this." (*See* **Exhibit 27**.)

196.    Defendant Page declined to make any comment on this matter.  Defendant Page has or had an interest in estates on the Illinois River and in Florida.

197.    Defendants Page and Bedford frequently go hunting at Defendant Page's Illinois River property.  Defendant Page pays for the trips.

198.    Defendant Bedford denied that such hunting trips occurred and stated he lacked information upon which to form a belief as to whether Defendant Page owns or did own property on the Illinois River.  However, Defendant Bedford admits to both in a letter written to Plaintiffs' counsel threatening a defamation lawsuit.

199.    Page and Bedford have hunted in Canada together with Page presumably paying for the same.

200.    Bedford has also taken plane rides on Torco Inc.'s private plane to sporting events

as well as other lodging, trips, or other gifts from Page and Stewart or at their expense.

201.   Defendant Stewart applied to the Office of the Governor, Appointments Division to replace Judge Hamre.

202.   Defendant Bedford drove Defendants Page and Stewart to Bill Schuette's fundraiser in July of 2013 in order to promote Defendant Stewart's efforts to replace Judge Hamre.

203.   Judge Hamre also undertook efforts to assist Defendant Stewart in his efforts to be appointed as judge.

204.   Defendant Page has a close, personal relationship with private attorney Don Sappanos.

205.   Defendant Page allows Sappanos to use his office space to meet with clients when in Paw Paw, as his office is in Portage.

206.   Defendant Page used his relationship with Sappanos to get him to donate the maximum campaign contribution to Defendant Bedford.

207.   Defendant Page further got all of his family members to donate the maximum campaign contribution to Defendant Bedford.

**Defendants Page & Stewart Use Their Influence With Defendant Bedford To Initiate Criminal Proceedings.**

208.   Deputy Perkins was called to ELC Leasing at approximately 10:17 a.m. on April 9, 2013, the date on which representatives of HLV allegedly trespassed on ELC' property.

209.   Shortly after Deputy Perkins arrived, Defendant Page gave Defendant Bedford the March 26, 2013 order signed by Judge Hamre, presumably in an attempt to cause Defendant Bedford to initiate charges against Baker and HLV attorney, Donovan Visser.

210.   On that same morning, Defendant Page discussed the alleged trespass and

Hamre's March 26, 2013 order with Defendant Bedford and urged him to prosecute Donovan Visser and Robert Baker.

211.   Deputy Perkins sought a warrant to search Baker's iPhone from Defendant Bedford, who approved the warrant.  After viewing the contents of the phone, Deputy Perkins concluded that there had been no criminal activity.  In other words, he concluded that there was no trespass or assault.

212.   On May 1, 2013, Defendant Stewart met with Defendant Bedford, McKay or both to discuss the criminal charges against Donovan Visser and Baker.  (ELC Email attached as **Exhibit 28**.)

213.   Upon information and belief, ELC had called Defendants Page and Stewart, who in turn used their influence and relationship with Defendant Bedford to get charges filed against Donovan Visser and Baker despite law enforcement's conclusion that no criminal activity occurred.

214.   Defendants Page, Bedford, and Stewart made communications, which used the interstate wires, for the purpose of initiating charges against Donovan Visser and Robert Baker.

215.   By initiating criminal proceedings against Visser and Baker, Defendant Bedford violated Michigan Rules of Professional Conduct 3.8 as there was no probable cause to bring charges of trespass and assault.

216.   Since the time when Visser and Baker were charged, Defendants Page, Stewart, and Bedford have denied the communications amongst themselves on April 9, 2013, or any time thereafter, regarding the charges.  They have done so to cover up their involvement and obstruct justice.

217.   Defendants Page, Stewart and Bedford utilized the United States Mail as well as

30

the interstate wires to transmit such false denials in furtherance of their scheme to defraud Plaintiffs.

218.    Defendant Bedford also utilized the United States Mail to transmit his complaint against Don Visser, which had no good faith basis, to the Attorney Grievance Commission.

**Judge Hamre Provides Favorable Rulings In Exchange For Consideration And/Or For Other Things Of Value.**

219.    Defendants exchanged things of value in exchange for favorable actions.

220.    For instance:

    a.   Defendant Page has provided Hamre with office space for his personal legal practice.

    b.   Defendant Page has provided Hamre with plane tickets and trips to Florida.

    c.   Attorney Matt DePerno brought suit against WalMart and was assigned to Judge Hamre, who dismissed the case almost immediately after Defendant Page met with WalMart representatives as legal counsel for Paw Paw and accepted a $100,000 pledge to the Village.

    d.   Further, after the WalMart case was dismissed, Defendant Page told Mr. DePerno that if his client gave him $25,000 he "would straighten things out with Judge Hamre and may be able to get him to reconsider."

221.    In fact, Judge Hamre favored Defendant Page so much that attorneys in Van Buren County began sending their clients to Defendant Page for consultations solely to create a conflict of interest so he could not oppose them.  When Defendant Page found out about this, he began charging exceedingly large consultation fees.

222.    Further, Defendants Page and Judge Hamre frequent one or more restaurants together, including the Dykman House, and even each other's residences, as evidenced by the

May 10 recording.

223.    Defendants Page, Stewart, and Judge Hamre violated Michigan Rules of Professional Conduct 1.12 when they entered a *quid pro quo* arrangement in which Judge Hamre obtained office space and/or other consideration from the Page & Stewart law firm in exchange for favorable rulings from the bench and otherwise.

**Judge Hamre Retires Under Suspicious Circumstances And Recants His Statements About The May 10 Recording.**

224.    During the last week of June 2013, Judge Hamre announced that he was retiring from the bench.

225.    Conspicuously, this decision came a few weeks after Baker filed a grievance against Judge Hamre with the Judicial Tenure Commission and after HLV counsel moved to disqualify Judge Hamre from the case.

226.    However, Judge Hamre waited until after he found alternative reasons to recuse himself from the HLV case before announcing his retirementAlthough Judge Hamre claimed to be active through August 3, 2013, and took a paycheck from the County through that date, he left his office much earlier and never returned.

Although Defendants Judge Hamre, Stewart and Page's scheme to exchange items of value for favorable rulings had been exposed, Defendant Stewart still had the audacity to seek an appointment for the vacant judgeship.

227.    After retiring, Judge Hamre implicitly admitted in an interview with the Kalamazoo Gazette, which was published on August 15, 2013, that the conversation on May 10 did indeed occur, and said, "after the incident I recused myself from further involvement in this case.  The case has been assigned to another judge and I respect any decision made in that regard. I have had no other involvement in that case or any other cases pending in Van Buren

32

County regarding these attorneys." (Kalamazoo Gazette Article attached as **Exhibit 29**.)

228.    This admission means that Judge Hamre's opinion on HLV's motion to remove him from the case due to a conflict of interest, in which he denied that the conversation occurred, was a blatant deception, which he made while on the bench.

### Defendants Page And Stewart Continue To Deny The May 10 Conversation With Judge Hamre And Communications With McKay And Bedford.

229.    On June 18, 2013, HLV counsel filed, with Judge Dodge in Cass County, a motion for disqualification against Defendants Page and Stewart. In that motion, HLV counsel summarized the unlawful and unethical influence that Defendants Page and Stewart exerted, as well as the *ex parte* communications with the Judge Hamre.

230.    In response, on July 18, 2013, Defendants Page and Stewart unequivocally denied that the conversation even took place stating "Attorney Page and Attorney Stewart never engaged in *ex parte* communications about the pending matter before or after the conference call." (Answer to Motion to Disqualify attached as **Exhibit 30**.)

231.    Further, Defendants Page and Stewart conspired to influence Peggy Grote to sign and file a false affidavit to support their fraudulent denials.

232.    The recording of the May 10, 2013 conversations proves that the conversation occurred. Defendants Page and Stewart lied to Judge Dodge and the Cass County Circuit Court.

233.    Sometime in May or June of 2013, Plaintiff Baker submitted a request for investigation of Stewart and Page with the Michigan Attorney Grievance Commission.

234.    After lying to the Michigan Attorney Grievance Commission in their responses to Baker's grievances, it came as no surprise that Defendants Page and Stewart later lied to the Cass County Circuit Court. (Aff. Of R. Baker attached as **Exhibit 31**.)

235.    Defendants Page and Stewart also falsely alleged that they had absolutely no role

33

whatsoever in charges being authorized against Baker and Donovan Visser, that no improper relationships exist between Defendants' counsel and Judge Hamre, and that Defendants Page and Stewart never engaged in *ex parte* discussions concerning the case with Judge Hamre.  They further attached the false affidavit of Defendant Grote.

236.    Further, Defendant Stewart sent Don Visser a letter dated June 12, 2013, in which he stated the following:  (Stewart Email attached as **Exhibit 32**.)

a.    "I can assure you that the affidavits submitted in your motion for disqualification refer to conversations that simply never happened between Judge Hamre, Kelly Page and me."

b.    "We do not socialize with Judge Hamre, and only see him outside the courtroom on chance meetings and rare occasions in group settings such as golf outings or funerals."

c.    "I have heard there has been some baseless insinuation that our office had something to do with criminal charges being authorized relating to the incident at ELC.  Nothing could be further from the truth."

d.    "I never had any conversation with any prosecutor relating to the incident at ELC prior to the charges being authorized."

e.    "I certainly never encouraged [our client's employee] to press charges against anyone."

237.    In stating the above, Defendant Stewart flat-out lied, as the recording of the May 10, 2013, conversation proves that the conversation did occur and that Defendants Page and Stewart are friendly with Judge Hamre outside of the courtroom.  Further, Defendants Page and Stewart did, in fact, encourage the Prosecutor's Office to press charges.  Not only did he lie, but

Defendant Stewart violated the Michigan Rules of Professional Conduct 4.1 when he did so.

### Page And Stewart's Inherent Conflicts Of Interest.

238.    For several years, Defendants Page and Stewart have practiced with inherent and acute conflicts of interest.

239.    Defendant Page was appointed by the Village Council to act as an attorney for the Village of Paw Paw.

240.    Defendant Page has further represented other entities in Van Buren County as both a prosecutor for local ordinances, as well as in civil matters.

241.    However Defendant Page has also represented or attempted to represent defendants in state criminal actions whose interest are in direct conflict with the entities he represents and the police officers he is charged with defending.

242.    Further, Defendants Page and Stewart often use their loose, and apparently amorphous, professional relationship with each other to represent both sides of the same case.

243.    Paw Paw Village President, Roman Plaszczak had to remind Defendant Page in a letter dated May 14, 2012, that under Rules 1.7 and 1.8 of the Rules of Professional Conduct for Attorneys, he could not represent defendants who he had previously prosecuted for the village. It is remarkable that this was even necessary.  (Village of Paw Paw Letter attached as **Exhibit 33**.)

244.    Additionally, on August 14, 2013, Almena Township, who had been represented by Defendant Page & Stewart, hired outside counsel to investigate them, because Almena learned that Defendant Page was also legal counsel for ELC, and because Almena had discovered that someone within the township had mysteriously, and without explanation, reduced ELC's property taxes by 96%.  Out of the 30 tax appeals that year, only four others were

approved and none were lowered by more than 20%.  Further, when the Township began its investigation, it immediately discovered that the ELC property tax file had gone missing.  Almena believed that Defendant Page was behind the unwarranted reduction.

### Bedford Engages In A Pattern
### Of Retaliation Against HLV's Counsel.

245.    Unable to initiate criminal charges against everyone involved, Bedford, on July 16, 2013, filed a complaint with the Michigan Attorney Grievance Commission against HLV's counsel, Donald Visser.  He did so, among other reasons, to interfere with HLV's right to choose counsel.

246.    On information and belief, Bedford used in some regard the false affidavit of Peggy Grote, which was prepared at the behest of Page and Stewart, and which Bedford knew was false, in an attempt to interfere with Plaintiffs' constitutional rights to choose their own counsel and their rights of due process.

247.    Bedford alleged that Donald Visser knowingly made false statements to the court and urged the media to report on those alleged lies.

248.    Bedford also stated that the criminal charges against Donovan Visser, Donald Visser's son, were authorized by Michael McKay who based his decision solely on the Sheriff's report (which stated that there was no evidence of criminal activity) and that Defendant Bedford in no way influenced his decision.

249.    However, there was at least one occasion where Bedford spoke with McKay about the case and advised him as to how to proceed.  (Email to McKay attached as **Exhibit 34**.)

250.    Bedford also claimed that the McKay had full discretion over the cases, but in fact, McKay's discretion was limited by Bedford's desire to proceed with the case.  (Email to Dodge attached as **Exhibit 35**.)

251.    McKay denies these facts in his Answer to the original Complaint in this matter, stating that he "lacks information sufficient to admit or deny" any allegations regarding the initiation of these criminal proceedings.

252.    Bedford's allegations to the Grievance Commission were not true and were made for the purpose of silencing Donald Visser, depriving HLV its choice of counsel, and as retribution for onald Visser's exposing Bedford's inappropriate relationships within the judicial system.

253.    When the Complaint in this matter was filed, Bedford retaliated again.

254.    In early March, 2014, Plaintiffs' counsel received a letter, dated February 28, 2014, from Attorney Lee Silver of Silver & Van Essen, P.C., on behalf of Defendants Bedford and Stewart threatening a defamation lawsuit against both plaintiff attorneys of record as individuals, and The Law Office of Jordan C. Hoyer, PLLC.

255.    This was yet another attempt to intimidate and bully counsel into dismissing claims that expose the improprieties of these individuals.

256.    Attorney Silver demanded a number of times throughout his initial letter and subsequent emails that plaintiffs' counsel reveal the names and contact information provided by each witness.

257.    Plaintiffs' attorney, Derek Witte, offered Attorney Silver an opportunity to examine the facts and evidence that underlie the allegations in this complaint under the condition of attorneys' eyes only.

258.    Attorney Silver declined the offer.

259.    In one of the correspondence with Attorney Silver, Attorney Witte disclosed the name of one witness and referenced that another was a police officer.

260.    Just days after Attorney Witte's correspondence disclosing such information, Defendant Bedford showed up at the Van Buren County Police Department on an early Sunday morning badgering at least one police officer about whether he spoke to any investigators.

261.    Attorney Silver also denied that Bedford and Stewart had any formal affiliation and claimed that they had learned about him from separate sources and approached him separately.  Yet, the two are golf partners and best friends.

**Bedford And Hamre's Misuse Of The Nonprofit And The County's Unaccredited Drug Treatment Court.**

262.    Defendant Bedford helped create a non-profit corporation called Van Buren County Drug Treatment Court Foundation, Inc., ("Foundation"), the stated purpose being to "provide substance abuse treatment for non-violent offenders."  (Foundation Articles attached as **Exhibit 36**.)

263.    The Foundation is separate from the Van Buren County Drug Court.

264.    In fact, it claims to be a wholly private non-profit.

265.    However, the Foundation, through Bedford and Hamre, raised money from the private defense bar, most notably Page and Stewart, in the name of the court, not the Foundation. (*See* **Exhibit 17**.)

266.    In 2010, Bedford was an officer of the Foundation.  (Foundation Annual Reports attached as **Exhibit 37**.)

267.    In 2012 and 2013, Defendant Hamre was an officer.  (*See* **Exhibit 37**.)

268.    At all relevant times in 2013, Defendant Stewart was also a member of the fundraising board, which was responsible for raising money for the Foundation and which reported to Bedford.  (Foundation Emails attached as **Exhibit 28**.)

269.    Stewart is carbon copied on emails with Bedford and the other Foundation

officers and fund-raisers.  (*See* **Exhibit 28**.)

270.     The non-profit purports to raise revenue for the Van Buren County Drug Court by hosting an annual golf fundraiser and other by engaging in other private fund-raising.

271.     The Foundation's 2012 annual report certifies that the entity held two fundraisers and raised $23,000 for drug treatment purposes during the corresponding year.  (*See* **Exhibit 37**.)

272.     In 2013, the Foundation hosted a golf fundraiser to raise money for itself, but misleadingly did so in the name of the Van Buren County Drug Court.  (*See* **Exhibit 17**.)

273.     Page, Stewart and their law firm made cash payments to the Foundation, which was run by Bedford and Hamre.

274.     In April 2013, the Michigan Supreme Court issued an Administrative Order, which was sent to Bedford, stating that county employees, such as prosecutors, and judges should not be involved in raising money for non-profit corporations created to support drug courts, like the one in Van Buren County.  The letter stated that these activities may violate, among other rules, the Judicial Code of Conduct.  (April 24, 2013 Supreme Court Admin. Order attached as **Exhibit 39.)**

275.     Despite this Order, Hamre remained President of the Foundation and Bedford brazenly moved forward with the 2013 fundraiser, raising money directly from Page and Stewart for payment into the Foundation, which he controlled, and from which he enjoyed benefits.  (__, 2013 email from M. Bedford attached as **Exhibit 40**.)

276.     The Foundation still exists.  Hamre is still the President.  And, according to the most recent records, the Foundation has tens of thousands of dollars in assets.  (*See* **Exhibit 37**.)

277.     Then, after Bedford raised $12,000 for the Foundation from payments made by his opponents in court, including Page and Stewart, the Foundation mysteriously shut down their

website and also issued a July 23, 2013 "Memorandum of Understanding," in which the Foundation stated that its sole purpose is to fund "advanced payment of expenditures, such as gas, debit cards and other resources in [sic] behalf of program participants and desires to avoid having county staff utilize their own personal financial resources for such advance payments." (Memo. of Understanding attached as **Exhibit 41**.)

278.   The Memorandum also provided that Van Buren County agrees "to timely reimburse the foundation for such advances."  (*See* **Exhibit 41**.)

279.   In other words, the Foundation provides no donations to the Van Buren County Drug Treatment Court, only short-term, no-interest loans.   Thus, the non-profit foundation continues to receive money, misleadingly in in the name of the County Drug Court itself, for its own use.

280.   However, one thing the Foundation does is pay for drinks.  Bedford's fund-raising committee met weekly and used the Foundation debit card, which it admits was reserved for expenses incurred by county officials related to official business.  The Foundation bought dinner, drinks, bottles of liquor and "jello shots" for the personal enjoyment of Bedford and others. (Fundraising committee emails attached as **Exhibit 42**.)

281.   Thus, the money paid to the Foundation from Page and Stewart (as well as other attorneys) in the name of the drug court flowed through the Foundation to Bedford for his personal bar tab.

282.   Page's good friend Sappanos also donated money to the Foundation, of which Hamre was, and still is, the President.

283.   Were this not enough, the Foundation's finances make no sense.  In 2012, the Foundation claimed its assets totaled about $22,000.  (*See* **Exhibit 37**.)

284.     In the 2013 information update report submitted to the Michigan Department of Licensing and Regulatory Affairs the Foundation certified that it held one fundraiser in the corresponding year "and the asset total is $38,547."  (*See* **Exhibit 37**.)

285.     Defendant Page & Stewart provided money to the Foundation by sponsoring the golf fundraiser at the "gold" level.  (*See* **Exhibit 17**.)  Other gold level sponsors donated between $250 and $500.

286.     Interestingly, the Van Buren County Drug Treatment Court website (now missing) announced that the 2013 golf fundraiser raised $12,000.  (*See* **Exhibit 17**.)  This means that, according to its filings with the state, and relying on the Foundation's statement that it only held one fund-raiser in 2013, the Foundation spent absolutely no money between 2012 and 2013. (*See* **Exhibit 37**; *see also* **Exhibit 17**.)

287.     Thus, the publicly available records neither account for the Foundation's payment of money paid to the drug court itself, nor explain how the Foundation could afford to fund weekly meetings at various drinking establishments.

288.     To make matters even worse, the Van Buren County Drug Treatment Court is not even an approved sobriety court.  This is relevant to this case for a few reasons.

289.     First, the very purpose of the Foundation is to support the Drug Treatment Court. Thus, the fact that one of the Judge's (notably not Hamre) in the County learned that the Van Buren Drug Treatment Court was not an official sobriety court and thus the County would stop referring cases to it, (June 6, 2013, Judge Hentchel email attached as **Exhibit 43**), calls the Foundation into even further question.

## FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS

290.     Plaintiffs incorporate by reference the preceding paragraphs.

## CULPABLE RICO PERSONS

291.    Defendants Paul Hamre, Kelly Page, Gary Stewart, Michael Bedford, Michael McKay, Peggy Grote, and Defendants Page and Stewart's law firm, Page & Stewart are RICO persons.

## RICO ENTERPRISE

292.    The RICO enterprise consists of all the defendants who, associated in fact, worked through the enterprise to commit a pattern of racketeering, which included the specific predicate acts alleged here in.

## INTERSTATE OR FOREIGN COMMERCE

293.    Defendant's racketeering activity affected interstate commerce.

294.    The May 10, 2013 telephone call in which Hamre, Page, and Stewart implicitly admitted their unlawful affiliation, as well as the correspondence, documentation, and other *ex parte* communications with Judge Hamre and Defendant Bedford, used the U.S. Mail and interstate wires.

295.    Also, the Pattern of Racketeering crossed state lines when Page provided in-kind payment to Bedford by taking him out of state on free hunting trips and vacations.

296.    Therefore, the activity of the enterprise and the predicate acts of racketeering affect interstate commerce.

## PATTERN OF RACKETEERING

297.    Defendants have engaged in a long-term pattern of racketeering activity, which has benefited the criminal RICO enterprise and harmed both Plaintiffs and the citizens of Van Buren County and Michigan.

### *Charles Hafer*

298.   Mr. Charles Hafer applied for a guardian *ad litem* for his wife, whose mental capacity had diminished due to her brain cancer and multiple tumors on her brain.

299.   Judge Hamre was assigned to the case.

300.   Mrs. Hafer's son from a previous marriage, Mike, hired Defendant Page to intervene.

301.   Through Defendant Page, Mike moved Mrs. Hafer out of state before a competency hearing could be held.

302.   Mr. Hafer moved to hold Mike in contempt.

303.   Instead of finding Mike in contempt, Judge Hamre fraudulently held that the court had already conducted a competency hearing via telephone (a hearing which never occurred) and had determined Mrs. Hafer was competent.  Thus, Judge Hamre denied the petition to appoint Mr. Hafer as his wife's guardian.

304.   After Judge Hamre's ruling, Mr. Hafer requested power of attorney over his wife several times and was denied each time.

305.   In proceedings initiated by Defendant Page, Judge Hamre granted Mrs. Hafer's son, Mike, power of attorney over her.

306.   Through Defendant Page, Mike then filed for divorce on behalf of Mrs. Hafer. Judge Hamre granted the divorce without ever having Mrs. Hafer appear in court.

### The WalMart Case

307.   Attorney Matt DePerno was involved in a case against WalMart in front of Judge Hamre.

308.   Attorney DePerno filed multiple motions to compel routine and allowable discovery against WalMart; each in turn were denied by Judge Hamre.

309.    Defendant Page, in his capacity as legal counsel for the Village of Paw Paw, met with WalMart representatives, who uncharacteristically pledged approximately $100,000 to the village.

310.    WalMart attorney, Tom King later claimed that WalMart had never offered money to any community in an amount this large.

311.    Less than ten days following the meeting, Judge Hamre granted WalMart's motion for summary disposition without having allowed discovery and without consideration of the facts being presented.

312.    Further, Judge Hamre set aside a $400,000 judgment already obtained by Attorney DePerno's client against WalMart.

313.    Attorney DePerno met with Defendant Page shortly after the motion for summary disposition was granted.

314.    Defendant Page stated that if Mr. DePerno's client would give him $25,000 he would straighten things out with Judge Hamre.

### *Nan Walsh*

315.    Nan Walsh appeared in front of Judge Hamre in 2004 for a divorce proceeding.

316.    Her ex-husband had been a divorce attorney for 18 years prior to the proceeding so he represented himself.

317.    As soon as Judge Hamre was assigned to the case, Ms. Walsh's ex-husband immediately hired Defendant Page.

318.    From that point on, Ms. Walsh was railroaded out of spousal support and custody.

319.    Ms. Walsh attempted to obtain the transcripts from when her ex-husband testified as to the couple's finances and she was told that the transcripts were gone.

*Additional Racketeering Activity*

320.　A confidential informant, who provided information on the promise of anonymity, after hearing about Judge Hamre's actions in this case on the news, stated that a lot of people on the police force were surprised when Evan Knolls was "busted" for tax evasion and went down alone.　It is widely believed that as Mr. Knolls's attorney, Defendant Page was actually the mastermind behind the tax evasion scheme.

321.　An informant who has requested that he remain anonymous indicated that if Defendant Page was your opponent in Judge Hamre's court room there was not an even playing field because of the "unholy alliance" between the two.

## RACKETEERING ACTIVITY

322.　In addition to the established pattern of racketeering through which Defendants harmed others, Defendants engaged in a pattern of racketeering activity that harmed Plaintiffs, including additionally incurred legal costs, the inability to collect the money owed to them by ELC and a violation of their due process.

### Bribery And Unlawful Acceptance Of Bribes In Violation Of
### MCL §§ 750.117, 750.118 And 750.123

323.　Defendants Page and Stewart have provided items of value to both Prosecutors Bedford and McKay and Judge Hamre in order to influence their decisions in, and relating to, the Collection Action.

324.　Defendant Page brought Prosecutor Bedford on at least two hunting trips, at Page's expense, one of which was out-of-state.　Upon information and belief, Page also contributed cash and in-kind assistance to Defendant Bedford's election campaign.

325.　Defendant Page did so in exchange for the opportunity and ability to influence Prosecutor Bedford's decisions.

326.    Defendant Bedford accepted these bribes and, in exchange, allowed Page and Stewart to influence his decisions to charge, or not charge, arrestees and potential criminal defendants.

327.    Kelly Page and Gary Stewart, and the law firm of "Page and Stewart," made cash payments to the Foundation controlled by Bedford and Hamre.

328.    Bedford used the assets of the Foundation to buy drinks, jello shots, dinners and other perks for himself, Hamre and other members and affiliates of the Foundation.

329.    Gary Stewart was intimately involved in the Foundation's affairs, including as a fund-raiser for its annual golf outing.

330.    Thus, Stewart knew that the amounts he and Page paid to the Foundation were being used by Bedford for his own personal enjoyment.

331.    These payments through the Foundation to Bedford were a bribe.

332.    As a result of Page's and Stewart's bribery of Bedford and Bedford's acceptance of those bribes, Page – on his own and through his on-and-off law partner – caused Prosecutor Bedford to charge Plaintiff Robert Baker and Attorney Donovan Visser for trespassing, despite there being no probable cause for such charges.

333.    Robert Baker was harmed by this indictment, because his constitutional rights were violated.

334.    Defendants Page and Stewart also bribed Defendant Hamre by both providing him items of value and by implicitly promising him benefits upon his retirement and by knowingly paying money to the Foundation for which he was the President.

335.    Judge Hamre accepted these bribes, and in reliance on Page and Stewart's promises to him, allowed Page and Stewart to influence his decisions in cases involving Page

and Stewart's clients.

336.    In exchange for these bribes, which he accepted, Judge Hamre unlawfully interfered with, re-wrote, and refused to enforce the settlement agreement in the Collection Action, harming Plaintiffs and worked with Bedford to initiate retaliatory criminal charges against Baker and Donovan Visser.

## Mail And Wire Fraud – 18 U.S.C. §§ 1341, 1343

337.    Defendant Stewart committed mail fraud when he sent a letter to Donald Visser dated June 12, 2013 using the U.S. Mail and stated that "I can assure you that the affidavits submitted in your motion for disqualification refer to conversations that simply never happened between Judge Hamre, Kelly Page and me," and that "[w]e do not socialized with Judge Hamre."

338.    These statements were false.   The conversation did occur; it was recorded. Further, in the recording, either Page or Stewart say "Sunday night at your house" to Judge Hamre.

339.    Further, the June 12 letter is fraudulent and part of a greater scheme to defraud Plaintiffs and abridge their constitutional rights, because it refers to "our office" not initiating criminal charges.   However, Mr. Stewart's letterhead is that of a solo practitioner and his only true denial of the accusation that either Page or Stewart used their influence to initiate retaliatory criminal charges is that "I never had any conversation with any prosecutor."

340.    Thus, by referring to "our" and "Kelly Page and me" in the letter he intended to mislead HLV's counsel into believing that there was no conspiracy or retaliation, when in fact he was only writing on behalf of himself as a solo practitioner, as evidenced from his letterhead.

341.    Therefore, the June 12, 2013 letter is false, fraudulent and misleading.   It was an attempt to conceal the goings-on of the RICO enterprise and was part of a greater "scheme or

artifice to defraud" that involved bribing officials to influence the outcome of cases and criminal indictments.

342.    The June 12, 2013 letter was transmitted over the wires electronically via electronic mail.

343.    Defendant Grote committed mail fraud, and perjury, when she signed an affidavit, (*see* **Exhibit 14**) stating that the May 10, 2013 ex parte communication never happened.  This was a blatant lie belied by the recording of the conversation.

344.    Defendant Grote provided this affidavit to ELC's counsel and, on information and belief, to the Attorney Grievance Commission and to the Circuit Court.

345.    Defendants Stewart and Page knowingly transmitted their lies and Defendant Grote's perjured statement through the U.S. Mail.

346.    Peggy Grote's affidavit is false, fraudulent and misleading.  It was an attempt to conceal the goings-on of the RICO enterprise and was part of a greater "scheme or artifice to defraud" that involved bribing officials to influence the outcome of cases and criminal indictments.

347.    Further, Defendants Page, Stewart and Bedford committed wire fraud when someone from the "law office" of Page and Stewart faxed a copy of an order from the Collection Case directly to Prosecutor Bedford on April 9, 2013.  It was a successful attempt to influence the bringing of criminal charges and was part of a greater "scheme or artifice to defraud" that involved bribing officials to influence the outcome of cases and criminal indictments.

348.    Page and/or Stewart transmitted the order as part of their scheme to bribe Prosecutor Bedford and cause him to initiate criminal charges against Baker and Donovan Visser.  The order accompanied, or was within a short time of, a meeting between Page and

Bedford, whereby Page told Bedford that he should charge Baker and Donovan Visser for trespassing and that the State's theory should be that the transmitted order somehow rescinded HLV's right to enter ELC's premises to inspect books and records.

349.    Stewart then spoke to McKay or Bedford on May 1, 2013, about the charges.

350.    The communications were part of Defendants' greater scheme to defraud, and was used as a tool to support the fabricated criminal charges and retaliation that Page and Stewart initiated against HLV Counsel and Robert Baker using the influence they gained over Bedford.

351.    Defendant Bedford sent false allegations to the Attorney Grievance Commission in an effort to conceal both his involvement and the involvement of Defendants Page and Stewart to obstruct justice.

352.    Defendant Bedford falsely asserted that "Attorney Page and Attorney Stewart had no role in the decision and had no discussions at all with the prosecutor or any assistant prosecutors regarding the incident."  This allegation was made to cover-up the existing wrongdoing and in an effort to obstruct justice.

353.    Defendant Bedford utilized the mail to perpetuate his misdeeds.

354.    Further, Defendants Page, Stewart, Hamre, and Page & Stewart knowingly and willingly engaged in a scheme to defraud plaintiffs when someone forged Judge Hamre's signature on an *ex parte* court order.

355.    This order misled HLV's counsel into believing the temporary restraining order against its clients had been extended, and caused HLV harm by further obstructing and interfering with their efforts to enforce performance of the parties' binding settlement agreement, and the court orders entered pursuant to that agreement.

356.    When that order was transmitted electronically to HLV counsel, it touched on the

interstate wires.

357.    The electronically transmitted forgery was part of Defendants' greater scheme to defraud and was used as a tool by the Defendants to further Hamre's unlawful decisions in the Collection Action that were influenced by Page and Stewart's bribery.

358.    Upon information and belief, Defendants engaged in other acts in furtherance of the schemes that involved use of interstate wire and the U.S. Mail.

359.    Defendants further obstructed justice when they removed the suspect order from the court file or when they conspired to keep the false order from ever entering the official court file.

## INJURY

360.    Plaintiffs are persons who sustained injuries to their business or property by reasons of the Defendants' violation of Section 1962 and Defendants' commission of the predicate acts.

361.    HLV was harmed because, as a result of Defendants' actions, it has, to this day, been deprived of its property owed by ELC  under the binding settlement agreement in the Collection Action

362.    HLV has also been harmed, because it has been forced to incur substantial attorneys' fees in order to enforce its rights in the face of the Defendants' criminal actions.

363.    HLV has also been harmed because it has been deprived of due process and equal protection.

364.    Plaintiff Baker has been harmed, because he has suffered mental and emotional distress and attorneys' fees caused by the malicious prosecution against him, which was part of Page and Stewart's greater scheme to bribe and influence Prosecutors Bedford and McKay.

**COUNT I—RICO 1962(c)**
**Against Defendants Hamre, Page, Stewart, Bedford, McKay, Grote, And Page & Stewart**

365.    Plaintiffs incorporate by reference all preceding paragraphs.

366.    The Count I Defendants are a group of individuals associated in fact, but are not a legal entity.   The group is an enterprise engaged in and whose activities affect interstate commerce.  The Count I Defendants are employed by or associated with the enterprise.

367.    The Count I Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.

368.    Pursuant to and in furtherance of their fraudulent scheme, Defendants committed bribery, accepted bribes and engaged in mail and wire fraud. These acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

369.    The Count I Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

370.    As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property.

**COUNT II—RICO Conspiracy**
**Against Defendants' Page, Stewart, Hamre, Bedford, McKay And Page & Stewart**

371.    Plaintiffs incorporate by reference all preceding paragraphs.

372.     Section 1962(d) makes it unlawful to conspire to violate subsections (a), (b) or (c) of Section 1962.  18 USC 1962(d).

373.    Each Defendant was a co-conspirator that knowingly joined the conspiracy and involved himself or herself, directly or indirectly, in the commission of at least two predicate offenses, including but not limited to the predicates of bribery, accepting a bribe, mail fraud and

51

wire fraud, as alleged herein.

374.   Defendant Bedford was aware of his role as a co-conspirator because he has been engaged in a quid-pro-quo relationship with Defendant Page for some time, particularly including when Defendant Bedford's traffic violation was removed by Defendant Page, acting as Village Attorney, without any knowledge of the Chief of Police of Paw Paw.

375.   Defendants Bedford and McKay knowingly and willingly involved themselves in a greater scheme to defraud, and commit the predicate acts alleged above, when they conspired with Defendants Page and Stewart to create a mutually beneficial business relationship whereby they "scratched each other's backs" and exchanged things of value for influence.   Upon information and belief, this relationship was perpetuated when Defendants Bedford and McKay charged Baker with trespass and Donovan Visser with trespass and assault, despite Deputy Perkins' police report indicating that nothing criminal in nature occurred.

376.   Further, Defendants Bedford and McKay obstructed justice when they acted negligently as a public officer and failed to report the unlawful behavior of Defendants Page, Stewart and Page & Stewart.

377.   Defendant Bedford knowingly and willingly involved himself in a greater scheme when he obstructed justice by filing a complaint with the Attorney Grievance Commission.

378.   Defendants Bedford and McKay also knowingly and willingly committed the predicate act of accepting a bribe.

379.   Defendants were each aware of their role as co-conspirators.

380.   Defendants knowingly participated in a greater scheme to defraud, and commit the predicate acts alleged herein.

381.   As a result of their conspiracy, the predicate acts and greater scheme to defraud,

Plaintiffs were harmed.

## COUNT III— RICO Aiding And Abetting
## Against Defendant Grote

382.   Plaintiffs incorporate by reference all preceding paragraphs.

383.   Defendant Grote aided and abetted the RICO enterprise in its commission of at least two acts of racketeering activity when she provided a false affidavit to HLV counsel and the Attorney Grievance Commission in an attempt to conceal the RICO enterprise and racketeering activity.

384.   Defendant Grote also aided and abetted the RICO Enterprise when she destroyed a filing in the Collection Action submitted by HLV Counsel, thus subverting counsel's efforts to gain compliance with the binding court orders and settlement agreement.

385.   Defendant Grote was generally aware of her role as part of an overall improper activity at the time that she provided assistance and she knowingly and substantially assisted the principal violation.

## COUNT IV— 42 U.S.C. §1983
## Against Defendants Bedford, Hamre, Van Buren County And Village of Paw Paw

386.   Plaintiffs incorporate by reference all preceding paragraphs.

387.   Pursuant to 42 U.S.C.A. § 1983, every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, subjects, or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

388.    Judge Hamre's repeated failure to have hearings or issue opinions on HLV's multiple contempt motions, his *sua sponte* decision to renegotiate an already agreed-to settlement, and his blatant bias in favor of Defendants Page and Stewart violated the rights of HLV as guaranteed by the Fourteenth Amendment to the United States Constitution.

389.    Judge Hamre's decision to throw away HLV's pleadings, which Judge Hamre had specifically instructed HLV to submit, violated the rights of HLV as guaranteed by the Fourteenth Amendment to the United States Constitution.

390.    Judge Hamre's actions were undertaken with evil motive or intent towards HLV and reckless disregard or callous indifference to the Constitutional rights of HLV.

391.    As a direct and proximate result of Judge Hamre's acts, HLV suffered harm.

392.    The unwarranted instigation of factually unsupported criminal charges against Baker and Donovan Visser violated both Baker's and HLV's rights as guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution.

393.    Defendants' actions were undertaken with evil motive or intent toward Baker and Donovan Visser, HLV's counsel, driven by their inappropriate relationship with Defendants Page and Stewart, and made with reckless disregard or callous indifference to the Constitutional rights of Baker and Donovan Visser.

394.    As a direct and proximate result of Defendant Bedford's acts, Baker suffered harm.

395.    Defendant Page's use of his badge of authority as Village of Paw Paw prosecutor as well as his inappropriate relationship with Defendants Bedford and McKay to initiate unwarranted and factually unsupported criminal charges against Baker and Donovan Visser violated the rights of Baker and HLV as guaranteed by the Fourth and Fourteenth Amendments

of the United States Constitution.

396.    Defendants Page and Stewart's actions were undertaken with evil motive or intent toward Baker and HLV and with reckless disregard or callous indifference to the Constitutional rights of Baker and HLV.

397.    As a direct and proximate result of Defendants Page and Stewart's actions, Baker and HLV suffered harm.

## Village of Paw Paw

398.    The Village of Paw Paw was aware that Defendant Page was using his position as City Attorney to peddle influence, trade favors and harm litigants in the civil and criminal courts of Van Buren County.

399.    For instance, when Defendant Michael Bedford, was ticketed for speeding within the Paw Paw Village limits, Defendant Page, who had a duty to enforce the Village ordinances as an arm of the village government, instead dismissed the speeding ticket without even informing the Village Police.

400.    According to the Kalamazoo Gazette, city police were not aware of the ticket being dismissed and believed that Defendant Page acted outside of his authority when he surreptitiously dismissed it.

401.    Both Defendants Page and Stewart used their loose and unlawful affiliation to represent defendants against whom the Village was adverse - even playing roles on both sides of the case.

402.    They did so for pecuniary gain and with the knowledge of Village officials.

403.    Defendant Page further used his authority as Village of Paw Paw prosecutor as well as his inappropriate relationship with Bedford and McKay to initiate unwarranted and

factually unsupported criminal charges against Baker and Donovan Visser violated the rights of Baker and HLV as guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution.

404.   The Village turned a blind eye to these problems.  Indeed, even after Page and Stewart were notified that they could not represent private clients whose interests were adverse to the Village's or who either had actually appeared against on behalf of the Village, the Village did not remove them from their official positions.

405.   Had the Village removed Defendant Page from his official governmental post, Defendant Page would not have had the access and special privileges - afforded him as governmental official - that allowed him to trade favors, initiate retaliatory charges against Donovan Visser and Baker using his special access to local government, and by further benefitting Plaintiffs' adversary in the Collection Action thus furthering a larger scheme to defraud by Defendants Judge Hamre, Page, and Stewart.

### Van Buren County

406.   The County was aware that Defendants Bedford and McKay used their positions to peddle influence, trade favors, and harm litigants in both the civil and criminal courts of Van Buren County.

407.   Defendant Bedford traded favors with Defendants Page and Stewart in exchange for free or subsidized hunting trips or vacations to Illinois, Canada, Northern Michigan, and possibly Florida.  In fact, according to another confidential informant, it is well known in Van Buren County that Defendant Page "owns" Defendant Bedford.

408.   The County knew that its resources were being used and its employees were actively participating in a scheme to raise money for a non-profit through which local attorneys

paid money to Bedford and other county officials and employees, and which was knowingly being misused by Bedford and Hamre.

409. It was also publicly known that, for instance, when Defendant Bedford was ticketed for speeding within the Paw Paw Village limits, Defendant Page, who had a duty to enforce the Village ordinances as an arm of the village government, instead dismissed the speeding ticket without even informing the Village Police.

410. In getting this ticket dismissed, Defendant Bedford improperly used his position and *quid pro quo* relationship with Defendant Page to his benefit.

411. The County knew that Defendant Bedford was violating the law, peddling influence, and harming Van Buren County citizens. The County purposely turned a blind eye or in the very least was deliberately indifferent to Defendant Bedford's action because they did not and have not removed him from office or taken some other remedial action to prevent further harm.

412. Thus, the County sat idly by when Defendants Page and Stewart exchanged hunting trips and other items of value for Defendants Bedford's and McKay's willingness to prosecute, without just cause, Donovan Visser and Robert Baker.

413. Had the County not been deliberately indifferent, Plaintiff Baker would never have suffered the indignity, mental distress, or expense caused by this unfounded criminal prosecution.

414. Had the County not been deliberately indifferent, Plaintiff HLV would not have incurred such substantial cost caused by unfounded criminal prosecution of its attorney.

415. What is more, Van Buren County knew that ELC had a duty to preserve documents as they had all been copied on the same preservation letter.

416.    Van Buren County knew that its IT official was working for ELC on the side that he was engaged to defragment ELC's computers after the date when Van Buren County was notified of this lawsuit.

417.    Defragmentation involves deleting files.

418.    The IT official, as an agent of the County, deleted and transferred files that were subject to a preservation duty in the Collection Action from Belco's computers and was paid in cash for his services.

419.    Van Buren County was deliberately indifferent in allowing its IT official to do so.

420.    Had the County not been deliberately indifferent, Plaintiff HLV would not have had to incur the additional costs of trying to recover the deleted files.

### COUNT V – Conspiracy to Commit 42 U.S.C. § 1983
### Against Defendants Page, Stewart And Page & Stewart

421.    Plaintiffs incorporate by reference all preceding paragraphs.

422.    Defendants Page and Stewart, and Defendant Page & Stewart had a plan to deprive HLV of the property it rightfully owned.

423.    Because of their relationship, Judge Hamre agreed to help Defendants Page and Stewart deprive HLV of its property.

424.    Judge Hamre took overt acts to further the agreement to deprive by repeatedly failing to have hearings or issue opinions on HLV's multiple contempt motions, and his attempt to completely renegotiate the settlement agreement already in place.

425.    Defendants Page and Stewart took overt acts to further their agreement by initiating and engaging in ex parte communications with Judge Hamre to renegotiate a one-sided settlement agreement for ELC.

426.    Further overt acts taken by Defendants Page, Stewart, and Hamre include the

buying of drinks and other things of value for the judge in exchange for the favorable rulings.

427.     As a direct and proximate result of Defendants Page and Stewart's actions, HLV suffered harm.

428.     Criminal proceedings were initiated against Donovan Visser and Robert Baker in May of 2013.

429.     The charges Visser and Baker were charged with arose out of interactions that took place on ELC's property.

430.     Charges against Baker were dropped, but Donovan Visser proceeded to trial on assault and trespass charges.  The trespass charges were dismissed by a directed verdict and the assault trial ended in a hung jury.

431.     Defendant Page and Stewart are ELC's counsel.  Defendants Page and Stewart also maintain a close, personal relationship with Defendant Bedford and McKay.

432.     On at least two occasions, Defendant Page and Stewart spoke with Defendant Bedford and McKay about initiating the criminal proceedings against Donovan Visser and Baker.

433.     Defendant Page and Stewart intended to deprive Donovan Visser, Baker and HLV of its Fourth and Fourteenth Amendment rights under the Constitution of the United States.

434.     Because of the nature of the relationship between the Defendants, Defendants Bedford and McKay agreed to bring such charges, albeit no criminal activity had been found to have occurred according to the police report.

435.     Defendant Bedford and McKay charged Donovan Visser and Baker knowing they were deprive them of constitutionally protected rights, and in fact did so willingly and intentionally.

436.    As a direct and proximate result of Defendants Page and Stewart's action, HLV suffered harm.

**COUNT VI—Malicious Prosecution**
**Against Defendants Van Buren County, Michael McKay And Michael Bedford**

437.    Plaintiffs incorporate by reference all preceding paragraphs.

438.    Criminal proceedings against Donovan Visser and Robert Baker were initiated by Defendant Bedford and carried out by Defendant McKay.

439.    The criminal charges against Robert Baker were dropped on June 19, 2013. The criminal charges against Donovan Visser were not.

440.    There was no probable cause for any of the charges brought against Donovan Visser and Baker. The police report from the incidents states that Deputy Perkins "did not find anything criminal in nature."

441.    Defendants Bedford and McKay initiated the criminal proceedings against Donovan Visser and Baker, because Page and/or Stewart told him to do so. Bedford allowed Page and Stewart to influence him, because they had bribed him with hunting trips and other items of value.

442.    The purpose of the malicious prosecution against Baker (and Donovan Visser) was not to bring an offender to justice, but to terrorize HLV, Baker and their counsel and from moving forward with their claims and investigation regarding the exchange of bribes and influence between Page, Stewart, Hamre and Bedford.

443.    As a result of the malicious prosecution, Robert Baker suffered harm.

**COUNT VII—Tortious Interference With Contract**
**Against Defendant Paul Hamre**

444.    Plaintiffs incorporate by reference all preceding paragraphs.

445.    HLV and ELC had an enforceable settlement agreement in the Collection Action.

60

446. The parties entered into the contract and memorialized their mutual assent and consideration when they placed the contract on the record on September 19, 2012.

447. The contract was amended on October 11, 2012 and distilled in writing.

448. Therefore, as of October 11, 2012, the parties had an enforceable settlement agreement, which required Engel and ELC to provide to HLV 600 trailers or containers and $2,500 for each trailer less than 600 that Engel and ELC transferred to HLV.

449. Judge Hamre was aware that the parties had an enforceable settlement agreement.

450. In exchange for the promise that Defendants would provide him with items of value, Judge Hamre issued an opinion on March 26, 2013, purportedly requiring Engel and ELC to provide only 347 trailers to HLV (or their cash equivalent), despite the parties' enforceable agreement on different terms.

451. Had Judge Hamre's decision been a reasoned decision, issued on a pending motion and otherwise within the scope of Judge Hamre's judicial duties, then there could be no claim.

452. However, because Judge Hamre's March 26, 2013 opinion was the product of fraud and bribery, it was unlawful and tortious.

453. As a result of this opinion, Judge Hamre caused and/or assisted ELC to breach the settlement agreement.

454. Although Judge Dodge has since vacated Judge Hamre's opinion, which in and of itself reveals its unlawful nature, the Judge Hamre opinion, which was issued as part of the greater scheme to defraud and in violation of Plaintiffs' constitutional and contractual rights, harmed Plaintiffs substantially, and caused them them tens of thousands of dollars in unnecessary attorneys' fees and emotional and mental distress.

**Prayer for Relief**

WHEREFORE, the Plaintiffs, by their counsel, The Law Office of Jordan C. Hoyer, PLLC, respectfully request that the Court:

I.      Award any and all damages suffered by Plaintiffs;

II.     Award treble damages for Plaintiffs' RICO claims, Counts I, II and III;

VII.    Award attorneys' fees incurred as a result of this matter to the extent allowed by statute;

VIII.   Enjoin Defendant Bedford from further contact with any witnesses, named or unnamed; and

VIII.   Award any other relief that justice so requires.

**JURY DEMAND**

The Plaintiffs hereby demands a jury trial to the fullest extent allowed by law.

April 23, 2014                              Respectfully Submitted,

                                           Counsel for Plaintiffs


                                           By:_____
                                           THE LAW OFFICE OF JORDAN C. HOYER, PLLC
                                           Jordan C. Hoyer (P75659)
                                           Derek S. Witte  (P68329)
                                           40 Pearl St. N.W., Ste. 924
                                           Grand Rapids, MI 49503
                                           616-350-9924