IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HLV, LLC, a Michigan limited liability
Company, LANDWORTHY CONTAINER,
LLC, a Michigan limited liability company,
and ROBERT BAKER, an individual,

       Plaintiffs,                        Case No. 1:13-cv-01366-PLM

v.                                        HON. PAUL L. MALONEY

VAN BUREN COUNTY, a municipal
corporation, VILLAGE OF PAW PAW,
a municipal corporation, PAGE &
STEWART, an ad hoc professional
Partnership, KELLY PAGE, an individual,
GARY STEWART, JR., an individual,
PAUL HAMRE, an individual,
PEGGY GROTE, an individual,
MICHAEL MCKAY, an individual, and
MICHAEL BEDFORD, an individual,

       Defendants.

_____/

Jordan C. Hoyer  (P75659)
Derek S. Witte (P68329)
Attorneys for Plaintiffs
THE LAW OFFICE OF JORDAN C. HOYER,
PLLC
Trust Building, 40 Pearl St., NW, Suite 924
Grand Rapids, Michigan   49503
(616) 350-9924

Robert A. Callahan  (P47600)
Attorney for Defendants
VILLAGE OF PAW PAW
PLUNKETT COONEY
950 Trade Centre Way, Suite 310
Kalamazoo, Michigan   49002
(269) 226-8856
E-mail:  ccallahan@plunkettcooney.com

Michael S. Bogren (P34835)
Attorney for Defendants
VAN BUREN COUNTY
PAUL HAMRE and PEGGY GROTE
PLUNKETT COONEY
950 Trade Centre Way, Suite 310
Kalamazoo, Michigan   49002
(269) 226-8822
E-mail:  mbogren@plunkettcooney.com

Colleen H. Burke
Donald Douglas Campbell
Attorneys for Defendant Kelly Page
COLLINS EINHORN FARRELL &
  ULANOFF PC
4000 Town Center, Suite 909
Southfield, MI  48075-1473
(248) 355-4141
E-mail:  Colleen.Burke@ceflawyers.com
E-mail:  Donald.Campbell@ceflawyers.com

1

James E. Tamm
Attorney for Defendant Michael McKay
O'CONNOR DeGARZIA TAMM &
    O'CONNOR, PC
40701 Woodward Avenue, Suite 105
Bloomfield Hills, MI   48304
(248) 433-2000
E-mail:  jetamm@odtlegal.com

George Michael DeGrood, III
Attorney for Defendant Michael Bedford
THOMAS DeGROOD & WITENOFF, PC
400 Galleria Officentre, Suite 550
Southfield, MI  48034
(248) 353-4450
E-mail:  gdegrood@thomasdegrood.com

Lee T. Silver (P36905)
Co-Attorney for Defendant STEWART
SILVER & VAN ESSEN PC
300 Ottawa Ave., NW, Suite 620
Grand Rapids, Michigan  49503
(616) 988-5600
E-mail:  ltsilver@silvervanessen.com

## BRIEF IN SUPPORT OF MOTION TO DISMISS

### STANDARD OF REVIEW

In *Washington v. Roosen, Varchetti & Oliver, PPLC*, 894 F. Supp. 2d 1015, 1020 (W.D. Mich. 2012), this Court stated the standard for deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6):

"Under the notice pleading requirements, a Complaint must contain a short and plain statement of the claim showing how the pleader is entitled to relief. Fed.R.Civ.P. 8(a)(2). The Complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide sufficient factual allegations that, if accepted as true, are sufficient to raise a right to relief above the speculative level, *Id.,* 550 U.S. at 555, 127 S.Ct. 1955, and the 'claim to relief must be plausible on its face' *Id.* at 570, 127 S.Ct. 1955. 'A claim is plausible on its face if the "'plaintiff pleads factual content that allows the

2

court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"" *Ctr. for Bio–Ethical Reform, Inc. v. Napolitano,* 648 F.3d 365, 369 (6th Cir.2011) (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). 'The plausibility standard is not akin to a "'probability requirement,'" but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citations omitted). When considering a motion to dismiss, a court must accept as true all factual allegations, but need not accept any legal conclusions. *Ctr. for Bio–Ethical Reform.,* 648 F.3d at 369."

When considering whether to grant a Rule 12(c) or 12(b)(6) motion, the court primarily considers the complaint's allegations, but may also take into account items appearing in the record and attached exhibits. *Poly–Flex Const., Inc. v. NTH, Ltd.,* 582 F.Supp. 892, 901 (W.D.Mich.2008) (Maloney, C.J.) (citing, *inter alia, Amini v. Oberlin College,* 259 F.3d 493, 502 (6th Cir.2001)). Moreover, because plaintiffs' RICO claims require proof of mail or wire fraud as an element, the plaintiffs must also satisfy the heightened particularity requirements of Fed. R. Civ. P. 9(b) with respect to the elements of fraud. "Rule 9(b) states that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.,* 668 F.3d 393, 403 (6th Cir.2012) (quoting Fed.R.Civ.P. 9(b)). This requirement includes alleging the "time, place, and content" of the fraudulent acts, the existence of a fraudulent scheme, the intent of the participants in the scheme, and "the injury resulting from the fraud." *Id.* (internal quotation marks omitted).

## STATEMENT OF FACTS

As it relates to these defendants, the pertinent allegations of fact are as follows.

Landworthy is an affiliate of HLV, LLC to which HLV, LLC assigned its rights under the settlement agreement between HLV, LLC and ELC Leasing regarding the case *HLV, LLC v. ELC Leasing, et al,* Case No. 11-61-558-CH.   For convenience, HLV, LLC and Landworthy shall be referred to as "HLV." (Amended Complaint, ¶ 9).

Through their attorneys, Visser and Associates, HLV filed a collection action against ELC Leasing ("ELC"), and its many affiliates and d/b/a's, including its owner, William Engel ("Engel"), to collect more than $600,000 owed from the ELC defendants to HLV.  The case was filed in Van Buren County and assigned to Judge Paul Hamre.  The case is *HLV, LLC v. ELC Leasing, et al*., Case No. 11-61-558-CH (the "Collection Action"). (Amended Complaint, ¶ 20).

At a hearing on September 19, 2012, before the Honorable Kathleen Brickley, the parties stipulated to a settlement agreement on the record.   The terms of the September 19, 2012 settlement agreement were:

a.    Engel would transfer the assets of a trailer and container business to HLV, which consisted of approximately 600 trailers and containers;

b.    Engel would give HLV the book of business that went along with the trailers and containers, including his rights to future rent payments from third-parties in possession and/or use of the trailers and/or containers; and

c.    Engel would immediately sign the Bill of Sale and Assignment of Leases for the transfer of all assets, but would hold all assets for a 90-day period during which he could redeem the assets by paying the debt owed to HLV; upon expiration of 90-days, all assets not redeemed would belong to HLV and Engel would cooperate in locating all such assets. (Amended Complaint, ¶ 21).

Prior to October 11, 2012, the parties amended the settlement agreement (Exhibit 1 to Amended Complaint.) The amended settlement agreement did not replace the September 19, 2012 settlement agreement, but included the following additional terms: a. If Engel was unable to provide 600 trailers and containers by the deadline, he would provide HLV with cash or other machinery or equal "in a value equal to $2,500 per trailer/container unit less than 600, as necessary to make [HLV] whole on its loan to [ELC]"; b.  Engel and ELC could not sell, transfer, remove, secrete, or in any manner dispose of the assets of the trailer and container business; and c. HLV was entitled to review all records, books and the like relating to the trailer and container business during regular business days and hours upon 24-hour notice. The Settlement was signed by Judge Hamre and entered as an order of the Van Buren county Circuit Court on October 11, 2012. Amended Complaint, ¶¶ 22 – 24).

ELC executed the required Bill of Sale and Assignment of Leases on November 27, 2012. (Amended Complaint, ¶ 25). The 90-day redemption period during which ELC and Engel were entitled to redeem the assets described in the settlement agreement expired on December 19, 2012.  Engel failed to tender any portion of the amount owed to HLV in order to redeem his property. Thus, he was required to hand over the 600 trailers named in the settlement agreement. (Amended Complaint, ¶ 26). Sometime before March 2013, Engel and ELC retained Defendants Page and Stewart, and Attorney William Donovan to represent all of the defendants in the Collection Action. (Amended Complaint, ¶ 28).

In February 2013, Baker located a buyer who was willing to purchase each of the 600 trailers that ELC was required to transfer to HLV. (Amended Complaint, ¶ 29). Engel and ELC refused to cooperate with HLV's efforts to locate its assets and recover the trailers. (Amended Complaint, ¶ 30). On March 6, 2013, HLV's legal counsel was served with an *ex parte* order

enjoining HLV from collecting any more of its assets from Engel or ELC. (Amended Complaint, ¶ 32). The *ex parte* order was signed by Judge Paul Hamre. (Amended Complaint, ¶ 34). On March 20, 2013, Judge Hamre presided over a hearing on Engel and ELC's motion for an order further enjoining HLV from any collection actions under the Settlement Agreement – and also on a Motion for Contempt, which HLV and its counsel had filed against Engel and ELC for their violation of the parties' binding settlement agreement. (Amended Complaint, ¶ 35). Judge Hamre heard oral arguments from both parties and took them under advisement.  He did not rule from the bench. (Amended Complaint, ¶ 36). Judge Hamre did not extend the temporary restraining order at the hearing. (Amended Complaint, ¶ 37).

On March 21, 2013, HLV renewed its attempts to recover its containers and/or trailers from ELC and Engel. (Amended Complaint, ¶ 39). HLV's counsel was then served with another *ex parte* order purportedly signed by Judge Hamre dated March 22, 2013, which extended the temporary restraining order issued March 6, 2013. (Amended Complaint, ¶ 40). The March 22 Order extended the expired temporary restraining order "until further order of the court." (Amended Complaint, ¶ 41). On March 26, 2013, Judge Hamre entered an "Order After Hearing," which purportedly ruled on the motions argued before the court on March 20, 2013. (Amended Complaint, ¶ 50). In the Order After Hearing Judge Hamre revised the October 11, 2012, Order and Settlement Agreement and ordered that ELC and Engel were only required to provide 347 trailers or containers, rather than the 600 originally agreed upon by the parties. (Amended Complaint, ¶ 51). In the Order After Hearing, Judge Hamre failed to rule on HLV's contempt motions against ELC and Engel. (Amended Complaint, ¶ 56). On April 12, 2013, HLV filed a motion for reconsideration of the Order After Hearing. (Amended Complaint, ¶ 57). On

April 24, 2013, Judge Hamre denied HLV's motion for reconsideration. (Amended Complaint, ¶ 58).

On April 10, 2013, Judge Hamre issued a Show Cause for Contempt against HLV and Visser and Associates. (Amended Complaint, ¶ 91). HLV renewed its motion for contempt against Engel and ELC. (Amended Complaint, ¶ 94). HLV scheduled a hearing on its renewed motion for contempt for May 6, 2013. (Amended Complaint, ¶ 95). At the hearing, Judge Hamre stated that HLV and its counsel must make a *prima facie* showing of contempt – and, if they failed to do so, there would be no evidentiary hearing on the alleged contempt. Judge Hamre did not accept that the testimony presented to the court met the threshold for a *prima facie* showing. In place of conducting a contempt hearing, he instead tried to negotiate a new settlement agreement with HLV on behalf of the ELC defendants. (Amended Complaint, ¶ 96). Judge Hamre gave ELC and Engel additional time to try to sell the trailers and containers themselves and enjoined HLV from selling any trailers until after May 10, 2013. (Amended Complaint, ¶ 99). Judge Hamre also enjoined Engel from contacting any former client whose payments and leases had been assigned to HLV. (Amended Complaint, ¶ 100). The court also set a telephone status conference for Friday, May 10, 2013, at 4:00 p.m. and it ordered Visser and Associates to submit a detailed report regarding the location, condition and ownership of the specific trailers and containers that HLV had recovered from ELC. (Amended Complaint, ¶ 102).

Judge Hamre held the telephonic status conference on May 10, 2013, at 4:00 p.m. Judge Hamre, and Defendants Page and Stewart participated from Judge Hamre's office. (Amended Complaint, ¶ 105). Donovan Visser, Donald Visser, Rebecca Baker, and HLV representative Robert Baker participated from Visser and Associates' office in Kentwood, Michigan. (Amended Complaint, ¶ 106). Mr. William Donovan, an additional attorney representing ELC, participated

7

via telephone from his Detroit, Michigan office. (Amended Complaint, ¶ 107). Judge Hamre ordered that all of the parties should return to Court the following Monday, May 13, 2013, at 9:00 a.m. He did not rule on the pending contempt motion or sign the 7-day order submitted by Visser and Associates. (Amended Complaint, ¶ 113).

At the end of the call, Attorney Donald Visser voiced his objection to the scheduled hearing on the parties' settlement agreement, because there was no motion pending.  Judge Hamre responded that "I am the Court, so that makes it proper."  After Visser's objection, the call ended. (Amended Complaint, ¶ 115). Then, HLV's counsel heard a click – presumably because Attorney William Donovan hung up his phone in Detroit. (Amended Complaint, ¶ 116). Almost immediately, and allegedly before Visser could hang up the conference call, HLV's counsel heard further conversation between Judge Hamre and defendants Page and Stewart. (Amended Complaint, ¶ 117). With the court and defendants Page, Stewart and Grote unaware that Visser and Associates were still on the line, additional conversation occurred. (Amended Complaint, ¶ 118).

Plaintiffs allege Judge Hamre stated that the original order and settlement agreement gave HLV a right to 600 trailers, but that Stewart told the Judge the parties had not really agreed to that. Judge Hamre allegedly then stated that he "looked again" at the original order and decided that ELC was not required to provide 600 trailers. (Amended Complaint, ¶ 118). Judge Hamre further stated that it was the court's intention to extend the injunction at the hearing on the following Monday. (Amended Complaint, ¶ 121). Without the knowledge of any of the participants to the conversation, Donovan Visser, Donald Visser, Rebecca Baker and/or HLV representative Robert Baker recorded the conversation. (Amended Complaint, ¶ 124).[1]

---

[1] Based on the allegations in the Amended Complaint, it appears the person or persons who recorded the conversation may well have violated M.C.L. 750.539d which criminalizes, *inter alia*, the use in any private place,

HLV filed a motion to disqualify Judge Hamre on May 13, 2013. (Amended Complaint, ¶ 127). In response to the motion to disqualify Page and Stewart filed papers that included an affidavit from Peggy Grote, Judge Hamre's secretary. (Amended Complaint, ¶ 135). Grote stated in the affidavit that Judge Hamre's office door remained open throughout the telephonic status conference and that **she did not recall** hearing any inappropriate language coming from Judge Hamre, defendant Page or Stewart. (Amended Complaint, ¶ 137). (Emphasis added). Grote also swore that "after the phone conference was over I heard no further conversation about the case or conversation discussing anyone's social plans."   She also denied that there was any laughter. (Amended Complaint, ¶ 138). Plaintiffs allege that Judge Hamre denied the motion to disqualify on May 24, 2013. (Amended Complaint, ¶ 130). Plaintiffs assert the legal conclusion that Grote's affidavit constituted perjury. (Amended Complaint, ¶ 139).[2]

---

without the consent of the person or persons entitled to privacy in that place, any device for recording or eavesdropping upon the sounds or events in that place. The violation of the statute is a felony offense.

[2] While the court does not have to accept the legal conclusion that Grote's affidavit constituted perjury, it must be pointed out that this legal conclusion is completely meritless based on the plaintiffs' own Amended Complaint. First, Grote does not state in her affidavit that no inappropriate language was used by Judge Hamre, Page or Stewart; it states that she did not **hear** such language. Unless plaintiffs have some powers not possessed by mere mortals, they are in no position to assert such a statement is untrue. Second, plaintiffs misrepresent throughout the Amended Complaint that there was some arrangement for a social gathering at Judge Hamre's home on Sunday night. A review of the plaintiffs' own ill-gotten recording shows this allegation to be a complete falsehood. Defendant Page is attributed with saying "Conference call Sunday at your house **if I can get Visser on it**." (Amended Complaint, Exhibit 10)(Emphasis added). This is hardly an agreement for a social gathering. For plaintiffs to make such an assertion is sanctionable conduct. Finally, based on the factual allegations in the Amended Complaint, the elements of perjury have not been pled. In *In re Contempt of Henry,* 282 Mich. App 656, 677–678; 765 N.W.2d 44 (2009) the Michigan Court of Appeals explained that the elements of perjury are: "(1) the administration ... of an oath authorized by law, by competent authority; (2) an issue or cause to which facts sworn to are **material**; and (3) willful false statements or testimony ... regarding such facts."(Emphasis added). In *People v. Gardner*, 297981, 2011 WL 5008578 (Mich. Ct. App. Oct. 20, 2011), the Court of Appeals found there was absolutely no evidence to prove that the witnesses gave willfully false testimony or made willfully false statements. "The fact that two of the eyewitnesses to the shooting testified that they did not remember telling police officers certain things that the officers themselves testified about does not constitute perjury." Even taking the allegations in the Amended Complaint in the most favorable light, whether there was or was not laughter in chambers is not **material** to anything. Plaintiffs' Amended Complaint alleges no more than what was rejected in *People v. Gardner.*

The case was then reassigned by the Supreme Court Administrators Office to the Honorable Michael Dodge of Cass County. (Amended Complaint, ¶ 153).[3] On August 12, 2013, Judge Dodge vacated all orders issued by Judge Hamre subsequent to the October 11, 2012 order. (Amended Complaint, ¶ 154).

Further allegations, if necessary, will be added in the Argument portion of this brief.

## ARGUMENT

I. **DEFENDANT HAMRE IS ENTITLED TO DISMISSAL OF ALL CLAIMS ASSERTED AGAINST HIM ON THE BASIS OF ABSOLUTE JUDICIAL IMMUNITY.**

It is well-established that judges enjoy judicial immunity from suits arising out of the performance of their judicial functions. *Pierson v. Ray,* 386 U.S. 547, 553-554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Mann v. Conlin,* 22 F.3d 100, 103 (6th Cir.1994) (A judge performing his judicial functions is entitled to immunity from a suit seeking monetary damages.). The Supreme Court has specifically held that state judges are absolutely immune from liability under 42 U.S.C. § 1983. *Briscoe v. LaHue,* 460 U.S. 325, 334, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Pierson,* 386 U.S. at 554-55, 87 S.Ct. 1213. *Brookings v. Clunk*, 389 F.3d 614, 617 (6th Cir. 2004).

This immunity extends to cases asserting RICO claims. Judges and prosecutors have long been held to be absolutely immune from being sued on account of their judicial or prosecutorial acts. See *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871); *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct.

---

[3] Although this is a motion to dismiss and all well-pled allegations of fact must be taken as true, the defendants are constrained to point out that plaintiffs allege in Paragraph 152 Judge Kathleen Brickley recused herself from hearing the case after Judge Hamre recused himself "because of her personal relationships with Defendants Page and Stewart." This statement is a lie. Plaintiffs do not content themselves with smearing the name and reputation of those whom they believe have opposed them. They show their true colors by gratuitously lying about the reason another judge recused herself. The plaintiffs' despicable conduct is simply beyond the pale.

2894, 57 L.Ed.2d 895 (1978); *Burns v. Reed,* 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). "***Section 1983 was not intended to abolish this immunity*** (see Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)), ***and we have been given no reason to suppose that RICO was intended to abolish it either***. It would be anomalous, we think, if officials who are immune from suit for alleged violations of the Constitution itself should be denied immunity from suit for alleged violations of a statute that does not incorporate the Constitution—particularly a statute as amorphous as RICO." *Cullinan v. Abramson*, 128 F.3d 301, 307-308 (6th Cir. 1997). (Emphasis added; footnote omitted). See also, *Doe v. Boland*, 630 F.3d 491, 498 (6th Cir. 2011) (same).

"A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." *Stump v. Sparkman,* 435 U.S. 349, 359, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). A judge will not be deprived of immunity because the action he took was in error or exceeded his authority. *Mireles,* 502 U.S. at 12–13. Judicial immunity applies "however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." *Cleavinger v. Saxner,* 474 U.S. 193, 199–200, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (*quoting Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646 (1872). Furthermore, "judicial immunity applies to acts performed maliciously and corruptly as well as acts performed in bad faith or with malice." *Brookings,* 389 F.3d at 617. In *Forrester v. White,* 484 U.S. 219, 226-227, 108 S.Ct. 538, 98 L.Ed.2d 555, (1988), the Supreme Court explained the rationale for this long-standing rule:

> If judges were personally liable for erroneous decisions, the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits. The resulting timidity would be hard to detect or control, and it would manifestly detract from independent and impartial adjudication. Nor are suits against judges the only available means through which litigants can protect themselves from the

consequences of judicial error. Most judicial mistakes or wrongs are open to correction through ordinary mechanisms of review, which are largely free of the harmful side-effects inevitably associated with exposing judges to personal liability.

A judge's immunity can be overcome in only two situations: (1) nonjudicial actions (i.e., actions not taken in the judge's official capacity); and (2) judicial actions taken in the complete absence of all jurisdiction. *Mireles,* 502 U.S. at 10–11. Plaintiffs have not alleged either exception to judicial immunity. There is no question that Judge Hamre's order was a judicial action that fell within the scope of his authority as a circuit court judge. Plaintiff's Amended Complaint alleges the collection case was assigned to Judge Hamre and that he entered the March 6, 2013, *ex parte* order enjoining HLV from collecting any more of its assets from Engel or ELC. (Amended Complaint, ¶ 32). Moreover, plaintiffs were not contesting the jurisdiction of the court, as there was a hearing held on March 20, 2013, on Engel and ELC's motion for an order further enjoining HLV from any collection actions under the Settlement Agreement and also on a motion for contempt, which HLV and its counsel had filed against Engel and ELC for their violation of the parties' binding settlement agreement. (Amended Complaint, ¶ 35). Thus, plaintiffs acknowledge in the Amended Complaint that neither of the exceptions to absolute judicial immunity applies in this matter.

In *Stump,* the Supreme Court established a two-prong test to determine whether an act is "judicial." *Id.* at 362. First, the court must consider whether the act in question is a function that is "normally performed by a judge." *Id.* This has been described as the functional approach. Under this inquiry, a court is required to examine the nature and function of the act, not the act itself. The Supreme Court reformulated this inquiry in *Mireles* by establishing that, even if a particular act is not a function normally performed by a judge, the court must look to the particular act's relation to a general function normally performed by a judge. *Id.* at 13

Second, in determining whether an act is "judicial," the court must assess whether the parties dealt with the judge in his or her judicial capacity. *Id.* at 12. In examining the functions normally performed by a judge, the Sixth Circuit has recognized that "paradigmatic judicial acts," or acts that involve resolving disputes between parties who have invoked the jurisdiction of a court, are the touchstone for application of judicial immunity. *Barrett v. Harrington,* 130 F.3d 246, 255 (6th Cir.1997) (citing *Antoine,* 508 U.S. at 435-36, 113 S.Ct. 2167). Conversely, whenever an action taken by a judge is not an adjudication between the parties, it is less likely that it will be deemed judicial. *Cameron v. Seitz,* 38 F.3d 264, 271 (6th Cir.1994).

In this case all of the actions attributed to Judge Hamre are judicial actions that directly adjudicated the plaintiffs' claims in the collection action. Indeed, it is the precise act of adjudication that plaintiffs claim is actionable in this case. Plaintiffs allege that Judge Hamre revised the October 11, 2012, Order and Settlement Agreement and ordered that ELC and Engel were only required to provide 347 trailers or containers, rather than the 600 originally agreed upon by the parties and which the court incorporated in an Order in October of 2012 (Amended Complaint, ¶ 51). It is this act that plaintiffs assert gives rise to various causes of action. However, since adjudication is the quintessential judicial act, Judge Hamre has an absolute privilege from suit.

Plaintiffs allege Judge Hamre changed the terms of the settlement agreement and was motivated by improper and illegal considerations. Even if Judge Hamre acted in such a manner (which he explicitly denies), he is still entitled to absolute judicial immunity under these circumstances. *See Mireles,* 502 U.S. at 9–11; *Cleavinger,* 474 U.S. at 199–200; *Stump,* 435 U.S. at 359; *Pierson,* 386 U.S. at 553–54; *Brookings,* 389 F.3d at 61.

Judge Hamre is entitled to dismissal of all federal claims asserted against him on the basis of absolute judicial immunity.

> II.    **DEFENDANT GROTE IS ENTITLED TO DISMISSAL OF THE FEDERAL CLAIMS ASSERTED AGAINST HER ON THE BASIS OF ABSOLUTE WITNESS IMMUNITY AND AS THE AMENDED COMPLAINT FAILS TO STATE AN ACTIONABLE CLAIM AGAINST HER.**

Plaintiffs have asserted RICO claims against Peggy Grote in Counts I and III. Count I alleges a violation of RICO under 18 U.S.C. § 1962(c). Count III alleges "RICO Aiding and Abetting" only against Grote under – absolutely no legal authority.

Addressing Count III first, it is clear there is no actionable claim for "aiding and abetting" an alleged RICO violation. All of the case law to address this issue has rejected the cause of action. "Appellant Pennsylvania Association of Edwards Heirs ("the Association") appeals from a grant of summary judgment dismissing its Amended Complaint, which alleged that Wachovia Bank of Georgia ("Wachovia Bank") aided and abetted in the commission of a RICO violation. In *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644 (3d Cir.1998), we extended the Supreme Court's reasoning in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), to RICO, and held that, because RICO's statutory text does not provide for a private cause of action for aiding and abetting and 18 U.S.C. § 2 cannot be used to imply this private right, no such cause of action exists under RICO." *Pennsylvania Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839, 840 (3d Cir. 2000).

"[T]here is no basis to conclude that Congress created a private civil right of action for aiding and abetting a RICO violation under § 1962(c). The text of § 1962(c) does not reference 'aiding and abetting.' Further, Supreme Court case law indicates that the most encompassing phrase, 'participate indirectly,' cannot be read to include aiding and abetting liability. *See Reves*

*v. Ernst & Young,* 507 U.S. 170, 178, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (noting that 'participate,' as used in § 1962(c), has a narrower meaning than 'aid and abet'); *see also Central Bank of Denver,* 511 U.S. at 175, 114 S.Ct. 1439 (finding that the phrase 'directly or indirectly,' as used in § 10b of the Securities Exchange Act, did not suffice to impose aiding and abetting liability)." *Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006, 1029 (S.D. Iowa 2009).

"The RICO statute does not create a cause of action for civil aiding and abetting liability, and common law principles or policy considerations do not warrant recognition of such a claim." *Devon IT, Inc. v. IBM Corp.*, 805 F. Supp. 2d 110, 126 (E.D. Pa. 2011).

"Congress knew how to impose aiding and abetting liability when it chose to do so. See, *e.g.,* Act of Mar. 4, 1909, § 332, 35 Stat. 1152, as amended, 18 U.S.C. § 2 (general criminal aiding and abetting statute); Packers and Stockyards Act, 1921, ch. 64, § 202, 42 Stat. 161, as amended, 7 U.S.C. § 192(g) 1988 ed. and Supp. IV) (civil aiding and abetting provision); see generally *infra,* at 1450–1452. If, as respondents seem to say, Congress intended to impose aiding and abetting liability, we presume it would have used the words "aid" and "abet" in the statutory text. But it did not." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176-177, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994). Count III fails as a matter of law.

Count I against Grote, alleging substantive RICO claims, fails for a plethora of reasons. First, the action alleged against Grote is that she signed a false affidavit which constituted perjury. (Amended Complaint, ¶¶ 139, 346). Grote is entitled to absolute witness immunity for signing the affidavit. In *Briscoe v. LaHue*, 460 U.S. 325, 345-346, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983), the Supreme Court accorded witnesses absolute immunity from civil damages claims under 42 U.S.C. § 1983: "In short, the rationale of our prior absolute immunity cases governs the

disposition of this case. In 1871, common-law immunity for witnesses was well settled. The principles set forth in *Pierson v. Ray* to protect judges and in *Imbler v. Pachtman* to protect prosecutors also apply to witnesses, who perform a somewhat different function in the trial process but whose participation in bringing the litigation to a just-or possibly unjust-conclusion is equally indispensable."

In *Todd v. Weltman, Weinberg & Reis Co., L.P.A.*, 434 F.3d 432, 439-440 (6th Cir. 2006), the Sixth Circuit held that testimony presented in the form of an affidavit is generally protected under absolute witness immunity. The Sixth Circuit cited *Cruz v. Kauai County,* 279 F.3d 1064, 1068 (9th Cir.2002) ("It is also true that, in this circuit, a person who functions as a witness in an adversarial proceeding to revoke a defendant's bail is to be accorded absolute immunity for her testimony, even if the witness's testimony is provided by way of affidavit."; *Thomason v. SCAN Volunteer Servs., Inc.,* 85 F.3d 1365, 1373 (8th Cir.1996) ("To the extent Wordlaw and SCAN are sued because Wordlaw made arguably false statements in her affidavit in her role as a witness before the state court, the doctrine of absolute witness immunity applies."); and *Giffin v. Summerlin,* 78 F.3d 1227, 1231 (7th Cir.1996) ("The policy considerations underlying witness immunity for testimony in open court apply with equal force to other forms of testimony such as depositions and affidavits.") for this conclusion.

The Sixth Circuit then examined the twin rationales behind absolute witness immunity. "We find that a reviewing court should look at the twin rationales listed in *Briscoe:* insuring that a witness is unafraid of providing testimony, and, when the witness testifies, insuring that the witness is not impermissibly pressured to alter her testimony. 460 U.S. at 333-34, 103 S.Ct. 1108. Additionally, a reviewing court should look to the common law to determine whether immunity was available in specific instances." *Todd v. Weltman, Weinberg & Reis Co., L.P.A.,*

434 F.3d at 442. The court concluded that these rationale applied to witness affidavits and found absolute immunity. Similarly in *Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 725 (6th Cir. 2011), the Sixth Circuit quoted with approval *Thomason v. SCAN Volunteer Servs., Inc.,* 85 F.3d 1365, 1373 (8th Cir.1996), to afford a witness absolute immunity for executing an affidavit: "To the extent [defendant child welfare authorities] are sued because [defendant social worker] made arguably false statements in her affidavit in her role as a witness before the state court, the doctrine of absolute witness immunity applies." Grote is entitled to absolute witness immunity for signing the affidavit in question.

In addition to absolute witness immunity, Grote is entitled to dismissal on the basis that the Amended Complaint simply does not state an actionable RICO claim against her. 18 U.S.C. § 1962(c) provides:

"(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

"To state a RICO claim, a plaintiff must plead the following elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' *Moon v. Harrison Piping Supply,* 465 F.3d 719, 723 (6th Cir.2006) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985))." *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 791 (6th Cir. 2012) *cert. denied,* 133 S. Ct. 2735, 186 L. Ed. 2d 192 (U.S. 2013). 18 U.S.C. § 1961(4) defines an "enterprise" to include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(5) defines "pattern of racketeering activity" to

require "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

In *Reves v. Ernst & Young,* 507 U.S. 170 at 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court held that participation in the conduct of an enterprise's affairs requires proof that the defendant participated in the "operation or management" of the enterprise. *Id*. at 183. RICO liability is not limited to those with primary responsibility for the enterprise's affairs; only "some part" in directing the enterprise's affairs is required. *Id.* at 179. However, defendants must have "conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Id.* at 185 (emphasis in original). "[S]ome part in directing the enterprise's affairs is required." *Id*. at 179 (emphasis in original). The Supreme Court went on to explain the relatively limited scope of RICO:

> It is clear from other remarks, however, that Congress did not intend RICO to extend beyond the acquisition or operation of an enterprise. While S. 30 was being considered, critics of the bill raised concerns that racketeering activity was defined so broadly that RICO would reach many crimes not necessarily typical of organized crime. See 116 Cong.Rec. 18912–18914, 18939–18940 (1970) (remarks of Sen. McClellan). Senator McClellan reassured the bill's critics that the critical limitation was not to be found in § 1961(1)'s list of predicate crimes but in the statute's other requirements, including those of § 1962:
>
>> "The danger that commission of such offenses by other individuals would subject them to proceedings under title IX [RICO] is even smaller than any such danger under title III of the 1968 [Safe Streets] [A]ct, since commission of a crime listed under title IX provides only one element of title IX's prohibitions. Unless an individual not only commits such a crime but engages in a pattern of such violations, and uses that pattern to obtain or operate an interest in an interstate business, he is not made subject to proceedings under title IX." 116 Cong.Rec., at 18940.

18

> Thus, the legislative history confirms what we have already deduced from the language of § 1962(c)—that one is not liable under that provision unless one has participated in the operation or management of the enterprise itself.

*Id.* at 182-183.

The plaintiffs have certainly not alleged that Peggy Grote participated in the "operation or management" of the "enterprise" (whatever that might be). The failure to do so is fatal to the RICO claim asserted against her. In *Stone v. Kirk*, 8 F.3d 1079 (6th Cir. 1993), the Sixth Circuit held that a sales representative of a company allegedly engaged in RICO violations was not subject to liability under RICO. "Mr. Kirk was associated with the Sagittarius entity as a sales representative, just as Arthur Young was associated with the *Reves* co-op as an auditor. Mr. Kirk engaged in a pattern of racketeering activity when he repeatedly violated the anti-fraud provisions of the securities laws, just as Arthur Young did. But Mr. Kirk, like Arthur Young, did not participate in the "operation or management" of the RICO entity with which he was associated—and because he was not a participant in the operation or management of the Sagittarius entity, and had no part in directing its affairs, Mr. Kirk cannot be held liable under § 1962(c)." *Id*. at 1092. The same result must follow in this case.

Additionally, the plaintiffs have failed to allege facts from which the court can conclude there is a RICO enterprise in existence. In order to establish the existence of an "enterprise" under subsection (c), three elements must be proven: an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; that the members of the enterprise functioned as a continuing unit with established duties; and that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged. *Frank v. D'Ambrosi,* 4 F.3d 1378, 1386 (6th Cir.1993). The plaintiffs have not alleged the necessary elements of an "enterprise." The Supreme Court recently clarified what is required to show an

19

association-in-fact enterprise in *Boyle v. United States,* 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). The Court stated that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. "An association-in-fact enterprise 'require[s] a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach.' *VanDenBroeck v. CommonPoint Mortg. Co.,* 210 F.3d 696, 699 (6th Cir.2000), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008)." *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 794 (6th Cir. 2012) *cert. denied,* 133 S. Ct. 2735, 186 L. Ed. 2d 192 (U.S. 2013).

The plaintiffs have made rote allegations of the existence of a RICO enterprise. In Paragraph 292 plaintiffs allege: "The RICO enterprise consists of all the defendants who, associated in fact, worked through the enterprise to commit a pattern of racketeering, which included the specific predicate acts alleged here in." This is a classic example of circular reasoning. All paragraph 292 does is state that the RICO enterprise consists of the people in the RICO enterprise who use the RICO enterprise to commit RICO violations. One is no closer to being able to identify the RICO enterprise after reading ¶ 292 than one was before reading ¶ 292. Plaintiffs have failed to allege the three elements of an association in fact enterprise. There is no allegation of any "organizational structure" that allows the reasonable inference that an association in fact existed.

Finally, and perhaps most basically, plaintiffs have failed to allege a prima facie RICO claim against Grote as there are no predicate acts alleged. 18 U.S.C. § 1961(5) defines "pattern of racketeering activity" to require "at least two acts of racketeering activity. . ." The only

"predicate act" plaintiffs have alleged against Grote is her alleged "perjury" in signing the affidavit. The federal criminal statute prohibiting perjury, 18 U.S.C. § 1621, does not appear among the statutes listed in § 1961(1)(B), which lists the federal statutory violations that constitute the necessary predicate acts to support a RICO claim. *United States v. Eisen,* 974 F.2d 246, 254 (2d Cir.1992); *Ho Myung Moolsan Co., Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 260 (S.D.N.Y. 2009). As the Seventh Circuit succinctly stated: "For starters, we know that telling a lie or committing perjury is not *per se* a RICO predicate act for one simple reason: it is not included among the list of predicate acts in 18 U.S.C. § 1961(1)." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1021 (7th Cir. 1992).

Some courts have found perjury to be a predicate act under the theory that the RICO statute specifies that acts indictable under the obstruction of justice statute (18 U.S.C. § 1503) are RICO predicate acts, *see* 18 U.S.C. § 1961(1)(B). However, § 1503 applies only to perjury offered in federal court proceedings. *See O'Malley v. New York City Transit. Auth.,* 896 F.2d 704, 708 (2d Cir.1990) (finding that plaintiff failed to state a violation of § 1503 where the alleged acts took place in "state judicial or administrative courts, not in a federal court as required by § 1503"). Here, all of the alleged "perjury" took place in state court, not federal court. Thus, § 1503 is not implicated by plaintiffs' perjury allegations. *See Streck v. Peters*, 855 F. Supp. 1156, 1162 (D. Haw. 1994); *United States v. Van Engel,* 15 F.3d 623, 627 (7th Cir.1993) (obstruction of state court proceedings is not a RICO predicate act—to implicate 18 U.S.C. § 1503, the conduct must arise out of *federal* judicial proceedings.) In the absence of a predicate act, Grote cannot be liable under a RICO theory.

Plaintiffs attempt to allege other predicate acts against Grote, but the allegations in the Amended Complaint are insufficient on their face to avoid dismissal. For example, in ¶ 343

plaintiffs allege: "Defendant Grote committed mail fraud, and perjury, when she signed an affidavit, (*see* **Exhibit 14**) stating that the May 10, 2013 ex parte communication never happened.   This was a blatant lie belied by the recording of the conversation." There are numerous deficiencies in ¶ 343. First, plaintiffs seem to have difficulty reading and understanding the English language. Based on the actual language in affidavit itself, which plaintiffs attached to the Amended Complaint, Grote never stated "ex parte communications never happened." Her affidavit states that she didn't ***hear*** certain statements, not that no ex parte communications occurred. The patently false allegation in ¶ 343 must be disregarded by the court. Further, while plaintiffs allege mail fraud, there is not a single factual allegation to support that claim. Where plaintiffs' RICO claims require proof of mail or wire fraud as an element, the plaintiffs must satisfy the heightened particularity requirements of Fed. R. Civ. P. 9(b) with respect to the elements of fraud. "Rule 9(b) states that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.,* 668 F.3d 393, 403 (6th Cir.2012) (quoting Fed. R. Civ. P. 9(b)). This requirement includes alleging the "time, place, and content" of the fraudulent acts, the existence of a fraudulent scheme, the intent of the participants in the scheme, and "the injury resulting from the fraud." *Id.* Here, plaintiffs have utterly failed to meet the pleading obligation.

Plaintiff also alleges in Count III the non-existent claim of RICO Aiding and Abetting. This claim – asserted only against Grote – is based on the allegation that she removed an order from the court file. In ¶ 384 plaintiffs allege: "Defendant Grote also aided and abetted the RICO Enterprise when she destroyed a filing in the Collection Action submitted by HLV counsel, thus subverting counsel's efforts to gain compliance with the binding court orders and settlement agreement." The Aiding and Abetting claim has already been addressed. However, giving the

plaintiffs the benefit of every doubt, it is also conceivable that plaintiffs are alleging obstruction of justice as a predicate offense based on the allegations in ¶ 359: "Defendants further obstructed justice when they removed the suspect order from the court file. . ." Even assuming plaintiffs were attempting to assert obstruction of justice against Grote as a predicate offense (which is highly doubtful), the conduct alleged simply does not fall within 18 U.S.C. § 1503, as the conduct did not arise out of *federal* judicial proceedings.

For all of the foregoing reasons plaintiffs have failed to state a claim upon which relief can be granted as to Peggy Grote and she is entitled to dismissal under Fed. R. Civ. P. 12(b)(6).

### III. DEFENDANT VAN BUREN COUNTY IS ENTITLED TO DISMISSAL OF THE MALICIOUS PROSECUTION CLAIM ON THE BASIS OF GOVERNMENTAL IMMUNITY.

Count VI alleges malicious prosecution against, *inter alia*, Van Buren County. Governmental immunity from tort liability is governed by the operation of M.C.L. 691.1407. Immunity is broadly interpreted and exceptions to it are narrowly construed. *Frohriep v. Flanagan,* 275 Mich.App. 456, 468, 739 N.W.2d 645 (2007), *rev'd in part on other grounds* 480 Mich. 962, 741 N.W.2d 516 (2007). The governmental tort liability act (GTLA), MCL 691.1401 *et seq.,* grants immunity from tort liability to the state, as well its agencies when they are engaged in the exercise of a governmental function, except where the Legislature has expressly granted an exception. MCL 691.1407(1).

M.C.L. 691.1401(a) defines governmental agency as "this state or a political subdivision." M.C.L. 691.1401(b) defines governmental function as "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." Plaintiffs allege in Count VI that Van Buren County, Bedford and McKay committed malicious prosecution by bringing charges against Robert Baker and Donovan Visser. First,

23

Donovan Visser is not a plaintiff and any allegations related to him are completely irrelevant. Moreover, there is not a single mention of Van Buren County in Count VI, apart from its name being included in the title of the count. Finally, the operation of a Prosecuting Attorney's office is a governmental function; that is, it is an activity mandated by constitution and statute. Mich. Const. art. VII, § 4 provides:

> There shall be elected for four-year terms in each organized county a sheriff, a county clerk, a county treasurer, a register of deeds and a prosecuting attorney, whose duties and powers shall be provided by law. The board of supervisors in any county may combine the offices of county clerk and register of deeds in one office or separate the same at pleasure.

M.C.L. 49.153 provides:

> The prosecuting attorneys shall, in their respective counties, appear for the state or county, and prosecute or defend in all the courts of the county, all prosecutions, suits, applications and motions whether civil or criminal, in which the state or county may be a party or interested.

M.C.L. 168.200 provides:

> A county clerk, a county treasurer, a register of deeds, a prosecuting attorney, a sheriff, a drain commissioner, and a surveyor shall be elected at the 2000 general November election and every fourth year after that.

M.C.L. 561.9 provides:

> The expenses and compensation of the prosecuting attorney, the county clerk and the register of deeds in carrying out the provisions of this act shall be paid from the general fund of the county

Thus, counties in the State of Michigan are mandated by state constitution and statute to operate and fund a prosecuting attorney's office. The operation of a prosecutor's office constitutes a governmental function.

### IV. DEFENDANT VAN BUREN COUNTY IS ENTITLED TO DISMISSAL OF THE CLAIM AGAINST IT BASED ON 42 U.S.C. § 1983.

The plaintiffs lack a basic understanding of the concept of municipal liability under 42 U.S.C. § 1983. "A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *See Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir.2005). A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell,* 436 U.S. at 694." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). There are four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom. "The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Id.; Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Stemler v. City of Florence,* 126 F.3d 856, 865 (6th Cir.1997); *Doe v. Claiborne County,* 103 F.3d 495, 507 (6th Cir.1996)." *Thomas v. City of Chattanooga*, 398 F.3d at 429.

Here, plaintiffs have alleged none of the necessary elements to make out a claim of municipal liability against Van Buren County. Here are the specific allegations plaintiffs assert against Van Buren County:

> 411. The County knew that Defendant Bedford was violating the law, peddling influence, and harming Van Buren County citizens. The County purposely turned a blind eye or in the very least was deliberately indifferent to Defendant Bedford's action because they

did not and have not removed him from office or taken some other remedial action to prevent further harm.

412. Thus, the County sat idly by when Defendants Page and Stewart exchanged hunting trips and other items of value for Defendants Bedford's and McKay's willingness to prosecute, without just cause, Donovan Visser and Robert Baker.

413. Had the County not been deliberately indifferent, Plaintiff Baker would never have suffered the indignity, mental distress, or expense caused by this unfounded criminal prosecution.

However, contrary to the suggestion in plaintiffs' Amended Complaint, the County has no authority to discipline or remove the prosecutor. M.C.L. 168.207 provides that only the Governor has the authority to remove a prosecuting attorney:

The governor may remove any and all county officers named in section 200 of this chapter when he shall be satisfied from sufficient evidence submitted to him, as hereinafter provided, that such officer has been guilty of official misconduct, or of wilful neglect of duty, or of extortion, or habitual drunkenness, or has been convicted of being drunk, or whenever it shall appear by a certified copy of the judgment of a court of record of this state that such officer, after his election or appointment, shall have been convicted of a felony; but the governor shall take no action upon any such charges made to him against any such officer until the same shall have been exhibited to him in writing, verified by the affidavit of the party making them, that he believes the charges to be true.

More to the point, none of the allegations, if true, result in municipal liability. The County cannot be liable under 42 U.S.C. § 1983 for the acts of a rogue elected official. Moreover, the plaintiffs do not allege any previous constitutional violations were visited upon others. Self-dealing may be illegal and inappropriate, but the Constitution is not a remedial measure instituted to police local governmental ethics. In the absence of prior constitutional harm, the activities of individuals associated with the government simply do not give rise to municipal liability. There is not a single allegation in the Amended Complaint that gives rise to a colorablr claim of liability against Van Buren County.

## V.   DEFENDANT PAUL HAMRE IS ENTITLED TO DISMISSAL OF COUNT VII ALLEGING TORTIOUS INTERFERENCE WITH CONTRACT ON THE BASIS OF ABSOLUTE IMMUNITY.

Count VII of the Amended Complaint is addressed only against Judge Paul Hamre and alleges tortious interference with contract. Judge Hamre is entitled to dismissal of this claim on the basis of absolute immunity as set forth in M.C.L. 691.1407(5), which provides: "A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority."

Plaintiffs allege Judge Hamre issued an opinion on March 26, 2013 altering the parties' settlement agreement to the detriment of HLV. (Amended Complaint, ¶ 347). Plaintiffs attempt to avoid an absolute immunity defense by alleging the March 26, 2013 decision was not within the scope of his judicial duties. (Amended Complaint, ¶ 348). The allegations in the Amended Complaint conclusively demonstrate Judge Hamre's actions were within the scope of his judicial authority. As a result, he is entitled to dismissal of Count VII on the basis of absolute immunity.

There are few Michigan cases construing the absolute immunity afforded judges under M.C.L. 691.1407(5). However, the cases that have addressed the issue demonstrate beyond dispute that Judge Hamre is entitled to absolute immunity. In *McCarthy v. Sosnick*, 293482, 2011 WL 4424344 (Mich. Ct. App. Sept. 22, 2011), (Exhibit A), plaintiff was the subject of both an Oakland Circuit Court child protection proceeding filed by the Department of Human Services (DHS), and criminal charges brought by the Oakland Country Prosecutor after plaintiff's children accused him of inappropriate sexual conduct. After the children recanted their allegations, the child protection proceeding and criminal charges were dismissed. Plaintiff later filed an action against the DHS and other defendants in the Oakland Circuit Court (the "DHS action"). That

case was assigned to Oakland Circuit Court Judge Edward Sosnick, who granted summary disposition in favor of the defendants and dismissed plaintiff's claims. Plaintiff then sued numerous defendants, including Judge Sosnick. The Court of Appeals affirmed dismissal of the claims against Judge Sosnick.

"Here, plaintiff has not established that the trial court erred in granting summary disposition in favor of defendant Sosnick with respect to the claims for fraud and intentional infliction of emotional distress, which were factually based on defendant Sosnick's judicial actions in the DHS action. Under MCL 691.1407(5), a judge is absolutely immune from tort liability when acting in the scope of his or her judicial authority." *McCarthy v. Sosnick*, *supra*. "Plaintiff's tort claims against defendant Sosnick were based on his decisions in the DHS action. Because defendant Sosnick was acting within the scope of his judicial authority when deciding the motions in the DHS action, he was entitled to judicial immunity under MCL 691.1407(5) with respect to the tort claims." *Id.*

In *Mangano v. Saffady*, 302893, 2012 WL 1314130 (Mich. Ct. App. Apr. 17, 2012), (Exhibit B), the Court of Appeals again affirmed summary disposition of a judge under 1407(5): "By appointing Saffady to serve as receiver of plaintiffs' assets and by overseeing Saffady's performance in this regard, Chief Judge Lowe was clearly acting within the scope of his judicial authority." In *Olsen v. Cnty. of Muskegon*, 233258, 2002 WL 31934158 (Mich. Ct. App. Nov. 19, 2002) (Exhibit C), the Court of Appeals *sua sponte* dismissed claims against a circuit court judge on the basis of absolute judicial immunity. "Here, Judge Hicks was acting within the scope of his authority pursuant to MCR 8.110 in terminating plaintiff's employment; therefore, the judge's motive and purpose in firing plaintiff, ***even if driven by an unlawful intent***, is irrelevant.

Accordingly, Judge Hicks was protected by judicial immunity under M.C.L. § 691.1407(5), and plaintiff failed to state a cause of action in avoidance of immunity." (Emphasis added).

Judge Hamre is entitled to dismissal on the basis of absolute immunity under M.C.L. 691.1407(5).

## RELIEF REQUESTED

Defendants Paul Hamre, Peggy Grote and Van Buren County respectfully request the court grant their motion to dismiss under Rule 12(b)(6), dismiss the plaintiffs' Amended Complaint with prejudice and award defendants their actual, reasonable attorney fees pursuant to 42 U.S.C. § 1988.

Respectfully submitted,

DATED:  June 4, 2014                    PLUNKETT COONEY


BY:____/s/ Michael S. Bogren_____
          Michael S. Bogren (P34835)
          Attorney for Defendants Hamre, Grote and
          Van Buren County

BUSINESS ADDRESS:
950 Trade Centre Way, Suite 310
Kalamazoo, MI  49002
**Direct Dial:  269/226-8822**

Open.00560.40060.14143389-1