UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| HLV, LLC, ET AL.<br>Plaintiffs,<br><br>-v-<br><br>COUNTY OF VAN BUREN, ET AL.,<br>Defendants. | ) | No. 1:13-cv-1366<br><br>HONORABLE PAUL L. MALONEY |

**OPINION AND ORDER GRANTING MOTIONS TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on the motion to dismiss filed by Peggy Grote, Paul Hamre, and Van Buren County (ECF No. 54), the motion to dismiss filed by Michael Bedford (ECF No. 56), and the motion for summary judgment filed by Michael McKay (ECF No. 60). In their first amended complaint, Plaintiffs HLV, LLC, Landworthy Container, and Robert Baker ("HLV") allege seven counts, all stemming from the alleged misconduct of various state and judicial officials regarding Plaintiffs' attempt to collect a debt owed to them by ELC Leasing and William Engle. The claims include (I) RICO § 1962(c); (II) RICO Conspiracy; (III) RICO Aiding and Abetting; (IV) 42 U.S.C. § 1983; (V) 42 U.S.C. § 1983; (VI) Malicious Prosecution; (VII) Tortious Interference with Contract. In the motions before the Court, the Defendants assert judicial immunity, witness immunity, governmental immunity, and prosecutorial immunity arguments, as well as defects in adequately pleading RICO violations and municipal liability. In response to the Defendants' motions, Plaintiffs filed a consolidated response (ECF No. 67) and the Defendants filed replies (Grote, Hamre, Van Buren, ECF No. 75; Bedford, ECF No. 71; McKay, ECF No. 70).

For the reasons discussed below, the motions to dismiss and motion for summary judgment will be **GRANTED**. The claims against Defendants Grote, Hamre, Van Buren County, Bedford, and McKay will

be **DISMISSED**.

## LEGAL FRAMEWORK

### A. Motions to Dismiss

Under the notice pleading requirements, a complaint must contain a short and plain statement of the claim showing how the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests whether a cognizable claim has been pled in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). Although the court considers the well-pled factual allegations in the complaint, a motion to dismiss turns exclusively on questions of law. *See Thomas v. Arn*, 474 U.S. 140, 150 n.8 (1985); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 674-75 (2009) ("Evaluating the sufficiency of the complaint is not a 'fact-based' question of law . . .").

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide sufficient factual allegations that, if accepted as true, are sufficient "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true . . . ." *Id.* (internal citation omitted). Only enough facts are required "to state a claim to relief that is plausible on its face." *Id.* at 570; *see Iqbal*, 129 S. Ct. at 1949. "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556). The plausibility standard is not the same thing as "a probability requirement, but it asks for more than a

sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 129 S. Ct. at 1949 (internal quotations and citations omitted). When considering a motion to dismiss, a court must accept as true all factual allegations, but need not accept any legal conclusions. *Ctr. for Bio-Ethical Reform*, 648 F.3d at 369. Plausibility is determined in light of the context of the allegations. *Id.*

**B. Motion for Summary Judgment**

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts, supported by evidence in the record, showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252. The function of the district court "is not to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for trial." *Resolution Trust Corp. v. Myers*, 9 F.3d 1548 (6th Cir. 1993) *(citing Anderson,* 477 U.S. at 249).

**HAMRE, GROTE, AND VAN BUREN COUNTY MOTION TO DISMISS**

**A. Background**

Accepting the facts contained in the complaint as true, the background of this case is as follows. This dispute began with a state court lawsuit, *HLV, LLC v. ELC Leasing, et al.*, in which HLV sought to collect a debt of $600,000 that ELC Leasing and its owner, William Engle, owed to HLV. HLV assigned its rights to that debt to Landworthy. Robert Baker is the manager of Landworthy and a representative of HLV. Attorneys Visser and Associates represented HLV in the collection action, which was filed in Van Buren County and originally assigned to the Honorable Kathleen Brickley. On September 19, 2012, the parties to that action stipulated to a settlement agreement. The agreement required Engle to transfer approximately 600 trailers and containers owned by his trailer rental/leasing business to HLV, along with the book of business that went along with the trailers, including the rights to future rent payments from those in possession of the trailers and containers. Engle was allowed to redeem any of the assets by paying cash to HLV for 90 days, but at the expiration of that 90-day term, all of the assets would go to HLV. Engle was required to cooperate in locating all of the trailers and containers.

The settlement agreement was later amended to add three additional terms: (1) If Engle could not produce 600 trailers by the deadline, he would pay in cash or other machinery $2,500 per container/trailer; (2) Engle and ELC would not sell, move, hide, etc. any of its assets; and (3) HLV had a right to inspect the records and books of the trailer business. This amended settlement ( the "first amended settlement agreement") was signed by Defendant Judge Paul Hamre and entered on October 11, 2012.

Beginning the process contemplated by the settlement, ELC executed a Bill of Sale and Assignment of Leases on November 27, 2012. Ninety days later, ELC had not paid anything to redeem its property, so HLV was entitled to the 600 trailers under the agreement as of December 19, 2012. However, Engle and ELC refused to cooperate with efforts to locate its assets and recover the trailers. Engle and ELC retained defendant attorneys Page and Stewart and attorney William Donovan to represent them in the collection action at some point.

In early March 2013, Judge Hamre approved an ex parte TRO that enjoined HLV from collecting any assets from Engle or ELC. In response, HLV filed a motion for contempt against ELC for violation of the settlement agreement. Judge Hamre held a hearing on the motion for a preliminary injunction on March 20, 2013 and took the matter under advisement. The TRO was not continued from the bench. The next day, HLV tried again to collect its assets, but a day later Judge Hamre approve another ex parte order extending the TRO until further order of the court. On March 26, 2013, Judge Hamre issued an Order addressing the matters heard at the hearing, but not the motion for contempt. The Order (the "second amendment to the settlement agreement") held that ELC and Engle were required to provide a minimum of 347 trailers, rather than 600, to see if those trailers would satisfy the outstanding debt. HLV's motion for reconsideration of that order was denied on April 24, 2013.

On April 9, 2013, Donovan Visser, Rebecca Baker, and Robert Baker visited ELC's office to inspect the books and records, as they were authorized to do under the first amended settlement agreement. Because Engle was not present at that time, ELC employees urged the Plaintiffs to wait for him to return. Visser began to pick up boxes containing the records, but ELC employees forcibly took the boxes from him, unplugged a computer and took it to another room to avoid Visser accessing the records

on it, and blocked the HLV representatives' vehicle in so they could not leave. Sheriff's Deputy Dan Perkins arrived at the office in response to an ELC employee's call to the Sheriff's Department. An ELC employee provided Perkins with the second amendment to the settlement agreement, asserting that the HLV representatives were not allowed to be on the property or take the records from the property under that Order. Visser then presented the first amended settlement agreement, which contained the provision allowing for the inspection of the books. Deputy Perkins phoned Judge Hamre to determine which order prevailed. According to the incident report, Judge Hamre told Deputy Perkins that Visser was being deceptive if he was trying to use the earlier order when there was a more recent court order. Perkins passed the phone to Visser, who spoke with Judge Hamre for a moment concerning whether the second amendment to the settlement superceded or overrode the provisions of the first amended agreement. Judge Hamre then advised Perkins that Visser should bring up the issue in court. When Perkins told Judge Hamre that he was considering pursuing criminal charges, Judge Hamre told him that he "had no input on that side of the proceedings." (See Ex. 7 to Complaint, ECF No. 49-7.)

Deputy Perkins investigated the incident. ELC secretary Brenda Turner complained that Visser pushed her. Although she indicated she was not in pain that day, a few days later her boss reported that she had developed a limp. Plaintiff Baker told Perkins that he recorded the incident on his cell phone, and Perkins reviewed the video after obtaining a search warrant. Perkins did not see anything criminal in nature on the video, but forwarded the report to Defendant Mike Bedford in the prosecutor's office for possible assault and trespassing charges.

The next day, Judge Hamre issued a Show Cause for Contempt Order against HLV and Visser and Associates based on reports that HLV was attempting to collect the debt under a prior settlement

agreement. HLV also renewed its motion for contempt based on ELC's failure to comply with the original settlement agreement. At a hearing on May 6, 2013, Judge Hamre found that HLV did not make a prima facie case of contempt and thus no evidentiary hearing was held. Instead, HLV alleges that Judge Hamre tried to negotiate a new settlement agreement. The court ordered that ELC had additional time to try to sell the trailers and containers, prohibited HLV from selling the trailers that had been conveyed to it, ordered Engle not to contact any former client whose payments and leases had been assigned to HLV, and ordered Visser and Associates to submit a report of the trailers that had been given to HLV. A status conference was held on May 10, 2013 by telephone. Judge Hamre, Kelly Page, and Gary Stewart, Jr. participated from Judge Hamre's office, while Donovan and Donald Visser, William Donovan, and Rebecca and Robert Baker joined by phone. After pushing HLV to accept partial payment to no avail, Judge Hamre scheduled a hearing for the following Monday, which Donald Visser objected to because no motion was pending. The objection was overruled.

After the scheduling conference concluded but before HLV's attorneys and representatives hung up, Judge Hamre, Page, and Stewart engaged in a conversation that HLV recorded without the Defendants' knowledge. According to the transcript made of the conversation, these three Defendants discussed the case, cracked jokes, and described Plaintiffs' attorneys with derogatory terms, and Judge Hamre expressed his willingness to revise the settlement and continue the injunction. At some point, Judge Hamre's secretary, Peggy Grote, entered the office with the report submitted by HLV, but Judge Hamre instructed her to throw it away.

On May 8, 2013, criminal charges for assault and trespassing were filed against Visser and Robert Baker based on the incident at ELC's office on April 9, 2013. Plaintiffs allege that Judge Hamre, Page, and

Stewart influenced the prosecutor's decision to press charges without cause. Baker was arraigned on June 5, 2013, but the charges against him were dropped on June 19, 2013. Visser was arraigned on May 22, 2013, and proceeded to trial on December 6, 2013. The trespass charge was dismissed by directed verdict and the assault charges caused a hung jury.

HLV filed a motion to disqualify Judge Hamre on May 13, 2013. In response to the motion, Page and Stewart filed an affidavit from Grote that stated that the office door was open during the conversation and she did not recall hearing any inappropriate language coming from the Defendants or any additional conversation or laughter after the conference was over. Plaintiffs believe the affidavit constitutes perjury. Judge Hamre denied the motion to disqualify on May 24, 2013, but he issued an order of recusal that same day, noting that he might be a witness in the criminal case against Visser and Baker. The case was then reassigned by the Supreme Court Administrative Office to Judge Michael Dodge in Cass County. Judge Dodge vacated all of the orders issued by Judge Hamre except for the order approving the first amended settlement issued on October 11, 2012. Plaintiffs filed this suit in December 2013.

**B. Analysis**

In this motion, Judge Hamre argues that he is entitled to absolute judicial immunity from suit because the allegations against him all involve solely the performance of judicial functions. Next, the motion asserts that Peggy Grote is entitled to immunity from civil claims based on absolute witness immunity, and that the complaint does not assert actionable RICO claims against her. Van Buren County argues that the malicious prosecution claim cannot continue against it because of governmental immunity. Finally, Van Buren County argues that the § 1983 claim must be dismissed because Plaintiffs have not established municipal liability. Each Defendant's arguments are addressed below.

*1. Judge Hamre*

Judge Hamre is implicated in Count I (RICO), Count II (RICO Conspiracy), Count IV (§ 1983), and Count VII (Tortious Interference with Contract). Generally, judges are immune from suits for money damages. *Forrester v. White,* 484 U.S. 219 (1988). Specifically, judges are absolutely immune from individual liability for the performance of any "judicial act" unless they acted in the clear absence of jurisdiction. *Mireles*, 502 U.S. at 11. Immunity protects judges even if they are accused of acting maliciously and corruptly. *Pierson v. Ray,* 386 U.S. 547, 554 (1967). Judicial immunity can only be overcome in two situations: when the plaintiff alleges (1) nonjudicial actions, not taken in the judge's judicial capacity, or (2) judicial actions taken in the complete and clear absence of jurisdiction. *Bradley v. Fisher,* 80 U.S. 335 (1871); *King v. Love*, 766 F.2d 962, 966 (6th Cir. 1985). The Sixth Circuit has explicitly recognized that judges can enjoy immunity from § 1983 and RICO claims unless one of the two exceptions is met. *Culinan v. Abramson*, 128 F.3d 301, 308 (6th Cir. 1997).

To determine if an act is judicial, courts examine "whether it is a function normally performed by the judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Mireles v. Waco*, 502 U.S. 9, 12 (1991) (quoting *Stump v. Sparkman*, 435 U.S. 349, 362 (1978)). "The relevant inquiry is the 'nature' and 'function' of the act, not the 'act itself.'" Thus, the general function normally performed by a judge is to be examined, and the act "does not become less judicial by virtue of an allegation of malice or corruption of motive." *Mireles*, 502 U.S. at 13 (quoting *Forrester*, 484 U.S. at 227). For example, in *Mireles*, the judge performed a judicial function when he ordered police officers to use excessive force to bring in a defendant who failed to appear into his courtroom. *Id.* at 10. The function was judicial because judges normally direct court officers to bring people before them–it was

not made less judicial by the improper order to use excessive force. *Id.* at 12-13. Indeed, the Sixth Circuit held that "judicial immunity applies to acts performed maliciously and corruptly as well as acts performed in bad faith or with malice." *Brookings v. Clunk*, 389 F.3d 614, 617 (6th Cir. 2004). Additionally, any action that affects only the parties in a specific judicial proceeding will be a "paradigmatic judicial act." *See Mann v. Conlin*, 22 F.3d 100, 104 (6th Cir. 1994).

The next consideration is whether the activity was taken in the complete absence of jurisdiction. "A judge acts in the complete absence of jurisdiction only if a matter was clearly outside the court's subject matter jurisdiction." *Marshall v. Bowles*, 92 F. App'x 283, 285 (6th Cir. 2004). The judge is still immune, even if he exceeds his authority in resolving a matter, if the court has subject matter jurisdiction over the matter. *King,* 766 F.2d at 968. Neither procedural errors nor a lack of a statute authorizing the judge's actions make him or her liable: "A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." *Stump,* 435 U.S. at 359.

Here, Defendants argue that Judge Hamre's challenged actions were entirely judicial functions, and Plaintiffs have not alleged either exception to immunity. They argue that all of Judge Hamre's actions directly involved the adjudication of the Plaintiffs' claims in the state lawsuit and even if the changes to the settlement agreement were motivated by improper or illegal considerations, he is still entitled to absolute judicial immunity. In response, Plaintiffs argue that Judge Hamre took actions that were both non-judicial and without jurisdiction. First, Plaintiffs assert that Judge Hamre exceeded his authority to issue sua sponte and ex parte orders, which violated Plaintiffs' due process rights to notice and an opportunity to be heard. The allegedly extrajudicial orders include (1) the ex parte TRO issued in early March 2013; (2) the extension of the TRO on March 21, 2013, and (3) the March 26, 2013 Order After Hearing. Second,

Plaintiffs argue that Judge Hamre's actions relating to the initiation of criminal charges against Baker and Visser were non-judicial acts because judges do not enjoy immunity for prosecutorial acts. At oral argument, Plaintiffs expanded their theory to allege that Judge Hamre engaged in non-judicial acts through his role as an officer for the non-profit Van Buren County Drug Treatment Court Foundation, which was created to help provide substance abuse treatment for non-violent offenders. Plaintiffs allege that Hamre helped facilitate payments from members of the private bar, including Page and Stewart, to members of the judiciary and prosecution through the Foundation, effectively administering a bribery system.

Plaintiffs' argument that the sua sponte orders were issued without jurisdiction is unpersuasive. To start, there is no argument that the court lacked subject matter jurisdiction over the collection matter. The Van Buren County Circuit Court is a trial court of general jurisdiction and is given "original jurisdiction in all matters not prohibited by law" by the Michigan Constitution. Mich. Const. Art. VI, §§ 1, 13. Because Judge Hamre had subject matter jurisdiction over the collection suit, all of his actions taken to adjudicate that case were within the court's jurisdiction. He may have exceeded his authority, committed grave procedural errors, or acted beyond the power given to him by statute, but these questions are irrelevant to the immunity analysis. *See Stump,* 435 U.S. at 359; *Marshall*, 92 F. App'x at 285; *King,* 766 F.2d at 968.

Further, the issuance or extension of ex parte TROs is authorized without notice to the opposing party in certain circumstances. *See* M.C.R. 3.310(b)(1). Defendants correctly assert that "whether those conditions existed or not, and whether the TRO should have been granted or not are issues of law for appellate review." (ECF No. 75 at PgID #1987.) The March 26, 2013 Order After Hearing was also a normal part of adjudication; Judge Hamre determined that a settlement agreement filed by one party did

not accurately reflect the parties' agreement and modified the required transfers so that HLV would be made whole on the debt but not receive a windfall. Again, the propriety of this decision is an issue for appellate review, but there is no tenable argument that this is not a function normally undertaken by judges. Further, the parties were clearly dealing with Judge Hamre in his judicial capacity as he presided over the collection dispute. Ultimately, even if the sua sponte orders were improper or violated the parties' rights, Judge Hamre was not acting in the complete absence of jurisdiction and he is still entitled to immunity.

The next issue is whether Judge Hamre is immune from Plaintiffs' charges that he was involved in the criminal prosecutions of Visser and Baker. Plaintiffs allege that Judge Hamre's statement to Detective Perkins that Visser was being "deceptive" implicitly encouraged a criminal prosecution, and that the order to show cause issued the next day was "designed to bolster the trumped up trespassing and assault charges." Additionally, Plaintiffs argue that Judge Hamre's answer to HLV's motion to disqualify (Ex. 13, ECF No. 49-13) contained information not in the police report, so they believe it is reasonable to conclude that Hamre spoke to someone other than Deputy Perkins about the criminal charges. Finally, both Bedford and McKay deny that they initiated the charges against Visser and Baker, which Plaintiffs argue creates at least a fact issue concerning Judge Hamre's involvement in the decision to prosecute Visser and Baker. In response, Defendants argue that Plaintiffs cannot establish a claim by attaching their subjective interpretations to Judge Hamre's actions. They also argue that if the police report does not identify a crime being committed, the claim that Hamre somehow caused the prosecution is impossible. Ultimately, Defendants argue that Judge Hamre's statements to Deputy Perkins are entitled to judicial immunity because he was speaking as the judge presiding over the case.

Here, even if the facts pled in the complaint are taken as true, they do not plausibly suggest an

entitlement to relief. Defendants are correct that Judge Hamre is entitled to judicial immunity concerning his conversation with Deputy Perkins. That conversation was part of the process of adjudicating the collection action because he was consulted as to which court order governed the rights of the parties. Indeed, Plaintiffs admitted that the call was a judicial function at oral argument. Even if judicial immunity did not protect Judge Hamre, the complaint alleges and the police report documents that Judge Hamre said he had no input on whether to press criminal charges against Visser and Baker. Thus, even taking the facts in the complaint as true, Plaintiffs do not plead a colorable claim that Judge Hamre pushed for charges to be filed against Visser and Baker during his conversation with Deputy Perkins. Judge Hamre is also entitled to immunity concerning issuance of the order to show cause. Like the orders discussed above, the order to show cause is a normal judicial function and was done as part of the process of adjudicating the collection action.

The second allegation is that Judge Hamre somehow contacted the prosecutors after the incident and encouraged them to file charges against Visser and Baker. The complaint lacks any detail about when or how this occurred, but asserts that it is a reasonable assumption because Judge Hamre seemed to know more about the incident than what was contained in the police report. This type of conclusory statement is the type of blanket assertion that *Twombly* sought to eliminate. The complaint fails to adequately describe a plausible basis for concluding that Judge Hamre was involved in the prosecution's decision to initiate charges against Visser and Baker.

The third non-judicial act that Plaintiffs raised at oral argument concerns Judge Hamre's involvement in the Van Buren County Drug Treatment Court Foundation. The complaint alleges that Judge Hamre controlled the finances of the Foundation, "from which he enjoyed benefits." (ECF No. 49 at ¶

275.) The only illumination into what those "benefits" were is the allegation that Defendant Bedford used the assets of the Foundation to buy alcoholic drinks, dinners, and "other perks" for himself, Judge Hamre, and other members of the Foundation. Plaintiffs allege that Judge Hamre accepted these bribes through the Foundation in exchange for allowing Page and Stewart to influence his decisions in cases involving Page and Stewart's clients.

Plaintiffs only have standing to complain about Judge Hamre's actions that affected them and their collection suit; because they are not the Judicial Tenure Commission or prosecutors, they cannot rest a claim on the allegations that Judge Hamre misused non-profit funds or his position or engaged in illegal activities in connection with his involvement with the Foundation, except to the extent that it impacted the collection suit here. Thus, Plaintiffs' claim must rest on the allegation that Judge Hamre accepted money from Page and Stewart in exchange for issuing favorable rulings to ELC Leasing, a client of Page and Stewart, in the collection action brought by Plaintiffs. Again assuming for the sake of analysis that the complaint pleads sufficient detail about these allegations to satisfy *Twombly*, this claim nonetheless is barred by judicial immunity. A judge's motivation for his or her rulings is irrelevant if the court had jurisdiction over the matter and the judge was performing a judicial function. As noted above, a judicial act "does not become less judicial by virtue of an allegation of malice or corruption of motive," *Mireles*, 502 U.S. at 13, and "judicial immunity applies to acts performed maliciously and corruptly as well as acts performed in bad faith or with malice." *Brookings*, 389 F.3d 617. Also as noted above, Judge Hamre's actions in HLV's collection case, such as issuing TROs, modifying a settlement agreement, and issuing a contempt order, were judicial functions undertaken within the court's jurisdiction. Any alleged corruption or ill-motive does not remove those actions from the realm of judicial functions, and those actions are the only actions that

could form the basis of Plaintiffs' claim here. Thus, this argument fails.

Plaintiffs' final argument is that even if Judge Hamre is excused from the case, he will continue to be involved as a witness. Although it contains no argument, this section in the brief implicitly suggests that Judge Hamre should not be given immunity because he will nonetheless be subject to the burdens of litigation. This argument is facially invalid and lacks any support in the existing case law. The burden on a mere witness is substantially different from the burden on a party who may ultimately be subject to a judgement. Also, that Judge Hamre might need to be involved as a witness does not bear on any analysis of judicial immunity.

For these reasons, the motion to dismiss pertaining to Judge Hamre is **GRANTED**. The portions of Counts I, II, IV implicating Judge Hamre are **DISMISSED** and Claim VII is **DISMISSED** entirely.[1]

*2. Peggy Grote*

Plaintiffs bring two counts against Defendant Peggy Grote: (1) Count I alleging a RICO enterprise, and (2) Count III alleging a RICO aiding and abetting claim. Grote argues that there is no basis for "aiding and abetting" liability under RICO, and she is entitled to absolute witness immunity against the charge that she committed perjury when she submitted an affidavit. Alternatively, she argues that there is no actionable prima facie RICO claim alleged in the complaint because there are insufficient allegations of a RICO enterprise or predicate acts.

In response, Plaintiffs agree with the general principal that witnesses are entitled to immunity from

---

[1]In resolving Judge Hamre's Motion to Dismiss ultimately in his favor for the reasons and grounds set forth, this court in no way condones what appears to have been his dubious administration of the litigation before him.

liability for damages caused by their testimony. However, they argue that (1) witnesses are not immune from the consequences of their non-testimonial acts, (2) Grote's statement was not made as part of any lawsuit, and (3) there is an exception to witness immunity when fraudulent testimony is given as part of a larger fraudulent scheme.

The first issue is whether a private right of action exists under RICO for aiding and abetting, as Plaintiffs allege in Count III. Specifically, the complaint alleges that Grote aided and abetted the RICO enterprise by: (1) providing a false affidavit to HLV counsel and the Attorney Grievance Commission to conceal the enterprise, and (2) destroying a filing in the collection suit. The parties acknowledge that there is no binding Sixth Circuit authority addressing this issue, but many other courts have ruled on the availability of RICO "aiding and abetting" civil liability. The Court finds persuasive the Third Circuit's treatment of this issue.

In *Central Bank of Denver v. First Interstate Bank of Denver*, the Supreme Court ruled that the Securities Exchange Act of 1934 did not authorize private aiding and abetting suits, explaining: "Congress knew how to impose aiding and abetting liability when it chose to do so. If . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words "aid" and "abet" in the statutory text." 511 U.S. 164 (1994). The Third Circuit applied similar reasoning in the RICO context in *Rolo v. City Investing Co. Liquidating Trust*, holding that private plaintiffs cannot maintain a claim of aiding and abetting an alleged RICO violation. 155 F.3d 644 (3d Cir. 1998). Both cases found that the statutes contained no indication that Congress intended to create a private right of action for aiding and abetting violations and *Central Bank* recognized that there is no presumption in favor of recognizing civil aiding and abetting claims in the absence of such statutory authorization. The Third Circuit affirmed its

decision in the RICO context in *Pennsylvania Association of Edwards Heirs v. Rightenour*, 235 F.3d 839 (2000). Defendants also cite two district court cases in which the court found that no private cause of action exists. *See Young v. Wells Fargo & Co.* 671, F. Supp. 2d 1006, 1029 (S.D. Iowa 2009); *Devon IT, Inc. v. IBM Corp.*, 805 F. Supp. 2d 110, 126 (E.D. Pa. 2011). District courts in the Sixth Circuit have also recognized this conclusion in a number of unpublished opinions. *See, e.g., Wuliger v. Liberty Bank, N.A.*, No. 3:02-cv-1378, 2004 WL 3377416, at *10 (N.D. Ohio March 4, 2004); *HMV Properties, LLC v. IDC Ohio Mgmt., LLC*, No. 2:08-cv-895, 2011 WL 35166, at *14 (Jan. 6, 2011).

Although Plaintiffs are correct that *Central Bank* is not a RICO case, the Third Circuit acknowledged this in *Rightenour* and *Rolo* but found that a similar statutory analysis led to the conclusion that RICO also did not authorize private aiding and abetting suits. Thus, the earlier Third Circuit decision Plaintiffs cite–*Petro-Tech Inc. v. Western Co.*, 824 F.2d 1349 (3rd Cir. 1987)–is no longer good law. Plaintiffs also quote *HMV Properties*, in which the Southern District of Ohio noted that "the Sixth Circuit has not expressly ruled that RICO prohibits such an action [for aiding and abetting]". Again, this is true, but if one merely reads to the end of the paragraph, it is crystal clear that *HMV Properties* does not support Plaintiffs' position. Rather, that Court discussed *Central Bank* and *Rolo* and found that there is no private cause of action using statutory analysis. The Court is likewise unpersuaded by Plaintiffs' reference to *Wardlow v. Whiney National Bank*, No. 94-2026, 1994 WL 577442 (E.D. La. Oct. 17, 1994).

Ultimately, *Rightenour* and *Rolo* are persuasive, and the Courts finds that the RICO statute does not create a private right of action for RICO aiding and abetting. The motion to dismiss Count III is **GRANTED** and that count is **DISMISSED**.

The remaining claims against Grote are found in Count I, which alleges violations of RICO § 1962(c). Specifically, Count I alleges that the Defendants committed bribery, accepted bribes, and engaged in mail and wire fraud in furtherance of a scheme to defraud Plaintiffs. Plaintiffs' theory of Grote's involvement in the RICO enterprise is not explained within the count, but must be gleaned from the fact section of the First Amended Complaint. The main issue is whether Plaintiffs have adequately pled a RICO claim against Grote.

Plaintiffs' first theory of RICO liability centers on Grote's affidavit (Ex. 14, ECF No. 49-14), which was used to support an attorney grievance filed against Donald Visser by Defendant Bedford and an attorney grievance against Defendants Page and Stewart filed by Plaintiff Baker. It later appeared in the collection action in response to the motion to disqualify. Defendants argue that Grote is entitled to absolute witness immunity for any claims that she signed a false affidavit and committed perjury. Plaintiffs note that Grote's statement was taken under oath but not as part of a lawsuit or judicial proceeding. Thus, Plaintiffs assert that Grote's affidavit was not "intimately involved" with the judicial process, so it is not entitled to immunity. Plaintiffs also argue that Grote is not entitled to immunity for other non-testimonial acts merely because they were contained in the subsequent affidavit.

Like judges and prosecutors, witnesses involved in the judicial process are generally given absolute immunity from civil damages based on their testimony. *See Briscoe v. LaHue*, 460 U.S. 325, 327 (1983). This immunity, which arises entirely from common law, prevents self-censorship by depressing the fear of coming forward to testify and limiting the motivation for distorting testimony based on fear of subsequent liability. *Id.* at 333. It is part of the "cluster of immunities" that protects parties who are "integral parts of the judicial process" and are involved in judge-supervised trials. *Id.* at 335; *Butz v. Economou*, 438 U.S.

478, 512 (1978). It stems from the characteristics of the judicial process and aims to allow judges, advocates, and witnesses to "perform their respective functions without harassment or intimidation." *Butz*, 428 U.S. at 512. Witnesses are immune from suit "no matter how egregious or perjurious that testimony was alleged to have been." *Moldowan v. City of Warren*, 578 F.3d 351, 390 (6th Cir. 2009). The Sixth Circuit has held that "testimony presented in the form of an affidavit may be protected under absolute immunity." *Todd v. Weltman, Weinberg & Reis Co., L.P.A.*, 434 F.3d 432, 439 (2006). However, non-testimonial acts are not protected simply because the actor subsequently testifies about them. *Spurlock v. Satterfield*, 167 F.3d 995, 1003-04 (6th Cir. 1999).

Here, Plaintiffs argue that Grote is not entitled to immunity because her testimony was not part of the judicial process. Indeed, reasons for absolute witness immunity are not as strong when the testimony is not part of a criminal or civil judge-supervised suit. However, this Court has held that "witnesses who testify before both the Attorney Grievance Commission and the Judicial Tenure Commission are entitled to absolute immunity for statements given in the course of the proceedings." *Lepley v. Dresser*, 681 F. Supp. 418, 423 (W.D. Mich. 1988). Additionally, Grote's affidavit was used in the collection case, which was plainly a judicial proceeding. Accordingly, Grote is entitled to immunity from civil damages stemming from her allegedly false affidavit. Plaintiffs' RICO claim must be premised on Grote's non-testimonial acts outside of the affidavit.

Next, Defendants argue that the complaint does not allege that Grote participated in the operation or management of the alleged RICO enterprise, which is fatal to the RICO claim against her. Plaintiffs assert that they adequately alleged that Grote participated in the management and operation of the enterprise because she worked everyday with Judge Hamre and was involved in the actions and decisions

of the enterprise. The parties disagree on the holding and meaning of *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993).

Section 1962(c) makes it unlawful for a person employed by or associated with an enterprise to "conduct or participate, directly or indirectly, in the conduct" of the affairs of the enterprise. 18 U.S.C. § 1962(c). The Supreme Court has ruled that a party is not liable for a RICO § 1962(c) claim unless that person has participated in the operation or management of the enterprise itself. *Reves*, 507 U.S. at 187. This can include upper management and "lower rung" participants if they had "some part in directing the enterprise's affairs." *Id.* at 179, 183. The "operation or management" test is satisfied if the person either made decisions on behalf of the enterprise or knowingly carried them out. *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008). Although Plaintiffs argue that *Reves* concerns only "outside" employees, that argument is plainly contradicted by reading the opinion.

Aside from the allegations of perjury, the complaint only alleges Grote's involvement in the conference call incident. It alleges that Grote entered Judge Hamre's chambers after the conference call concluded, with a report sent by Plaintiffs in her hand. The complaint alleges that she threw the report away under Judge Hamre's direction. She also made a statement that she was surprised that Judge Hamre set another hearing in the collection case because she assumed Visser would not be pleased with that decision. The complaint states that Grote "was generally aware of her role as part of an overall improper activity at the time she provided assistance and she knowingly and substantially assisted the principal violation." (ECF No. 49 at ¶ 385.)

Plaintiffs' bare assertion that Grote was involved in the alleged RICO enterprise because she worked with Judge Hamre is not supported by the allegations in the complaint and is too vague to satisfy

*Twombly*. The few paragraphs that describe her involvement in the phone conference incident show that she did not make any decision on behalf of the alleged enterprise at that time–she was following Judge Hamre's orders. The question then is whether Grote's act of throwing away HLV's report constitutes knowingly directing or operating the enterprise. The complaint's conclusory allegation that Grote "was generally aware" of the conspiracy and her role in it is plainly insufficient to satisfy *Twombly's* pleading requirements. The complaint also contains no additional details concerning Grote's everyday work with Judge Hamre that would suggest she was aware of any RICO violations. Further, Grote's affidavit says she did not hear the conversation after the phone conference that was recorded. (Although Plaintiffs allege that this was proven false by the recording, Defendants correctly point out that there is a difference between testifying that one did not *hear* something and testifying that it did not occur.) Thus, nothing in the First Amended Complaint suggests that Grote was not simply doing her job when she followed Judge Hamre's direction to throw away the HLV report. Without some connection to the enterprise or details about further involvement, the complaint fails to sufficiently state that Grote managed or operated the alleged enterprise. The Court cannot assume that everyone employed in the same office as a person accused of engaging in violations of the RICO statute knew about the conspiracy and knowingly participated in it without something more than what was pled here. Because the complaint does not establish that Grote had a connection to the enterprise, the Court need not address whether it sufficiently pleads an enterprise and predicate acts at this time.

For these reasons, the remainder of Defendant Grote's motion to dismiss is **GRANTED**. The claims against Grote in Count I are **DISMISSED**.

*3. Van Buren County*

Van Buren County is implicated in two counts of the complaint: Count IV, which alleges a § 1983 claim premised on Fourteenth Amendment violations, and Count VI, which alleges malicious prosecution stemming from the criminal charges levied against Visser and Baker. Defendants first argue that Van Buren County is immune from the malicious prosecution claim because government entities are immune from tort liability with certain limited exceptions, none of which apply here. In their response, Plaintiffs only address the malicious prosecution claim and do not address the governmental immunity argument.

Michigan law provides that "a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function."M.C.L. § 691.1407. Municipalities are considered "governmental agencies" under this statute. *See Wright v. Genesee Cnty. Corp.*, 659 F. Supp. 2d 842 (E.D. Mich. 2009). A governmental function is defined as "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." M.C.L. § 691.1401(b).

Additionally, the Sixth Circuit has held that "[w]hen a party fails to respond to a motion or argument therein . . . the lack of response is grounds for the district court to assume opposition to the motion is waived and grant the motion." *Humphrey v. U.S. Att'y Gen.'s Office*, 279 Fed. App'x. 328, 331 (6th Cir.2008). Thus, it appears that Plaintiffs do not oppose Defendants' motion concerning Count VI. However, even if they did oppose the motion, Defendants are correct that Van Buren is not implicated by the facts alleged and decisions to prosecute are governmental functions undertaken by a governmental agency. Thus, Michigan law creates immunity from Plaintiffs' state law tort claim. For these reasons, the motion to dismiss Count VI as to Van Buren County is **GRANTED**.

Second, Defendants argue that the § 1983 claim cannot survive because nothing in the complaint

establishes municipal liability. They argue that Plaintiffs must allege that the federal violation occurred because of a municipal policy or custom, either (1) an illegal official policy or legislative enactment; (2) illegal action ratified by an official with final decision making authority; (3) inadequate training or supervision, or (4) a custom of tolerance or acquiescence to federal rights violations. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). They argue that a municipality cannot be sued under § 1983 for an injury inflicted solely by its employees or agents, citing *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978).

In response, Plaintiffs explain that they are relying on the fourth way to prove a municipal policy or custom by attempting to prove that Van Buren had a custom of tolerance or acquiescence of federal rights violations–the "inaction theory." They allege that Van Buren County was aware of the alleged wrongdoing by Defendants Bedford, Hamre, Page, Stewart, and McKay, and it "sat idly by" and did nothing. They acknowledge that the County did not have the authority to remove a prosecutor, but allege that it should have presented evidence of the wrongdoing to the Governor, who could have removed Bedford or McKay from the prosecutor's office. Plaintiffs also allege that the violations of Plaintiffs' constitutional rights were a predictable and foreseeable result of the County's failure to act, which establishes causation.

To succeed on the "inaction theory" of municipal liability, Plaintiffs must establish:

> (1) the existence of a clear and persistent pattern of [constitutional violations]; (2) notice or constructive notice on the part of the County; (3) the County's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the County's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Miller v. Calhoun Cnty.*, 408 F.3d 803, 815 (6th Cir. 2005). To establish a pattern of illegal activity, a

plaintiff must go beyond the facts of his or her own case and show other instances of the alleged constitutional violations occurring in other situations. *Thomas*, 398 F.3d at 434; *Miller*, 408 F.3d at 815-16. Proving that the municipality was deliberately indifferent requires that the municipality was "aware of prior unconstitutional actions by its employees and failed to take corrective measures." *Miller*, 408 F.3d at 815 (citing *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997)).

Here, Plaintiffs point to three pieces of evidence that they believe establish a pattern of illegal activity, specifically "the exchange of things of value between private attorneys and county officials for favorable rulings and the inappropriate use of the Van Buren County Prosecutor's Office." First, Plaintiffs allege that a county IT employee helped ELC obscure or delete documents that were relevant to the collection action. (See Complaint, ¶¶ 155-68, 415-20.) The County IT employee does private work, which included some work for Belco, a company run by William Engle's girlfriend, Susan Bell. The IT employee moved files from a Belco computer to a flash drive around August 2013, and purported to deliver those files to Plaintiffs pursuant to a subpoena. However, the documents delivered were not the documents from the flash drive that were moved in August. The files were required to be preserved due to a preservation order in the collection action. Plaintiffs allege that Van Buren knew that its IT employee was working for ELC, and it was deliberately indifferent to its knowledge that he or she was involved in deleting files.[2] Plaintiffs allege that this caused them the additional costs of trying to recover deleted files.

Next, Plaintiffs point to the paragraph of the complaint that alleges "[t]he County knew that its

---

[2]Plaintiffs allege that the IT employee defragmented Belco's computers and that "defragmentation involves deleting files." However, this is not correct. Defragmenting moves data around so that the hard drive does not have to work so hard to find each piece of information, but it does not delete anything.

resources were being used and its employees were actively participating in a scheme to raise money for a non-profit through which local attorneys paid money to Bedford and other county officials and employees, and which was knowingly being misused by Bedford and Hamre." (ECF No. 49, ¶ 408.) Finally, Plaintiffs allege that "an informant . . . indicated that if Defendant Page was your opponent in Judge Hamre's court room there was not an even playing field because of the 'unholy alliance' between the two." (ECF No. 49, ¶ 321.)

However, the Complaint does not contain any factual allegations that, if accepted, prove that the County had any notice that the Defendants were involved in the alleged illegal activities. The first and second pieces of evidence are bare assertions that "the County knew," but no details are provided about how or when or who was notified about the IT employee's private work or Bedford's use of the money raised by the Foundation. These types of conclusory statements are blanket assertions of the type that are proscribed by *Twombly*. The third piece of evidence from an unidentified "informant" also does not establish that the County knew about the unconstitutional actions alleged in this case. There is not any information about who the "informant" is, the allegation is rank hearsay with no indications of trustworthiness, and at most it supports the inference that *lawyers* or *parties* who appeared in front of Judge Hamre knew the rumors about his relationship with Page–not that anyone with authority to represent the *County* knew about any alleged wrongdoing. Additionally, none of these pieces of evidence establish that there were any previous constitutional violations in other situations to which the County could be deliberately indifferent. The first two allegations concern this case, not previous incidents. The third conclusory hearsay statement is plainly insufficient to show a prior incident of unconstitutional conduct. Even if the third allegation contained facts alleging that Judge Hamre violated the rights of other people who

appeared before him previously, unsupported speculation about a judge's proclivities does not demonstrate a pattern of conduct on the part of the County that is deliberately indifferent to constitutional violations.

The complaint is plainly insufficient to establish municipal liability on the part of Van Buren County. Even if all of the allegations in the complaint are taken as true, there would be no basis for a reasonable juror to find that Van Buren County knew about the Defendants' actions or was deliberately indifferent to a pattern or custom of constitutional violations in the county courts. There is no indication that any other citizens filed complaints against any of the Defendants or even that appellate courts were finding constitutional violations at a higher rate than normal. There is simply no evidence or allegation of similar incidents having occurred previously. For these reasons, the motion to dismiss the § 1983 claim against Van Buren County in Count IV is **GRANTED**.

### C. Conclusion

For these reasons, the entire motion to dismiss (ECF No. 54) filed by Defendants Hamre, Grote, and Van Buren County is **GRANTED**. Counts III and VII are **DISMISSED** and the claims against Defendants Grote, Hamre, and Van Buren County in claims I, II, IV, and VI are **DISMISSED**.

## BEDFORD'S MOTION TO DISMISS

In this motion to dismiss (ECF No. 56), Van Buren County Prosecutor Michael Bedford argues that he is entitled to absolute immunity from federal and state civil tort claims because the allegations in the complaint concern only normal prosecutorial functions.

### A. Background

According to the complaint, taken as true, the facts are as follows. Michael Bedford's involvement in this case began with the incident, described above, when HLV's attorney and representatives attempted

to inspect or remove records from ELC Leasing's place of business. Bedford approved the request for a warrant to search Baker's cell phone for footage of the ELC records incident. Bedford was involved in the decision to institute criminal charges against Visser and Baker. Although Bedford did not actually try the criminal case against Visser, he was present during jury deliberations and advised Defendant Michael McKay, an assistant prosecutor, on how to proceed with the case on at least one occasion. He also instituted an attorney grievance against Visser, which Plaintiffs assert was done to interfere with HLV's right to choose its counsel. In the grievance, Bedford asserted that Visser knowingly made false statements to the court and urged the media to report on those lies. Plaintiffs allege that these statements were false.

Plaintiffs describe the alleged relationships among the Defendants in the complaint. Page and McKay helped Bedford win the prosecutor election, and Bedford and Stewart are close personal friends, golf partners, and business partners. Bedford allegedly refers criminal defendants to Stewart and helps Stewart with those cases. Page and Bedford are also friends and they go on hunting trips together, paid for by Page. Page allegedly got Bedford out of a speeding ticket through his role as legal counsel to the village of Paw Paw. Plaintiffs allege that Page and Stewart used their friendships and gifts to influence Bedford to initiate the criminal proceedings against Visser and Baker without probable cause. Although Page, Stewart, and Bedford deny communicating about the case, Plaintiffs assert that they have done so to cover up their involvement. The communications were done through interstate wires and mail, leading to the mail fraud and wire fraud claims.

After this complaint was filed, counsel for Bedford and Stewart sent a letter to Plaintiffs' counsel threatening a defamation lawsuit. Bedford also asked at least one police officer whether he spoke to Plaintiffs' investigators about the case.

Bedford helped create and is an officer for the non-profit Van Buren County Drug Treatment Court Foundation, Inc. Hamre and Stewart have also been members or officers of the Foundation. Although the Foundation is separate from the county Drug Court, it allegedly raised money in the name of the court. An annual golf outing is held to raise money for the Foundation. In April 2013, the Michigan Supreme Court issued an Administrative Order stating that judges and court employees should not be involved in such fundraising because it may violate the Judicial Code of Conduct. Bedford continued to be involved in the fundraiser. Plaintiffs allege that the money raised was used to pay for Bedford's and other members' alcoholic drinks at Foundation meetings.

The complaint implicates Bedford in four claims, including Count I (RICO), Count II (RICO Conspiracy), Count IV (§ 1983), and Count VI (Malicious Prosecution). Essentially, Plaintiffs allege that Bedford accepted bribes from Page and Stewart in the form of hunting trips, election campaign help, contributions to the Foundation, etc. in exchange for allowing Page and Stewart to influence his decisions to charge or not to charge potential criminal defendants–including Visser and Baker. The complaint asserts that Bedford committed wire fraud in furtherance of his alleged misdeeds and initiated criminal charges against Visser and Baker without probable cause because Page and Stewart told him to do so.

**B. Analysis**

In this motion, Bedford argues that he is absolutely immune from the claims in Plaintiffs' complaint because of prosecutorial immunity. The United States Supreme Court has held that state prosecutors are immune from civil lawsuits when they initiate a prosecution and present the State's case, actions "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). As the individual seeking immunity, Bedford bears the burden of establishing that he is entitled to

prosecutorial immunity. *See Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)). Federal courts employ a functional test to determine whether the prosecutor is entitled to immunity by looking at "the nature of the function performed, not the identity of the actor who performed it." *Id.* at 402 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). The broad grant of immunity applies to even improper, dishonest, or illegal activities, as long as the general nature of the action at issue falls within the normal duties of a prosecutor. *Imbler*, 424 U.S. at 413, 430. It also extends to anyone who works on a case, even if he or she is not the trial prosecutor. *Van de Kamp v. Goldstein*, 555 U.S. 335, 345 (2009).

Additionally, Michigan law establishes immunity for county prosecutors in M.C.L. § 691.1407, as long as the actions are in the course of employment, the person reasonably believes he or she is acting in within the scope of his or her authority, the government agency is engaged in the exercise or discharge of a governmental function, and the conduct is not gross negligence that is the proximate cause of the injury or damage. M.C.L. § 691.1407(2). Additionally, the highest elected official of a government division is immune from tort liability if he is acting within the scope of his authority. M.C.L. § 691.1407(5). The Michigan Supreme Court has recognized that "the prosecutor's exercise of his independent discretion in initiating and maintaining a prosecution is a complete defense to an action for malicious prosecution." *Matthew v. Blue Cross & Blue Shield of Mich.*, 456 Mich. 365, 384 (Mich. 1998).

Defendant Bedford argues that the two actions Plaintiffs are complaining about–the decision to approve the search warrant request and the decision to institute criminal charges against Visser and Baker–were both undertaken in the exercise of governmental functions within the scope of prosecutorial activities expressly or impliedly required or authorized by the Michigan Constitution, statues, or case law,

and thus are immune under Michigan law. Bedford also argues that he is immune from suit concerning those actions under federal common law immunity principles.

In response, Plaintiffs argue that Bedford's actions fall outside of the scope of prosecutorial acts because he initiated the charges against Visser and Baker without any colorable basis. They rely on a Second Circuit case, *Bernard v. County of Suffolk*, to argue that prosecutors are stripped of their immunity when they act "without any colorable claim of authority" or "intertwine [their] exercise of authorized prosecutorial discretion with other, unauthorized conduct." 356 F.3d 495, 504 (2d Cir. 2004). In *Bernard*, the plaintiffs alleged that prosecutors were misusing their positions for political purposes by investigating and prosecuting Democratic Party leaders without probable cause to discredit them. The district court denied the defendants' motion to dismiss, holding that the defendants' alleged political motivation removed their conduct from the scope of activities shielded by absolute immunity. The Second Circuit reversed, reiterating that a prosecutor's motivation is irrelevant and he will be immune from malicious prosecution claims as long as he or she acts with colorable authority. The court analyzed whether the prosecutor acted with "colorable authority" by considering "whether relevant statutes authorize prosecution for the charged conduct" and whether the "prosecutor has linked his authorized discretion to initiate or drop criminal charges to an unauthorized demand for a bribe, sexual favors, or the defendant's performance of a religious act." *Id.* at 504.

Two Second Circuit cases were cited in *Bernard* that establish some parameters of what unauthorized demands are. In *Doe v. Phillips*, the prosecutor was not afforded immunity after he told Doe that charges against her would be dismissed if she would place her hand on a Bible and swear that she had not sexually abused her son. 81 F.3d 1204, 1207 (2d Cir. 1996). The court found that this demand was

manifestly beyond the prosecutor's authority and it was intertwined with the prosecutorial decision. *Id*. at 1210. In *Schloss v. Bouse*, the plaintiffs were arrested based on what turned out to be a fabricated story by a mentally ill woman about a robbery. *Id.* at 288-89. The ADA threatened that if the plaintiffs did not sign waivers releasing any claims against the police agencies and municipalities involved they would be prosecuted on criminal charges. *Id.* The court found that the demand for a release was not beyond the prosecutor's jurisdiction, so he was entitled to absolute immunity. *See also Lee v. Willins*, 617 F.2d 320, 322 (2d Cir. 1980) (threat to deprive witness of custody of her child in order to obtain perjured testimony "might not" be protected by absolute immunity).

The facts of this case are readily distinguishable from *Doe* and *Schloss*. Here, Bedford did not demand a bribe from or threaten Visser and Baker in any way; they were not coerced into something in exchange for Bedford dropping the criminal charges against them. *Bernard* reflects that the prosecutor must made some kind of demand in the context of a criminal case to warrant piercing absolute immunity. There is an argument that accepting bribes is outside of a prosecutor's jurisdiction, but when a *third party* (here, Page, Stewart, or Hamre) is alleged to be controlling the prosecutor (rather than the prosecutor demanding action of the accused), the question returns to the prosecutor's motivation. *Bernard* recognized that it is well established that the prosecutor's motivation is irrelevant to the immunity analysis. Thus, even if Bedford's motivation in initiating the charges against Visser and Baker was to remain on Page's and Stewart's good side to continue receiving bribes/trips/favorable treatment (as egregious as it would be) absolute immunity will shield the decision to prosecute, which is clearly a prosecutorial function. Thus, Bedford did not link his authorized discretion to initiate or drop criminal charges to an unauthorized demand for a bribe. Additionally, the relevant statutes authorize prosecution for the charged conduct. For the above

two reasons, Bedford had a colorable basis for the decision to institute charges. *See Bernard*, 356 F.3d at 504. Accordingly, Plaintiffs' argument that the bribery allegations dissolve Bedford's immunity must fail.

At oral argument, Plaintiffs raised for the first time the argument that Bedford engaged in investigatory conduct that is only entitled to qualified immunity when he interviewed witnesses and met with Page and Stewart, attorneys for the alleged victims, prior to instituting formal charges against Visser and Baker. Although some of a prosecutor's administrative duties and investigatory functions are given only qualified immunity, the Supreme Court has recognized that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Buckley*, 509 U.S. at 273. The complaint alleges that Page and Stewart talked with Bedford and/or McKay concerning the criminal charges on April 9, 2013 and May 1, 2013. The content of these conversations is unknown at this time. An email from William Engle to Stewart reveals merely that Stewart planned to visit the prosecutor's office to see if charges would be filed. (Ex. 28, ECF No. 49-28.) The complaint also alleges that Bedford asked at least one police officer if he had spoken to Plaintiffs' investigators prior to the filing of the instant lawsuit.

In the Court's judgment, Bedford's meetings with the representatives of the victims were acts undertaken in preparation for the initiation of judicial proceedings that occurred in the course of his role as an advocate for the state. Stripping prosecutors of immunity for merely speaking with the legal representatives of crime victims would do a great disservice to the goals and policies of prosecutorial immunity. Nothing in the complaint would support the conclusion that Bedford departed from his role as a prosecutor during these conversations. Accordingly, Bedford is entitled to absolute immunity from charges

that arise from his conversations with Page and Stewart concerning the trespass and assault charges. Although Bedford's questions to the police officer about *this* lawsuit were not undertaken in his prosecutorial role, they cannot support RICO, § 1983, or malicious prosecution claims against Bedford because Plaintiffs were not harmed by that inquiry. Thus, for all the reasons above, Bedford is entitled to immunity from the claims in Counts I, II, and IV under federal law, and he is immune from the claims in Count VI under state law.

Next, Plaintiffs argue that Bedford waived the prosecutorial immunity defense by denying that he was involved in the Visser and Baker prosecutions and threatening a defamation lawsuit against Plaintiffs' counsel. First, Plaintiffs argue that Bedford cannot claim immunity if he denies being involved at all in the decision to prosecute Visser and Baker. However, in a motion to dismiss, the Court is testing the sufficiency of the complaint and the Court must take all facts in the complaint as true. The complaint here alleges that Bedford had a role in bringing the charges. Bedford's assertions that he was not involved merely create a factual issue to resolve at trial. Additionally, if Bedford was not involved at all in the decision, as Plaintiffs seem to argue, then their claims against him must fail in their entirety (and the immunity decision thus becomes irrelevant). Plaintiffs cite no case law in support of their assertion that Bedford waived his immunity rights by denying his involvement, and indeed the federal rules allow pleadings to contain inconsistent defenses without causing waiver of any of the defenses. *See* Fed R. Civ. P. 8(d)(3), Fed. R. Civ. P. 12(b), *Carter v. Mitchell*, 693 F.3d 555, 566 (6th Cir. 2012); *Michals v. Baxter Healthcare Corp.*, 289 F.3d 402, 409 (6th Cir. 2002). Because Bedford pled absolute immunity in his answer (ECF No. 53-1), he has not waived it as an affirmative defense.

Second, Plaintiffs allege that Bedford waived the immunity defense by threatening to file a

defamation lawsuit against Plaintiffs' counsel because such a lawsuit would be asking a fact finder to scrutinize his prosecutorial actions, while immunity prevents such scrutiny. Plaintiffs assert that it would be inequitable to allow Bedford to claim immunity in this suit and pursue a retaliatory suit against Plaintiffs' counsel. As above, there is no support cited for this argument because no court could accept it. A separate defamation lawsuit (that has not yet been filed) has no bearing on the applicability of the immunity analysis in this suit. There is no reason the threat of a separate defamation lawsuit would waive a defendant's immunity defenses when he is sued. For these reasons, Bedford has not waived his immunity defense.

**C. Conclusion**

For the reasons discussed above, Defendant Bedford's motion to dismiss (ECF No. 56) is **GRANTED** because the claims against him are barred by federal and state principles of prosecutorial immunity. The claims against Bedford in Counts I, II, IV, and VI are **DISMISSED**.

## MCKAY'S MOTION FOR SUMMARY JUDGMENT

In this motion for summary judgment (ECF No. 60), Van Buren County Assistant Prosecuting Attorney Michael McKay argues that he is entitled to absolute immunity for his prosecutorial acts and qualified immunity because he did not violate clearly established statutory constitutional rights. He further argues that Plaintiffs have no factual support for their claims of bribery and that Plaintiffs lack standing to bring claims regarding Visser's criminal prosecution because he is not a party. For largely the same reasons that Bedford's motion should be granted due to prosecutorial immunity, McKay's motion should be granted.

**A. Background**

Assistant prosecutor McKay became involved in this lawsuit because he was the prosecuting

attorney in the criminal cases against Visser and Baker. The complaint alleges that McKay was influenced by his relationships with Bedford, Page, and Stewart to pursue the charges. Taking the facts in the complaint as true, they are as follows.

McKay was highly involved in Bedford's prosecutor campaign and had a business relationship with Page prior to being hired as an assistant prosecutor by Bedford. Page and Stewart are friends with Bedford and McKay. The complaint seems to alleges that McKay made an appearance on behalf of a criminal defendant retained by Page and then dismissed the charges against that defendant when he became an assistant prosecutor. Stewart met with someone at the prosecutor's office around May 1, 2013 concerning the charges against Visser and Baker.

Bedford stated that the criminal charges against Visser were authorized by McKay based on the Sheriff's report. Bedford also advised McKay concerning the case on at least one occasion. Plaintiffs allege that Page and Stewart provided items of value to McKay in order to influence his decisions. The complaint is otherwise bare of any details concerning when or how the bribes occurred and how Page and Stewart influenced McKay into initiating the charges. Plaintiffs also allege that McKay obstructed justice when he failed to report Page and Stewart's unlawful behavior.

The complaint raises three claims against McKay, including Count I (RICO), Count II (RICO Conspiracy), and Count VI (Malicious Prosecution).

**B. Analysis**

As noted above, a prosecutor is entitled to absolute immunity for performing functions "intimately associated with the judicial phase of the criminal process," regardless of his or her motivation. *Imbler*, 424 U.S. at 430. This includes the decision to institute criminal charges and the pursuit of those charges through

trial. McKay correctly argues that his acts of filing trespassing and assault charges and dismissing the charges against Baker and one of Page's clients are prosecutorial functions protected by absolute immunity. Even if McKay was influenced by Page and Stewart, his motivations for pursuing the charges are irrelevant to the immunity analysis. *Bernard*, 356 F.3d at 502.

Plaintiffs make the same argument concerning McKay that was addressed concerning Bedford above–that he has "intertwined his exercise of authorized prosecutorial discretion with other, unauthorized conduct," and thus he had no colorable basis to issue the charges. For the same reasons discussed above, this argument is meritless. There is no allegation that McKay demanded a bribe or anything else from the accused in exchange for dropping the charges and there is even less detail concerning McKay's relationships with the other Defendants than that concerning Bedford. Likewise, Plaintiffs' argument that McKay engaged in investigatory actions not shielded by absolute immunity must fail.

Ultimately, the complaint does not allege any claim against McKay that is not prohibited by absolute immunity. Because McKay is absolutely immune from the claims, the Court need not address the qualified immunity, standing, and question of fact issues.

### C. Conclusion

Defendant McKay's motion for summary judgment (ECF No. 60) is **GRANTED** and the claims against him in Counts I, II, and VI are **DISMISSED**.

## IV. CONCLUSION

For the reasons discussed above, the Court will **GRANT** the motions to dismiss filed by Peggy Grote, Paul Hamre, Van Buren County, and Michael Bedford. The Court will also **GRANT** the motion for summary judgment filed by Michael McKay. The claims against these Defendants will be

**DISMISSED**.

**ORDER**

For the reasons discussed in the accompanying opinion, the motion to dismiss filed by Defendants Peggy Grote, Paul Hamre, and Van Buren County (ECF No. 54) is **GRANTED**, the motion to dismiss filed by Michael Bedford (ECF No. 56) is **GRANTED**, and the motion for summary judgment filed by Michael McKay (ECF No. 60) is **GRANTED**. All of the claims against Defendants Grote, Hamre, Van Buren County, Bedford, and McKay are **DISMISSED**.

**IT IS SO ORDERED.**

Date: June 29, 2015

/s/ Paul L. Maloney
Paul L. Maloney
Chief United States District Judge