IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HLV, LLC, a Michigan limited liability
company, LANDWORTHY CONTAINER,
LLC, a Michigan limited liability company,
and ROBERT BAKER, an individual,

      Plaintiffs,

-vs-

Case No: 1:13cv1366PLM
Honorable Paul L. Maloney

VAN BUREN COUNTY, a municipal
corporation, VILLAGE OF PAW PAW,
a municipal corporation, PAGE & STEWART,
an ad hoc professional partnership, KELLY
PAGE, an individual, GARY STEWART, JR.,
an individual, PAUL HAMRE, an individual,
PEGGY GROTE, an individual, MICHAEL
MCKAY, an individual, and MICHAEL
BEDFORD, an individual,

      Defendants.
_____/

## DEPOSITION TRANSCRIPT OF DONALD VISSER

Open.00560.40061.13652873-1

Page 1

1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF MICHIGAN

3    HLV, LLC, a Michigan limited liability corporation,

4    LANDWORTHY CONTAINER, LLC, a Michigan limited

5    liability corporation, and ROBERT BAKER,

6    an individual,

7              Plaintiffs,

8      -vs-                        Civil Action

9                                  No. 1:13-cv-1366-PLM

10                                 Hon. Paul L. Maloney

11   VAN BUREN COUNTY, a municipal corporation, VILLAGE OF

12   PAW PAW, a municipal corporation, PAGE & STEART, an ad

13   hoc professional partnership, KELLY PAGE, an individual;

14   GARY STEWART, JR., an individual; PAUL HAMRE, an

15   individual; PEGGY GROTE, an individual; MICHAEL MCKAY,

16   an individual; and MICHAEL BEDFORD, an individual,

17             Defendants.

18   _____/

19   PAGE 1 TO 78

20      The deposition of DONALD VISSER,

21      Taken at 2480 44th Street East, Suite 150,

22      Grand Rapids, Michigan,

23      Commencing at 10:00 a.m.,

24      Tuesday, April 18, 2017,

25      Before Caitlyn Mancini, RPR, CSR-8887.

Page 2

1 APPEARANCES:
2 MS. BRITTANY W. BURKE (P81438)
3 Visser and Associates PLLC
4 2480 44th Street SE, Suite 150
5 Kentwood, Michigan 49512
6 (616) 531-9860
7 bburke@visserlegal.com
8    Appearing on behalf of the Plaintiffs.
9
10 MS. COLLEEN H. BURKE (P63857)
11 Collins Einhorn Farrell PC
12 4000 Town Center Floor 9
13 Southfield, Michigan 48075
14 (248) 355-4141
15 colleen.burke@ceflawyers.com
16    Appearing on behalf of the Defendant Kelly Page.
17
18 MR. ROBERT A. CALLAHAN (P47600)
19 Plunkett Cooney
20 950 Trade Centre Way, Suite 310
21 Portage, Michigan 49002
22 (269) 382-5935
23 rcallahan@plunkettcooney.com
24    Appearing on behalf of the Defendant Stewart.
25 ALSO PRESENT: Bob Baker

Page 4

1 EXHIBITS CONTINUED:
2 DEPOSITION EXHIBIT NO. 7                55
3    Elijah Invoices
4 DEPOSITION EXHIBIT NO. 8                59
5    HLV Invoices From 6/18/13-1/31/17
6
7
8        (Exhibits attached to transcript.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

TABLE OF CONTENTS

2 Witness                              Page
3 DONALD VISSER
4
5
6        E X A M I N A T I O N S
7 Witness                              Page
8 EXAMINATION BY MS. COLLEEN BURKE        4
9
10
11        E X H I B I T S
12 Exhibit                              Page
13 DEPOSITION EXHIBIT NO. 1             5
14    Deposition Notice
15 DEPOSITION EXHIBIT NO. 2             20
16    E-mails
17 DEPOSITION EXHIBIT NO. 3             33
18    Mr. Visser's Transcript of Recorded Hearing
19 DEPOSITION EXHIBIT NO. 4             37
20    Telephone Conference Transcribed by Court Reporter
21 DEPOSITION EXHIBIT NO. 5             38
22    Affidavit of Donald Visser
23 DEPOSITION EXHIBIT NO. 6             55
24    HLV Invoices from Visser & Associates 7/9/09-6/24/16
25

Page 5

1 Grand Rapids, Michigan
2 April 18, 2017
3 About 10:00 a.m.
4           DONALD VISSER,
5 having first been duly sworn, was examined and testified
6 on his oath as follows:
7      DEPOSITION EXHIBIT NO. 1
8      Deposition Notice
9      WAS MARKED FOR IDENTIFICATION
10 EXAMINATION BY MS. BURKE:
11    Q. Sir, can you please state your full name for the
12 record.
13    A. Donald R. Visser.
14    Q. Let the record reflect that this is the
15 deposition of Mr. Donald Visser taken pursuant to notice
16 and agreement of counsel and to be used for all intended
17 purposes under the Michigan Court Rules or I should say
18 the Federal Court Rules and the Federal Rules of
19 Evidence. Good morning, Mr. Visser.
20    A. Good morning.
21    Q. Do I really need to put the rules for a
22 deposition on the record or you think you got them?
23    A. Some people say I don't have anything at all so
24 every time I go into a deposition they tell me I have it
25 wrong. I'm just being facetious. I'm good.

2 (Pages 2 - 5)

Page 6

1  Q. Okay. Mr. Visser, you are the attorney of record
2  for HLV, Landworthy, and Mr. Baker in the HLV versus
3  Kelly Page, et al matter that's filed in United States
4  District Court for the western district of Michigan,
5  correct?
6  A. That's correct.
7  Q. And you are also the attorney of recovered for
8  HLV in underlying case which was HLV versus ELC that was
9  filed in Van Buren County Circuit Court, correct?
10  A. I was at some point.
11  Q. At some point, okay. What was the time period
12  that you were the attorney of record for HLV?
13  A. I wouldn't know exactly but it would have been in
14  the more contentious stages of the litigation after the
15  default and enforcement.
16  Q. Were you the attorney of record at the time that
17  a settlement was entered on to the record?
18  A. I was not.
19  Q. Who was your predecessor?
20  A. That was Donovan Visser.
21  Q. And Donovan Visser is your son and law partner?
22  A. Yeah well he's my son and he is an employee of
23  the firm.
24  Q. But your firm -- did your firm represent the
25  Plaintiffs continuously in the Van Buren County Circuit

Page 7

1  matter from start to finish?
2  A. I believe, again, I'm not exactly sure entirely
3  what happened before I got involved but that would be my
4  belief.
5  Q. How long has your firm represented HLC or HLV?
6  A. I wouldn't be able to tell you that in years. It
7  would be from the inception of HLV though so my guess is
8  we could pin that down by looking at when HLV was formed
9  with LARA.
10  Q. What sort of work have you done for HLV?
11  A. Drafting, litigation, consulting.
12  Q. Has for lack of a better description has HLV
13  always been your client as opposed to somebody else at
14  the firm?
15  A. I guess I've never thought of it in that fashion.
16  A firm client.
17  Q. Okay. What work have you done for HLV?
18  A. All of those litigation, consultation, drafting.
19  Q. Since the inception of HLV?
20  A. Correct.
21  Q. Have you represented Mr. Baker as an individual
22  in any other case other than the one that we're here for
23  today?
24  A. I believe so. One that I can recall.
25  Q. When was that?

Page 8

1  A. Last year.
2  Q. What type of matter was it?
3  A. That was relative to Mr. Bedford's alleged
4  slanderous comments.
5  Q. Was there a lawsuit involved with that?
6  A. There was.
7  Q. Where was that lawsuit filed?
8  A. Van Buren County.
9  Q. That matter was resolved was it not?
10  A. It was.
11  Q. How was it resolved?
12  A. It was dismissed.
13  Q. How was it dismissed? Was it voluntarily, was it
14  by motion?
15  A. No. How do I answer that question? By order,
16  you know. It was by motion.
17  Q. Was Mr. Baker the Plaintiff in that case or the
18  Defendant?
19  A. Plaintiff.
20  Q. And it was by Defendant's summary disposition
21  motion?
22  A. It was.
23  Q. Have you represent -- or you or your firm
24  represented Landworthy Container in any other matter
25  other than the one we're here for today?

Page 9

1  A. Not that I am aware of.
2  Q. Have you represented Mr. Howard Voorhees in any
3  matter or I should say have you represented Mr. Voorhees
4  or any of the companies that he is the majority
5  shareholder or owner of in any other matter other than
6  the one we're here for today?
7  MR. CALLAHAN: Would that be Harold
8  Voorhees?
9  MS. BURKE: Sorry, Harold.
10  THE WITNESS: Harold Voorhees, yes.
11  BY MS. BURKE:
12  Q. And what other representations have you provided
13  to Mr. Voorhees or his companies?
14  A. Drafting, litigation, and consultation.
15  Q. What other companies other than HLV have you
16  represented where Mr. Voorhees has been the owner of?
17  A. The entity called IROL it's I-R-O-L. I believe
18  it's an LLC. It was previously know as Serv-U-Success,
19  LLC. Also IROL Logistics.
20  Q. Any others?
21  A. HLV Zeeland.
22  Q. New Zealand?
23  A. Zeeland and HLV Holland. That's all that come to
24  mind right now.
25  Q. Are all these entities are they all in a similar

3 (Pages 6 - 9)

Page 10

1 business or are they all different businesses?
2   A. All different.
3   Q. Okay. IROL, LLC what type of business is that?
4   A. IROL is a wind up business. May not -- we may
5 have even completed the wind up I'm not sure from an
6 entity previously known as Serv-U-Success.
7   Q. What type of business is it?
8   A. It was in the cookies, crackers and basically a
9 food supply business.
10   Q. IROL Logistics what type of business was that
11 entity?
12   A. Trucking as basically related to the -- much of
13 it was related to the shipping of the cookies and
14 crackers and similar things.
15   Q. What about HLV Zeeland?
16   A. Real estate development.
17   Q. And HLV Holland?
18   A. Real estate development.
19   Q. You mentioned that you've been involved in
20 litigation with Mr. Voorhees's companies where have
21 those litigated matters been filed at?
22   A. Van Buren County. Illinois. Those are the only
23 ones that come to mind right now.
24   Q. How many cases were filed in Van Buren County?
25   A. I believe just one.

Page 11

1   Q. The HLV versus ELC?
2   A. Yes.
3   Q. How many in Illinois?
4   A. Did not file one we responded to one in Illinois
5 so it would be singular one.
6   Q. Where was that one at?
7   A. I think the middle district.
8   Q. So in federal court?
9   A. It was.
10   Q. What entity, what Voorhees entity was filed in
11 federal court in Illinois?
12   A. That was IROL.
13   Q. Which one?
14   A. IROL.
15   Q. LLC or Logistics?
16   A. Oh LLC I'm sorry.
17   Q. When was that case filed?
18   A. I don't know right off the top of my head.
19 Several years ago.
20   Q. Have we talked about all the litigation that you
21 have been involved in as attorney of record for either
22 HLV, Mr. Baker, Landworthy Container, Mr. Voorhees or
23 any other company owned by Mr. Voorhees?
24   A. At least as my memory allows me right now, yes.
25   Q. Okay. Sir, where did you obtain your law degree?

Page 12

1   A. Valparaiso University.
2   Q. And now we are at your law office here in Grand
3 Rapids?
4   A. Correct.
5   Q. How long have you owned your own practice?
6   A. Since I graduated. Probably since I was admitted
7 to the bar.
8   Q. What year were you admitted to the bar?
9   A. 1977.
10   Q. What type of law do you practice, sir?
11   A. I practice a good deal of real estate, practice a
12 good deal of the business litigation related.
13 Occasionally get involved in a disciplinary case.
14   Q. You do the defense work for that?
15   A. No, I just occasionally get involved in the last
16 year.
17   Q. So you serve on ADB hearing panels?
18       MR. CALLAHAN: You filed a grievance?
19       THE WITNESS: I have.
20 BY MS. BURKE:
21   Q. But do you sit on hearing panels?
22   A. I do not.
23   Q. And the disciplinary work you're referring to the
24 grievances that you filed against Mr. Hamre,
25 Mr. Stewart, and Mr. Page, correct?

Page 13

1   A. That is correct.
2   Q. I'm going to show you what I marked --
3   A. I say that with a little wry smile because it has
4 ended up taking a lot more of my time this past year.
5 It has now become an area of my practice I guess.
6   Q. Filing grievances?
7   A. This particular problem with a couple of
8 individuals, yes.
9   Q. Show you what I marked as Deposition Exhibit 1
10 and this is a notice for your deposition here today and
11 I asked you bring a number of items with you?
12   A. Correct.
13   Q. The first one I asked all video or audio
14 recordings of any meetings, proceedings, telephone call
15 interview or any other event involving Plaintiffs
16 dispute with ELC leasing out of the Van Buren County
17 Circuit Court matter that we mentioned. Did you bring
18 anything responsive to that?
19   A. I have no physical documents other than the, and
20 I can make another copy of it if you wish, and that is
21 the CD recording which was a digital recording that was
22 provided earlier.
23   Q. And that's of the May conference call with Judge
24 Hamre?
25   A. Yes ma'am.

4 (Pages 10 - 13)

Page 14

1   Q. Did you record any other meetings, proceedings,
2   telephone call interview or anything else other than
3   that May conference call in the HLV versus ELC matter?
4   Did you record anything else?
5   A. Not that I recall.
6   Q. Then I asked for all recording devices used to
7   record the events identified in number one did you bring
8   that with you?
9   A. I did.
10   Q. And you have a Dictaphone?
11   A. I have a Dictaphone it's an Olympus DS-5000.
12   Q. And that's what was used to record --
13   A. That's correct.
14   Q. -- the May 10th, 2013 conference call, true?
15   A. I'm quite certain that it was. I had a number of
16   Olympus digital recorders before and I think I had that
17   one at this time. It might have been a 4000.
18   Q. But it was a digital recorder?
19   A. Yes, it was not a tape it's digital. It was
20   downloaded and saved to the directory probably within 24
21   hours.
22   Q. Okay. Third all documents or information
23   including but not limited to correspondence, e-mails,
24   memos, summaries, notes, proof of payment, and invoices
25   sent to and from Elijah.com as it relates to the review

Page 15

1   of ELC Leasing Corp computers and records?
2   A. Yes, ma'am. I have those right here.
3   Q. The retainer agreement between your firm and
4   Plaintiff's relative to the present matter?
5   A. I do not believe I have one.
6   Q. Did you look for one?
7   A. I did.
8   Q. Do you have a retainer as to any of the other
9   matters that we spoke of that you served as attorney for
10   HLV, Mr. Baker, Landworthy Container, Mr. Voorhees or
11   any other Voorhees company or entity?
12   A. There is a chance that I have such an agreement
13   one of my very early files maybe my earliest file is
14   highly questionable but on any of the matters I've done
15   over the past ten years I don't believe I've ever had a
16   retainer agreement with any of Mr. Voorhees's matters.
17   Q. Do you work on a flat fee for Mr. Voorhees or is
18   it a hourly basis?
19   A. Hourly basis.
20   Q. What's your hourly rate currently?
21   A. $400 an hour.
22   Q. Number five all invoices and statements generated
23   by you or your firm for the services provided in the
24   present matter?
25   A. I have a whole bunch of those. Left them in the

Page 16

1   copy room. They're heavily redacted but I do have them.
2   Q. So we can get those maybe at a break?
3   A. Yep.
4   Q. Then the retainer agreement between you or your
5   firm and HLV relative to the Van Buren Circuit Court
6   matter?
7   A. Again, I would not have one for that file either.
8   Q. And then number seven invoices and statements by
9   your firm relative to the HLV versus ELC Van Buren
10   Circuit Court matter is that also on the copier?
11   A. Isn't that what you just asked me? I'm sorry.
12   Q. No, I asked for invoices in the present matter
13   and then I asked for invoices in the underlying matter.
14   A. Yes.
15   Q. Okay. Then all documents, number eight, all
16   documents that show payment for the legal services
17   provided by your firm or you in the Van Buren Circuit
18   Court matter?
19   A. The only thing that would show it is on the
20   billing statements showing receipt of payment. I do
21   not -- I did not make any effort to retrieve checks from
22   any banks and get copy cost incurred or anything else
23   for old payments.
24   Q. Okay. Looks like number nine is duplicative of
25   number six so my apologies for that.

Page 17

1   A. That's why I jumped. I got lost. I thought you
2   were on nine and.
3   Q. I was trying to trip you up to say, you know, if
4   I didn't catch it on number six I'd catch it on number
5   nine.
6   MR. CALLAHAN: Let the record reflect that
7   was facetious too.
8   MS. BURKE: And the crowd laughed so. Yeah
9   I forget how this may look reading it later.
10   MR. CALLAHAN: I forget it all the time.
11   BY MS. BURKE:
12   Q. May I see the documents that you brought?
13   A. Sure.
14   Q. So Elijah.com can you tell me what kind of
15   company that is or Elijah Limited?
16   A. It's a forensic IT firm.
17   Q. And you contacted them regarding the underlying
18   case, correct, or was it this case?
19   A. The underlying case.
20   Q. What was it that you initial --
21   A. If you mean by the ELC matter?
22   Q. Yes.
23   A. Yes. I'm sorry what was?
24   Q. And you asked them to do what in the underlying
25   matter?

5 (Pages 14 - 17)

Page 18

1   A. We asked them to take a look at ELC's computers.
2   Q. And did they do that?
3   A. Whatever was turned over they did. Not
4  everything was turned over.
5   Q. What was withheld?
6   A. The details of that I would not be able to tell
7  you off the top of my head at this point. I have so
8  many storage cells up there and old cases tend to leave
9  as new cases come but I do recall that there was --
10 there were things that simply were not turned over.
11  Q. Was it they weren't turned over due to technical
12 computer science reasons and they couldn't be produced?
13  A. No, they just simply weren't turned over by ELC
14 or ELC's personnel.
15  Q. Okay. It was my understanding that some
16 computers were taken from ELC and were those computers
17 then reviewed by Elijah.com or are you talking about
18 information that was obtained in a different way?
19  A. These were devices were reported to be turned
20 over.
21  Q. Okay.
22  A. I don't know what your assumption is.
23  Q. I'm not assuming anything. I'm trying to figure
24 out exactly what -- so what you're saying as far as some
25 documents were withheld it wasn't from Elijah.com. What

Page 19

1  you're saying is that they were documents that were not
2  produced to HLV from ELC; is that true?
3   A. No, they were devices that were not turned over
4  to Elijah for forensic examination.
5   Q. By ELC?
6   A. By ELC and their personnel.
7   Q. What devices are you stating were not turned
8  over?
9   A. And that's the part that I don't recall. I just
10 know that there were some devices that were not turned
11 over and were missing and so therefore we're not sure
12 that we got a full view of for instance e-mails and so
13 forth.
14  Q. What devices were turned over?
15  A. I know that I think there was some memory cards.
16 I think there was a desktop. In truth I don't remember
17 all total what was turned over. I do remember that
18 there were a couple of different devices though.
19  Q. Okay. Mr. Visser has provided me with a stack of
20 e-mails and this is between your office and Elijah,
21 true?
22  A. Either between our office or -- and Elijah.
23 There are some from Mr. Witte's office as well and
24 Elijah.
25  Q. Mr. Witte for the record he was co-counsel with

Page 20

1  you on this case for some time?
2   A. No, he was counsel on this case prior to my
3  involvement.
4   Q. You weren't co-counsel?
5   A. Nope.
6      DEPOSITION EXHIBIT NO. 2
7      E-mails
8      WAS MARKED FOR IDENTIFICATION
9  BY MS. BURKE:
10  Q. This is Deposition Exhibit 2. And then like we
11 mentioned we'll get the invoices off the printer at the
12 break. Rebecca Baker she was an employee of your firm
13 at one time, correct?
14  A. She was.
15  Q. In what capacity was she employed?
16  A. Depend upon what times you're talking. For a
17 while she was a law clerk.
18  Q. So she worked for you as a law clerk and did that
19 change?
20  A. Then an intern or whatever. Then she was going
21 to school and eventually she passed the bar and worked
22 for us for a while while she was figuring out what she
23 wanted to do.
24  Q. So she worked for you as an attorney as well?
25  A. She did.

Page 21

1   Q. How long did she work for you?
2   A. Three years maybe, two and a half.
3   Q. Have you ever hired anyone else that is related
4  to Mr. Baker other than Rebecca?
5   A. Yes.
6   Q. Okay who else?
7   A. Jeremy Voorhees.
8   Q. Rebecca Baker is Robert Baker's daughter,
9  correct?
10  A. That is correct.
11  Q. And then Jeremy Voorhees in what capacity did he
12 work for you?
13  A. He worked as a law clerk and then for a short
14 time as an attorney.
15  Q. When did Rebecca Baker leave your employ --
16 employment?
17  A. Two years ago. A year and a half ago.
18  Q. And Jeremy Voorhees how is he related to Mr.
19 Baker?
20  A. Mr. Baker's nephew.
21  Q. Is he related to Mr. Voorhees, Harold Voorhees?
22  A. He is.
23  Q. How so?
24  A. He is his son.
25  Q. Is Jeremy Voorhees still employed by your office?

6 (Pages 18 - 21)

Page 22

1    A. He is not.
2    Q. When did he leave?
3    A. Mid March.
4    Q. Of this year?
5    A. That's correct.
6    Q. Why did he leave?
7    A. He wants to write a book.
8    Q. Any other relatives of Mr. Baker that your office
9  has employed?
10   A. No.
11   Q. Any other relatives of the Voorhees family that
12 your office has employed?
13   A. No.
14   Q. The incident involving Donovan your son and
15 others from HLV at ELC offices you were not there that
16 day, correct?
17   A. That's correct.
18   Q. That was in April of 2012 -- 2013, correct?
19   A. I think that sounds correct.
20   Q. Okay. You weren't there, correct?
21   A. I was not.
22   Q. Did Donovan tell you that he was going to the ELC
23 office?
24   A. Yes.
25   Q. Did you have any contact with either Mr. Stewart

Page 23

1  or Mr. Page prior to Donovan and company appearing at
2  the ELC office?
3    A. Lots.
4    Q. Who were you communicating with?
5    A. Page and Stewart.
6    Q. When did you first contact either Mr. Page or
7  Mr. Stewart about going to the ELC offices?
8    A. Oh okay. If you're limiting me to that it would
9  have been, if I recall correctly, probably the first
10 time of the month or between a month or two before the
11 actual arrival on-site.
12   Q. Who was it that you were speaking to?
13   A. I don't know it's difficult because they blend in
14 together. But I think it was Stewart primarily on this.
15   Q. And it was your position that HLV had the right
16 to go to the ELC offices and obtain documents and
17 computers; is that true?
18   A. I think that's overstating my position.
19   Q. Okay. Why don't you tell me.
20   A. Absolutely they had a right to be there. They
21 had a right to review the records. They had a right to
22 review the information on the computers. I don't think
23 anybody ever tried to take anything.
24   Q. And Mr. Stewart's position your interpretation of
25 Mr. Stewart's position was what?

Page 24

1    A. He just wanted to ride the fence and drag things
2  out.
3    Q. Did you have any contact with Mr. Stewart the day
4  of the visit?
5    A. Yes.
6    Q. Was that before or after Donovan and company
7  arrived?
8    A. Might have been both but certainly I remember
9  before.
10   Q. What was the conversation with Mr. Stewart
11 before?
12   A. It was communications by e-mail and basically it
13 was a follow-up of our notice of the prior day or two
14 and Gary had gotten back on the morning of the visit and
15 said something to the effect that, there is an e-mail
16 that's been circulated I haven't seen in quite some
17 time, but something to the effect that I don't think
18 they're going to let you look at the information so I
19 would suggest that you voluntarily not show up.
20   Q. Okay. And then did you talk or have any other
21 communications with Mr. Stewart after folks from your
22 office and folks from HLV arrived at the ELC office?
23   A. I don't think I had any further communication
24 after they arrived.
25   Q. Did you have any communication that day with

Page 25

1  Kelly Page?
2    A. I do not believe so. Not that I can recall.
3    Q. Okay. Did you have any conversations with
4  Donovan when the police showed up?
5    A. I know that we had communications that day but
6  I'm not sure when exactly it occurred relative to when
7  the police showed up or didn't show up or if they had
8  left or whatever. So I know we had communication
9  because we talked by telephone before he arrived back at
10 the office.
11   Q. Okay. Did you have any communications with Kelly
12 Page that day about the arrival of the police?
13   A. Not that I can recall.
14   Q. Did you have any communications with Gary Stewart
15 that day about the arrival of the police?
16   A. Not that I can recall about the arrival of the
17 police.
18   Q. I want to talk about the May 10th, 2013
19 conference call with Judge Hamre in the underlying
20 matter.
21   A. All right.
22   Q. Now at your office we heard from Mr. Baker at
23 your office that Mr. Baker was present at the -- for the
24 conference call?
25   A. Correct.

7 (Pages 22 - 25)

Page 26

1    Q.  But he did not let's just say voice his
2  appearance nor did anyone from your office who was in
3  the same room said Mr. Baker is here on the call,
4  correct?
5    A.  I think that's what he said.
6    Q.  Okay.  Who else other than Mr. Baker was in the
7  room for the conference call?
8    A.  I believe Rebecca Baker was in the room.
9    Q.  Was Ms. Baker, Rebecca Baker an attorney at that
10  time?
11    A.  Frankly, I don't recall at this moment.
12    Q.  Okay.  Who else other than Mr. Baker and
13  Ms. Baker?
14    A.  I know Donovan Visser was present but I don't
15  know that he was present when it began or not.
16    Q.  And then yourself of course, correct?
17    A.  Correct.
18    Q.  Where were you all seated at the time?  Were you
19  in your office?
20    A.  In my office.
21    Q.  And where did you place your recording device?
22    A.  Frankly, I don't recall that.  I know it would
23  have been someplace out of the way because I was trying
24  to take notes.
25    Q.  Okay.  Do you recall Mr. Baker's deposition

Page 27

1  testimony where he stated that he put his recording
2  device right next to yours?
3    A.  I do not recall that.
4    Q.  Do you recall Mr. Baker's deposition testimony
5  where he said that he announced to everyone in the room
6  that he was going out to his truck to retrieve his own
7  recording device and that he was laughed at and mocked
8  for doing that?
9    A.  I remember something to the effect that he said
10  he went out to his truck and something about laughed at.
11  I don't know if he was mocked or what he said there.
12    Q.  Do you recall others in the room laughing at him?
13    A.  I do not recall that.
14    Q.  Did you file a motion with the court prior to the
15  May 10th conference call asking that the -- asking for
16  your permission to record the proceeding?
17    A.  Did not.
18    Q.  Are you aware of the court rules specifically
19  MCR 8.109(C) that requires the notification of the court
20  and the filing of a motion before any proceedings can be
21  recorded?
22    A.  I am -- don't have the court rules memorized so
23  if you want to go over one of them I'll be happy do
24  that.
25    Q.  Well at the time that you recorded the proceeding

Page 28

1  were you aware of the court rule that required a motion
2  be filed before the actual proceeding where the court
3  may permit the audio recording in whole or in part?
4    A.  Of what?
5    Q.  Sure, I'll give it to you.  It's MCR8.109(C).  I
6  highlighted it there in my court rules.
7    A.  It's what I thought.
8    Q.  Were you aware of that court rule before you made
9  the audio recording?
10    A.  I am aware of the court rule, yes, ma'am.
11    Q.  And you did not file a motion with the court
12  prior to the recording of the May 10th proceeding,
13  correct?
14    A.  I would not call it a proceeding.
15    Q.  Did you notify the court in any way that you
16  would be recording the May 10th, 2013 proceeding or
17  however you want to classify it as?
18    A.  It was a status conference that was to be done by
19  telephone.  It was not intended by the court to be on
20  the record proceeding.
21    Q.  Okay but my question was a little bit different.
22  Did you notify the court in any manner that you would be
23  recording that proceeding, conference call, however you
24  want to classify it?
25    A.  I guess my problem in answering the question is

Page 29

1  the way it's formed and that is is that it assumes that
2  there was a requirement to do so.  I can answer the
3  question this way.  I did not inform the court that I
4  was recording the status conference and telephone call
5  that we had.
6    Q.  Now once this recording was made did you
7  distribute it to anybody?
8    A.  Yes.
9    Q.  Who did you distribute it to?
10    A.  Judge Dodge.
11    Q.  And that was in the contest of the underlying
12  case?
13    A.  Gary Stewart.  My client Mr. Baker.  I think the
14  attorney discipline or I'm sorry the attorney grievance
15  commission.  News people that called.  Derek Witte.  I
16  think each of your -- each of the attorney's offices in
17  this case.  That's all I can recall right off the top of
18  my head.
19    Q.  You mentioned Judge Dodge now that production was
20  in relation to the underlying matter, correct?
21    A.  That's correct.
22    Q.  Okay.  And then you said news people who called
23  did you notify the media initially?
24    A.  I don't believe so.
25    Q.  Who notified the media?

8 (Pages 26 - 29)

Page 30

1    A. I believe you'd have to ask the media. I know
2 that they obtained a copy of it after the court hearing.
3    Q. You said you provided them with a copy?
4    A. I did.
5    Q. Was that before or after -- well when was it that
6 you provided the news media with the copy?
7    A. After our hearing in front of Judge Dodge.
8    Q. Okay. But you don't know who tipped the media
9 off to the pending motion and the recording?
10    A. No, that was quite complex at that time because
11 the news media especially channel 3 was pretty hot on
12 the issue already. So I think --
13    Q. They were hot as to what issue?
14    A. With what was happening down at Van Buren County.
15 I think they had run a special in regards to Judge
16 Hamre. I think they had run a couple of different news
17 items already so they were pretty well aware what was
18 going on.
19    Q. So that you believe the media was already on to
20 Judge Hamre?
21    A. Yes.
22    Q. And --
23    A. If I recall correctly they had run one episode
24 where they had questioned him based upon the affidavits
25 and the motions and so forth and I think they showed him

Page 31

1 driving the wrong -- getting all crazy and driving the
2 wrong way out of a parking lot. Yeah.
3    Q. Do you know who tipped the media off to a
4 situation involving Judge Hamre?
5    A. I do not. I did not and I do not know for a fact
6 who did.
7    Q. Could it be anyone from your office?
8    A. It's always possible but I don't believe that to
9 be the case.
10    Q. Now on May 10th, 2013 you were aware that
11 Mr. Baker was also recording the proceeding, correct?
12    A. It was Mr. Baker's idea and I thought at the last
13 minute it was a good idea.
14    Q. But you were aware that there were two recording
15 devices being activated at the same time, correct?
16    A. Correct.
17    Q. You were also aware that in addition to
18 Mr. Baker's recording device Mr. Baker was not
19 identified as being a participant on the telephone call,
20 correct?
21    A. I do not know. I'd have to listen to the
22 recording to know whether that did or did not occur. I
23 don't believe that he was but.
24    Q. But you would rely on then the transcripts that
25 have been produced and created to find out whether or

Page 32

1 not that was in fact true would you not?
2    A. Well I'd rely on the recording, yes.
3    Q. Now because you were attending via telephone and
4 Mr. Stewart and Mr. Page were at the court at the time
5 because of those logistics you didn't know where for
6 example Mr. Page was sitting in relation to the
7 telephone in relation to Judge Hamre in relation to
8 Mr. Stewart, correct?
9    A. I assume they were going to appear by telephone.
10    Q. But when you got on the call and you were
11 informed both Mr. Page and Mr. Stewart were actually at
12 the court you don't know where Mr. Page was sitting in
13 relation to where Mr. Stewart was sitting in relation to
14 the telephone in relation to Judge Hamre? You didn't
15 know the logistics or the format, correct?
16    A. I have no idea that anybody could have been in
17 anybody's chair. They could have been standing that's
18 correct.
19    Q. And you don't know when people came into and/or
20 left the room because you weren't there, correct?
21    A. Now that's assuming something that I don't agree
22 with the form of the question because that somebody did.
23 I don't know if somebody did or didn't but I can't
24 really honestly answer a question that assumes that
25 somebody did or didn't.

Page 33

1    Q. Well my point was is that you don't know when
2 people came and/or left the room because you weren't
3 there? You didn't see it, correct?
4    A. You're assuming that somebody came and left. I
5 don't know that.
6    Q. So if Mr. Page and Mr. Stewart testify and say
7 that they left at a certain point during the recording
8 and the transcripts show that after that point neither
9 one of them said anything, you wouldn't have any
10 information to contradict the position that they
11 actually left the room, correct?
12    A. The only thing that I can say is what I heard and
13 what is on the tape and that is a few comments as we go
14 along by one or both Page and Stewart and their comments
15 at the end. How long they stayed after their voices
16 last on the tape I have no idea.
17    Q. Thank you.
18    A. They could have been there the entire time for
19 when Peggy Grote was making her comments directly with
20 the Judge Hamre or they could have been gone at that
21 time. The last I know and can verify that they were
22 there is when their voices put them there.
23    Q. Okay.
24      DEPOSITION EXHIBIT NO. 3
25      Mr. Visser's Transcript of Recorded Hearing

9 (Pages 30 - 33)

Page 34

1     WAS MARKED FOR IDENTIFICATION
2 BY MS. BURKE:
3    Q. I'm going to show you what I marked as Deposition
4 Exhibit 3. I made an extra copy for your office. And
5 this is a transcript that I've received on several
6 occasions and this is a transcript though that was
7 prepared from your recording? It was prepared at your
8 request was it not?
9    A. It was.
10    Q. Who prepared this transcript?
11    A. I believe that Lynn did, Lynn Rwswyk at our
12 office. She may have had some verification or some
13 assistance with it from Joan Mulder.
14        THE REPORTER: Can you spell the last name
15 for Lynn?
16        THE WITNESS: W I mean R-W-Y -- here you go.
17 R-W-S-W-Y-K. Mulder is M-U-L-D-E-R.
18        THE REPORTER: Thank you.
19 BY MS. BURKE:
20    Q. How many times did you compare this transcript to
21 the recording that you had?
22    A. I have not.
23    Q. You have not, okay. On page 18 -- well let me
24 ask you this. There are several places where it says
25 either inaudible or mumbling in the office. You would

Page 35

1 agree with me -- and there's also some places where the
2 speaker is unidentified with questions marks. So you'd
3 agree with me that whoever was transcribing this,
4 transcribing your recording they couldn't tell at
5 certain points who was saying what or what was being
6 said, correct?
7    A. That would be correct. Whoever prepared this
8 they were unable to identify the person.
9    Q. And you did not go back through and verify the
10 accuracy to your knowledge to the extent that you could
11 after the transcript was prepared, correct?
12    A. I did not. I decided not to have any input at
13 all into the preparation of the document.
14    Q. Okay. But it was prepared at your request was it
15 not?
16    A. That is correct.
17    Q. Page 18 at the very bottom of page 18 it said
18 click of line disconnect you see that at the very
19 bottom?
20    A. Correct.
21    Q. After that point then we go ahead and we talk
22 about a conversation between, well, it's depicted here
23 between Judge Hamre, Mr. Page, and Mr. Stewart. At that
24 point though it was your impression that Mr. Page and
25 Mr. Steward and Judge Hamre believed that you had

Page 36

1 disconnected the line, correct?
2    A. I have no idea what they believed.
3    Q. My question was a little bit different though.
4 It was what you thought they may have believed. At that
5 point you were with the understanding that they thought
6 you had then disconnected the line, correct?
7    A. No, I don't think I had any of those thoughts.
8    Q. No?
9    A. No.
10    Q. You don't believe that -- you didn't believe that
11 you thought that they didn't know that you were still on
12 the line?
13    A. I didn't have any thoughts with what they were
14 thinking or anything else. I was busy trying to make
15 notes because if you look at my calendar if you've read
16 the thing Judge Hamre was ordering me to appear when I
17 was scheduled to be someplace else just out of the blue
18 to show up the following Monday morning.
19    Q. So you're telling me that following the statement
20 click of the line disconnect you did not believe that
21 Judge Hamre thought that you were out of the hearing?
22    A. No, I had no thoughts. I was still making notes
23 at that particular point.
24    Q. Okay. And you have never attested otherwise to
25 that, correct?

Page 37

1    A. What my thoughts were at the time?
2    Q. No that you have -- at the time that it said
3 click of the line disconnect you have never attested
4 otherwise that Judge Hamre thought that you were out of
5 the hearing after that point?
6    A. Oh I've surmised after the fact, after I've
7 listened to the thing but I had no thoughts at the time.
8 I have since that time I can't imagine anybody engaging
9 in this type of behavior otherwise. Their true colors
10 showing forward but I don't think anybody would dare say
11 to this my face.
12    Q. So based on that your impression was they thought
13 that you were no longer on the line, true?
14    A. I have surmised since that time that they may
15 have thought that. I mean I guess we could all guess
16 what they were or were not thinking or that they weren't
17 thinking at all.
18    Q. Okay.
19        DEPOSITION EXHIBIT NO. 4
20        Telephone Conference Transcribed By Court
21        Reporter
22        WAS MARKED FOR IDENTIFICATION
23 BY MS. BURKE:
24    Q. I'll show you what I marked as Deposition Exhibit
25 4. This is actually just for the record I'm not going

10 (Pages 34 - 37)

Page 38

1  to ask you about any particular moment but this was a
2  transcript that was prepared by a court reporter who
3  signed the certification at the back of it that was
4  prepared in August of 2013 have you ever seen this
5  before?
6    A. I don't think so.
7    Q. So this was a court reporter an uninterested
8  third party who prepared who took your recording and
9  transcribed it.  And the differences are apparent.
10      DEPOSITION EXHIBIT NO. 5
11      Affidavit of Donald Visser
12      WAS MARKED FOR IDENTIFICATION
13 BY MS. BURKE:
14   Q. I'll show you what I marked as Deposition Exhibit
15 5.  And this is an affidavit that was signed by you,
16 correct?
17   A. Yes, ma'am.
18   Q. And it was -- it's dated May 12th, 2013 so two
19 days after the telephone conference, correct?
20   A. That's when it appears to be, yes.
21   Q. Does Lynn Rwswyk work on Sundays?
22   A. She may but I don't believe she does here.
23   Q. Because this document is signed May 12th, 2013?
24   A. Correct.
25   Q. And she signed it as being acknowledged by you on

Page 39

1  May 12th, 2013, correct?
2    A. Yes.
3    Q. May 12th, 2013 is a Sunday?
4    A. Okay.
5    Q. Were you working that Sunday?
6    A. I was, yes.
7    Q. Was Lynn working that Sunday?
8    A. I wouldn't... she may well have been because that
9  I know we had to put the motion together and a number of
10 affidavits to be filed the following Monday so we had to
11 have the package set to go so we may have gotten her to
12 come in on Sunday.
13   Q. Okay.  What was the purpose of you preparing this
14 affidavit?
15   A. For submitting to the court the factual basis for
16 the disqualification of Judge Hamre.
17   Q. Okay.  Paragraph four you state that on March
18 6th, 2013 Judge Hamre issued an ex-parte temporary
19 retraining order requested by Attorney Kelly Page in
20 case number 11-51-558-CH which interfered with and
21 enjoined HLV, LLC from enforcing the terms of the
22 settlement agreement with ELC defendants paren (sic)
23 Kelly Page's new clients end paren.  Despite the fact
24 that the settlement agreement had been entered as an
25 order of the circuit court by Judge Hamre on October

Page 40

1  11th, 2013.  Did I read that correctly?
2    A. Correct.
3    Q. Relative to your comments that the March 6th,
4  2013 ex-parte temporary retraining order was requested
5  by Kelly Page what personal knowledge do you have that
6  that TRO was requested by Kelly?
7    A. I think his signature's on the document.
8    Q. So you're only going by the signature on the
9  document?
10   A. I'm pretty sure that that's what that was the
11 primary factor.  I don't recall if at that time we also
12 had supplemental knowledge that Kelly had said he had
13 gone to get it.  But I believe that was -- would have
14 been based on his signature.
15   Q. You state in paragraph six that on March 22nd,
16 2013 Judge Hamre again had ex-parte communications with
17 Attorney Kelly Page and/or his office based on those
18 ex-parte communications Judge Hamre again issued an
19 ex-parte order enjoining HLV, LLC.  What personal
20 knowledge do you have that on March 22nd Judge Hamre had
21 ex-parte communications with Kelly Page and/or his
22 office?
23   A. That's a complex answer because since that time I
24 found out that that isn't true.  Although it was
25 represented to be true.  It was represented by your

Page 41

1  client Kelly Page in a document he transmitted over to
2  our office that he had obtained it.
3    Q. He obtained what, sir?
4    A. The ex-parte order from Judge Hamre.  Since that
5  time and we had -- we found out that it was not Judge
6  Hamre's signature it was somebody else's and that he had
7  not signed it so it was -- well at that time we still
8  thought it was Judge Hamre's signature.  It was Kelly
9  Page that purportedly transmitted it to his office.
10   Q. But my question is you say that Judge Hamre again
11 had ex-parte communications with Attorney Kelly Page
12 and/or his office.  Let me break it down.
13   A. Correct.
14   Q. Do you have any personal knowledge that on March
15 22nd, 2013 Judge Hamre had ex-parte -- had
16 communications with Attorney Kelly Page?
17   A. No.
18   Q. Do you have any personal knowledge that on March
19 22nd Judge Hamre had direct communications with anyone
20 from Kelly Page's office?
21   A. No.  Based upon the fact that it's not a document
22 that Judge Hamre actually signed I do not.
23   Q. Have you ever talked to Judge Hamre about that
24 signature on that order?
25   A. No.

11 (Pages 38 - 41)

Page 42

1  Q. Okay. Paragraph 11 it says during the status
2  conference, and it's my understanding you're referring
3  to the May 10th, 2013 status conference, correct?
4  A. Yes.
5  Q. You say during the status conference it became
6  clear that ex-parte communications and materials had
7  been received by Judge Hamre from Attorney Page. What
8  communications are you speaking of?
9  A. I have no idea. Other than that Judge Hamre was
10 bringing up things that weren't on the record and
11 advocating things that obviously had been expressed to
12 him outside of being on the record.
13 Q. Weren't the parties supposed to submit either the
14 day of or shortly before some type of status conference
15 submissions?
16 A. They were.
17 Q. Okay. And so?
18 A. I submitted mine I've never received anything
19 from Kelly Page.
20 Q. Did you receive anything from Gary Stewart?
21 A. Did not. Mine by the way were thrown away.
22 Q. So when you say that it became clear that
23 ex-parte communications and materials had been received
24 by Judge Hamre from Attorney Page you don't know if in
25 fact that they were in fact communications between Judge

Page 43

1  Hamre and Attorney Page? This is just your opinion,
2  correct?
3  A. Judge Hamre had information advocated positions
4  that came from I guess I would have to say Page or
5  Stewart. It could be either one of them at that
6  particular point. Gary -- Kelly Page was the one that
7  had been at the prior -- the week prior had been there
8  and he was the one that was supposed to submit the
9  additional information. Obviously the judge had
10 information that he could not have gotten except
11 somebody gave him additional numbers, additional
12 positions that were not advocated prior to that time.
13 Q. But you've never seen any sort of documents that
14 supports your position that there were in fact
15 communications between Kelly Page and Judge Hamre
16 relative to your statement in paragraph 11, correct?
17 A. No, it's kind of like sausage --
18 Q. But what I said was correct?
19 A. -- but I didn't see it going in but I see it
20 coming out.
21 Q. Well I understand. I understand your conclusions
22 but again you have never seen any type of letter,
23 e-mail, fax, document that supports that position that
24 there were --
25 A. Correct.

Page 44

1  Q. -- communications between Kelly Page and Judge
2  Hamre?
3  A. Because had I then it probably wouldn't have met
4  the qualifications of ex-parte communications anymore.
5  Q. And you also do you know of any witnesses who
6  could testify to support your position that there were
7  ex-parte communications between Mr. Page and Judge Hamre
8  before that May 10th, 2013 status conference?
9  A. No, other than again, you know, as I say the
10 sausage coming out.
11 Q. And I understand and that's your opinion,
12 correct? You don't have any proof of that? You don't
13 have any witnesses who will come in and say yes I saw
14 the two of them talking about this issue before the
15 status conference, correct?
16 A. No, I understand what you're trying to say but I
17 want to make the distinction that I don't have any
18 evidence; the evidence is the sausage that came out
19 because I didn't see somebody put it into the grinder
20 doesn't mean it wasn't put in.
21 Q. And if there is evidence that there was a
22 pre-status conference submission that was sent to the
23 judge on behalf of ELC and it was also sent to you, that
24 would be something that would be -- that you weren't
25 aware of as you sit here today, correct?

Page 45

1  A. Run that one by me again.
2  Q. Sure. You say, again going back to paragraph 11,
3  you say for example the court referenced an offer of
4  1,800 from a third party for purchase of trailers from
5  ELC although the assets belong to HLV. Do you see that
6  in paragraph 11?
7  A. Yes.
8  Q. And that was your reference that you're saying
9  that how could the judge have known that but for an
10 ex-parte communication, correct?
11 A. That is an example I gave of my memory at that
12 time of what had happened during that conference call.
13 That was an example, correct.
14 Q. And if there is -- if there was a status
15 conference submission on behalf of ELC that was sent to
16 the court and then also sent to your office, you would
17 agree with me then it would not be an ex-parte
18 communication, correct?
19 A. If it was also sent to me, it would not be
20 ex-parte, correct.
21 Q. Do you have any other examples other than the
22 court referenced an offer of $1,800 from a third party
23 that supports your opinion that there were ex-parte
24 communications between Judge Hamre and Attorney Page?
25 A. Not as I sit here.

12 (Pages 42 - 45)

Page 46

1  Q.  Okay.  Going on to paragraph 12, and paragraph 12
2  is your recollection and your opinion of how the status
3  conference went on and I want to go to it was actually
4  highlighted the first sentence that's highlighted there
5  on paragraph 12.  It says after Judge Hamre thought the
6  undersigned was out of the hearing; do you see that?
7  A.  Correct.
8  Q.  And in that sentence you're referring to the
9  point in your transcript on page 18 where it says line
10  disconnected, correct?
11  A.  The transcript had not been prepared yet.
12  Q.  I understand that.  I understand that.  But I'm
13  using the transcript to help me, you know, put the
14  timeline together.  But when you say after Judge Hamre
15  thought the undersigned was out of hearing, that's the
16  point in time that's referred to on Page 18 of the
17  transcript where it says click of line disconnect,
18  correct?
19  A.  No, I'm just simply saying there that he thought
20  that we were out of hearing.  I have no idea what
21  motivated him.
22  Q.  I'm not asking about his motivation.  I'm asking
23  about the point in time during the recording.  When you
24  say after Judge Hamre thought the undersigned was out of
25  the hearing that corresponds to page 18 where it says

Page 47

1  click of line disconnect does it not?
2  A.  No.  I think it refers to a later point where
3  apparently Gary Stewart and Kelly Page had left the
4  office.
5  Q.  So it's your understanding that you believe Judge
6  Hamre thought you were on the line the whole entire time
7  starting on page 19 of your transcript?
8  A.  I have no idea what Judge -- I can speculate as
9  to what Judge Hamre thought but I have no idea.
10  Q.  No.  No, I'm not talking about what Judge Hamre
11  thought.  I'm talking about when you say after Judge
12  Hamre thought the undersigned was out of the hearing.  I
13  want you to look then at your transcript Exhibit 3 and
14  tell me what point in the transcript does that statement
15  correspond to?
16  A.  It would be probably second to the bottom line on
17  paragraph -- on page 19.
18  Q.  No.  No.  I want to talk about you say two days
19  after the fact --
20  A.  Oh I'm sorry.  I'm sorry.
21  Q.  You say two days after the fact Judge --
22  A.  The top of page 20.
23  Q.  You say two days after the fact after Judge Hamre
24  thought the undersigned was out of the hearing.  And now
25  you're telling me that after all of the comments made

Page 48

1  about you and your son you believe that Judge Hamre
2  thought you were still in the hearing?
3  A.  No, this comment is referring to the top of page
4  20.
5  Q.  Okay but my question though is because you
6  already testified and you said that it would surprise
7  you if people would make these comments that start on
8  page 19 about you and your son knowing that you were
9  listening, knowing that you were there?
10  A.  Correct.
11  Q.  So what now you're telling me your sentence that
12  says after Judge Hamre thought the undersigned was out
13  of the hearing you're referring to a point in time that
14  started on page 20 after those comments were already
15  made?
16  A.  Twenty, yes.  That's when he indicated that he
17  had no intention of actually proceeding with the hearing
18  and he was going to cut us off.  And he thought -- I
19  think he thought everybody, and again I'm speculating at
20  this point.  As I look back I think he thought everybody
21  was out of ears reach.
22  Q.  Let me ask you this way.  The comments that start
23  on page 20 those comments that you have on your
24  transcript when those were said did you believe that
25  because they were being said on the other line do you

Page 49

1  believe that they knew you were still listening?
2  A.  Oh no as I look back on it, no.
3  Q.  So it's your belief that when the comments
4  started on page 19 your belief is that they didn't know
5  that you were still listening, correct?
6  A.  That is my current belief, yes.
7  Q.  Continuing on paragraph 12 of your affidavit you
8  say more importantly Judge Hamre continued to discuss
9  the matter with Attorney Page.  Just Attorney Page; is
10  that your position?
11  A.  No.  As I look at the transcript Gary Stewart was
12  involved but I remember hearing Kelly Page.  When I
13  wrote this affidavit I remember hearing Kelly Page.
14  Q.  Or who you thought was Kelly Page?
15  A.  Oh no I'm pretty sure.
16  Q.  You're pretty sure?
17  A.  Sure.
18  Q.  Did you know that Kelly Page uses hearing aids?
19  A.  Yes.
20  Q.  Did you know at the time that you made this
21  affidavit that for various reasons Kelly Page did not
22  have those hearing aids in?
23  A.  I have no idea.  I didn't even know if he wore
24  pants that day.
25  Q.  I'm sorry?

13 (Pages 46 - 49)

Page 50

1   A. I don't even know if he wore pants that day.
2   Q. Okay fair enough. I don't either but I'm going
3 to go out on a limb and say that he was. And again you
4 don't know where Attorney Page was situated in the room
5 and whether he was having hearing difficulty, correct?
6   A. I have no idea, ma'am.
7   Q. But you've since then seen documents that have
8 stated just that have you not, whether they be in this
9 litigation, the underlying litigation, or the AGC
10 matter? You have seen documents to that effect?
11   A. Let me put it this way I don't think that I have
12 seen anything to that effect in this litigation or the
13 underlying ELC litigation.
14   Q. Have you seen anything in the AGC matter to that
15 effect?
16   A. I am not going to discuss the AGC matter.
17   Q. Is there a reason why?
18   A. I believe everything that I have seen subsequent
19 to the initial request for investigation and the
20 response is subject to confidentiality.
21   Q. Even despite the fact that the formal complaint
22 has been filed you still believe that to be true?
23   A. I haven't seen with the -- I haven't seen
24 anything publicly.
25   Q. Okay.

Page 51

1   A. So I am concerned about -- I am not concerned
2 about disclosing the fact that a request for
3 investigation was filed. I'm not concerned. I don't
4 believe that's covered by the confidentiality
5 requirement or the response but I believe that anything
6 afterwards is covered.
7   Q. Okay.
8   A. If in fact there is anything.
9   Q. Okay.
10   A. And I'm not even going to acknowledge at this
11 point that there's a formal complaint. I'll take
12 your word for it.
13   Q. Okay.
14   A. I don't mean to be evasive but I think that's
15 important that I don't know if there's a waiver
16 provision that you're able to give on behalf of your
17 client or not but I am concerned about.
18   Q. Okay. Going back to paragraph 12 again you say
19 more importantly Judge Hamre continued to discuss the
20 matter with Attorney Page and what he intended to do to
21 help the ELC Defendants?
22   A. Correct.
23   Q. What did you hear that supports your statement
24 that Judge Hamre intended to help the ELC Defendants?
25   A. I can probably listen to the tape and give you --

Page 52

1   Q. Well it's on your transcript.
2   A. Well again I haven't read the details of the
3 transcript. There could be variations but my
4 recollection was is that they were going to have a
5 meeting and discuss it and laughed about whether they
6 were going to invite me. I assume me as opposed to my
7 son but it could have been my son but about inviting
8 Visser.
9   Q. And that was based on what you heard or what you
10 read in your transcript?
11   A. What I heard.
12   Q. Is it possible you heard incorrectly?
13   A. Everything's possible in this world. It all gets
14 down to probabilities.
15   Q. Paragraph 15 you say while having his ex-parte
16 communications with Attorney Page you keep referring to
17 Attorney Page during this whole process?
18   A. Correct.
19   Q. So it's your believe that Mr. Stewart was not
20 there; is that true?
21   A. No.
22   Q. Then why didn't you reference Mr. Stewart in any
23 of these alleged ex-parte communications?
24   A. Because I remember hearing what I believed was
25 Attorney Page and that's what I put in my affidavit.

Page 53

1   Q. Despite the fact that your transcript notes
2 statements that were allegedly made by Mr. Stewart
3 during this time period?
4   A. I understand. This was prepared from what I
5 heard and what I recalled. We had no transcript at that
6 time and I can tell you as we sit here I don't recall
7 ever having reviewed the transcript.
8   Q. Okay. When was this transcript prepared your
9 transcript Exhibit 3?
10   A. I do not know.
11   Q. Was it, you know, months after the recording?
12 Was it within 24 hours of the recording?
13   A. No. It was shortly after the recording but I
14 don't -- it wouldn't have been within 24 hours. I know
15 that Lynn had a few questions where she said I can't
16 hear what's going on.
17   Q. So even Lynn who was transcribing this was having
18 difficulty hearing at some point, correct?
19   A. Well I assume otherwise she wouldn't have made
20 the statement.
21   Q. Okay.
22   A. And I don't know...
23   Q. You say in paragraph 15 while having his ex-parte
24 communications with Attorney Page Judge Hamre indicated
25 that he did not review the undersigned's status

14 (Pages 50 - 53)

Page 54

1  conference's submission and that he threw it away,
2  correct?
3     A. Correct.
4     Q. But again we've already talked about you don't
5  know when or even to your benefit if Attorney Page left
6  the room when Judge Hamre was discussing your status
7  conference submission, correct?
8     A. That would be true.
9     Q. Okay. So you don't know if Judge Hamre's
10 comments about your status conference submission was
11 made in the presence of Attorney Page, correct?
12    A. That is true.
13    Q. Did you submit any correspondence to the Attorney
14 Grievance Commission after Mr. Page submitted his
15 response to the request for investigation? And I want
16 to say let me take this up and to the point of -- up
17 until the point with the briefing with the attorney
18 discipline board and I think you would agree with me
19 that's the most recent event?
20    A. I have trouble in answering that on the record.
21    Q. Are you aware of the court rule that makes the
22 request for investigation quasi-public that they're
23 available to the public once a formal complaint is made?
24    A. Once a formal complaint is made, yes.
25    Q. So with that agreement then are you still

Page 55

1  troubled?
2     A. I am still troubled.
3     Q. Are you refusing to answer?
4     A. At this point I think I need to.
5     Q. Okay. I am done with my questions -- oh I'm
6  sorry?
7     A. Yeah, we can discuss it off the record
8  potentially maybe you can provide some guidance for me
9  as to how you see this but due to certain events which
10 I'm not willing to describe that are still pending I
11 don't know that we're actually at what you call a formal
12 complaint.
13    Q. I want to have the opportunity to look through
14 these e-mails and your invoices so if we could take a
15 break now.
16    A. Yep.
17       (Off the record at 12:19 p.m.)
18       (Back on the record at 12:44 p.m.)
19    DEPOSITION EXHIBIT NOS. 6 and 7
20    HLV Invoices from Visser & Associates from
21    7/9/09-6/24/16
22    and Elijah Invoices
23    WERE MARKED FOR IDENTIFICATION
24 BY MS. BURKE:
25    Q. Mr. Visser, you handed me what I marked as

Page 56

1  Deposition Exhibit 6 and this is a rather voluminous
2  exhibit that's copied on both sides for the record so
3  you know when you're making your copies. These have
4  been represented as being your invoices to HLV in the
5  underlying matter?
6     A. To the best of my knowledge, yes.
7     Q. And we had discussions off the record concerning
8  the redacted portions and those would be the
9  descriptions for the billing entry?
10    A. Correct.
11    Q. So at this point these are being produced for
12 dollar amounts which have not been redacted and those
13 are shown, correct?
14    A. Correct.
15    Q. So your first invoice is dated August 13th, 2009?
16    A. It appears that way, yes.
17    Q. And then your last billing invoice appears to be
18 August 16th, 2016?
19    A. Yep, seven years I guess.
20    Q. Now was this the litigation part or was there
21 more to it than just the litigation?
22    A. No, that's the entire thing. That's what I
23 thought you wanted.
24    Q. So this includes more than the litigation?
25    A. Correct. Yes. The litigation would have

Page 57

1  actually started with that first ex-parte order from
2  Mr. Page back in March of 2013, early March.
3     Q. Well Mr. Page was not the original attorney on
4  the litigated matter, correct? You'll agree with me
5  there?
6     A. That is true. That is... that's correct. It may
7  be I just kind of misstated things because of my
8  involvement. I did not get involved until it became
9  about the same time Mr. Page became involved because of
10 his involvement and what was happening.
11    Q. Okay.
12    A. So if I said earlier that I became involved when
13 it was litigated not from the very beginning because it
14 was litigated. It was litigated to a settlement.
15    Q. By your firm though, correct?
16    A. By our firm and another attorney a Mr. Haywood I
17 think and my son Donovan Visser handled that portion of
18 it. I had not been involved. However when it became
19 contested with the ex-parte orders and so forth that
20 were obtained by Mr. Page then I became involved.
21    Q. Now --
22    A. That's really when you look at what I call the
23 contested and what I was thinking in my head was really
24 from early March of 2013 on.
25    Q. So then the billings from August 13th, 2009

15 (Pages 54 - 57)

Page 58

1 through let's just say February of 2013 that included
2 the litigation before you got involved but your firm was
3 involved, correct?
4    A. Correct.
5    Q. And then but what are the services that were
6 provided between 2009 and 2011 when the lawsuit was
7 filed?
8    A. It would have been initially drafting of the loan
9 documents and all the related matters everything
10 having -- getting the titles transferred for security,
11 UCC statements, pledges, everything associated with a
12 transaction. Promissory notes, loan agreements.
13    Q. Okay. We marked as Deposition Exhibit 7 these
14 are invoices between your firm and the Elijah entity
15 that was doing computer work for you?
16    A. Correct.
17    Q. That was relative to the devices that were
18 retrieved from ELC, correct?
19    A. I'd have to look at them. These I asked to pull
20 all of the -- we had to dig through our files to pull
21 everything that we had. I am not -- I assume so but...
22 I assume so because if it's posted to this file
23 hopefully it's related to this file. Yes. These are
24 all related to the ELC matter.
25    Q. Okay. And then is your assistant still

Page 59

1 retrieving the invoices for the current matter?
2    A. Let me check.
3       DEPOSITION EXHIBIT NO. 8
4       HLV Invoices From 9/30/13-1/31/17
5       WAS MARKED FOR IDENTIFICATION
6 BY MS. BURKE:
7    Q. Mr. Visser, I'm going to show you what we marked
8 as Deposition Exhibit 8 and it's my understanding that
9 these are the redacted invoices from your firm relative
10 to the present lawsuit, correct?
11    A. That is correct.
12    Q. Okay. And these began September 30th of 2013
13 that's the first invoice, the date of the first invoice?
14    A. Yes, and the last one I think is March of 2017.
15    Q. Okay. Mr. Visser, you had listed yourself on
16 Plaintiff's initial disclosures for this current
17 lawsuit; do you recall that?
18    A. Yes.
19    Q. Have we talked about all of the events or
20 incidents that brought about the inclusion of your name
21 on the initial rule 26 disclosure?
22    A. I have no idea. I put myself on there because I
23 have some knowledge for instance I have knowledge of the
24 conversation with the judge.
25    Q. Talking about the May 10th, 2013?

Page 60

1    A. Correct. I have knowledge of what led up to it
2 after the incident at HLV. I have first-hand knowledge.
3    Q. You mean at ELC?
4    A. At ELC. But, you know, to say it's all it might
5 be all you're interested in I don't know.
6    Q. Well I appreciate --
7    A. I mean I was involved in day to day stuff going
8 down. For instance, I was involved in the hearing the
9 week prior to the status conference, the show cause
10 hearing, which, you know, all the events that's one of
11 the events. I was involved in a prior show cause
12 hearing relative to ELC. So there's two hearings in
13 front of Judge Hamre.
14    Q. Let me ask these general questions. Have you
15 ever seen any documents or communications between either
16 and/or Mr. Page, Mr. Stewart, and Judge Hamre that would
17 support your position of these existence of ex-parte
18 communications?
19    A. Have I seen any documents?
20    Q. Yes, sir.
21    A. No, I think it's the absence of documents that
22 has been concerning to me.
23    Q. Have you ever witnessed Judge Hamre and Kelly
24 Page in a social setting where that you believe that
25 there were ex-parte communications occurring?

Page 61

1    A. No.
2    Q. Have you ever witnessed Judge Hamre and Gary
3 Stewart in, I guess I should broaden it a little bit, in
4 any type of situation where you believe that there were
5 ex-parte communications occurring?
6    A. Have I seen them in that situation?
7    Q. Yes, sir.
8    A. No.
9    Q. And it's my understanding that any sort of
10 knowledge that you have gained has been through other
11 people telling you so relative to the allegations in the
12 amended complaint in this case, correct? Let me ask it
13 this way. Do you have any personal knowledge of the
14 veracity of the allegations in the complaint?
15    A. Yes.
16    Q. And as to which instances?
17    A. Well I have, again, my conclusions based upon
18 what was filed and not filed and what Judge Hamre said
19 and so forth. The incident that or the status
20 conference that we've talked about. The court
21 appearances including the two show cause hearings. The
22 order that's really not an order. You know, I can look
23 at the signature and do a comparison and but I'm not an
24 expert but it doesn't look to be the same to me. Then
25 knowing since then that it's, you know, not the same

16 (Pages 58 - 61)

Page 62

1 and, you know, knowing that it's not -- I have personal
2 knowledge that it's not on the docket.
3  Q. Okay.
4  A. Because I've looked, you know, I've looked at the
5 docket. It was never entered as an order. I have
6 knowledge that Kelly Page at least the representation of
7 Kelly Page sent us the order as if it were a real order.
8  Q. And you're referring to the March?
9  A. 22.
10  Q. 2013 retraining order TRO, right?
11  A. Extension of TRO or resurrection of the TR -- I
12 guess that's probably a better term, resurrection of the
13 TRO. And I have knowledge that Gary Stewart's
14 explanation was that he had to do something because
15 Engle (sic) was calling him 30 times a day; he had to do
16 something. That was his explanation of why he did set
17 up a meeting with the judge and give me notice and so
18 forth. So I have knowledge of those things and the fact
19 that basically his admission that it was obtained
20 knowingly without giving anybody notice and through
21 communications with the court.
22  Q. Hold on let's back up that there a lot of
23 pronouns that were used that can't identify who they
24 were.
25  A. I might have done that, yes.

Page 63

1  Q. You said that Gary Stewart had to set something
2 up because Mr. Engle was calling him a number of times
3 per day?
4  A. 30 times a day is the number he used.
5  Q. Was this during a telephone call between you and
6 Mr. Stewart?
7  A. That's correct.
8  Q. And what are you referring to when you say that
9 Gary had to set something up?
10  A. Gary said that he -- which is kind of strange
11 because Page's letterhead is coming over. This
12 communication is from Page sending us over the
13 resurrection or the March 22 order. Gary was in the
14 office at the time. As soon as we got it I called and
15 Gary said that he had to do something. He. He didn't
16 say Page had to do something; he said he had to do
17 something because the guy was calling, the guy being
18 Engle, was calling him 30 times a day.
19  Q. So this was Gary Stewart's response to your call
20 saying hey what's this TRO?
21  A. What in the Sam hell you're doing; this is the
22 second time you've gotten an ex-parte order without
23 notifying us in violation of the court rule.
24  Q. So that was your position when you called Gary
25 Stewart?

Page 64

1  A. Correct. Then I said Gary I'm going to do what
2 the court rule requires I'm calling the court right now
3 and I'm going to try -- I'm letting you know I'm going
4 to try to set up either in person visit with the judge
5 or a telephone visit yet this afternoon because I want
6 to discuss other things that if it's going to be
7 extended I want to discuss bond, I want to discuss some
8 other things as well. Then I called the court and found
9 out that Judge Hamre wasn't around.
10  Q. Okay who did you speak to at that time court?
11  A. Oh heavens knows. I presume...
12  Q. Someone from his staff?
13  A. I would have called his staff. I presume it was
14 Peggy.
15  Q. It was a female?
16  A. It was. Not around he's gone for the day.
17  Q. Okay. Did they make any indication that he had
18 been there earlier?
19  A. Nope. Gone for the day.
20  Q. Okay did they make any indication to say that he
21 was here before but now he's left?
22  A. No.
23  Q. But what was told to you at the time that you
24 called he was gone for the day?
25  A. He -- I think they said he was at a conference

Page 65

1 for the day.
2  Q. Did they make any sort of indication that they
3 had been in communication with him that day?
4  A. No. Very clear at least with that there's no
5 chance that you're going to have audience with him today
6 he's --
7  Q. I understand. My again was a little bit
8 different though. Did they make any sort of
9 representation to you that they had been in
10 communication with him prior to the point of your call?
11  A. No.
12  Q. Okay. And did they make any sort of indication
13 that he had been at the office before the point of your
14 call?
15  A. Yes.
16  Q. They told --
17  A. They made the indication that he had not been
18 there that was the clear impact that he hadn't been
19 there all day.
20  Q. So what did they say? Tell me exactly what they
21 said or this person, this woman.
22  A. I don't remember exactly what was said but it was
23 very, very clear how in the Sam hell did this happen
24 then because the judge wasn't there.
25  Q. Did you say that to the person you were speaking

17 (Pages 62 - 65)

1 to on the phone?

2 A. No.

3 Q. When you called did you tell the person on the

4 phone that you wanted to have a conference with the

5 judge because of this TRO that was just signed that day

6 that you had just received?

7 A. I don't know that I would have put it in exactly

8 your words but clearly I got this TRO that was just

9 issued and I need to set up an ex-parte immediate

10 discussion with the judge. I let the other attorney

11 know. He's been gone. It was very clear, you know, all

12 day so.

13 Q. And they told you all day?

14 A. No, it was very clear from the discussion.

15 Again, I don't know the exact words. There's a time I

16 wish I had recorded something.

17 Q. Your take away was that -- your take away was

18 that Judge Hamre wasn't there at all that day; is that

19 your?

20 A. That's correct. Because I walked -- I hung up

21 with the weird concept of how in the Sam hell then did

22 this thing get signed? And that of course was the

23 impetus to send it to over to eventually look at it.

24 And figure out maybe it wasn't signed.

25 Q. Did you --

1 A. We assumed at the time that Gary had gone

2 someplace and found Judge Hamre. I think that's wrong.

3 Q. Did you ever ask anyone from Judge Hamre's staff

4 as to whether someone from the staff had contact with

5 Judge Hamre about this TRO?

6 A. No.

7 Q. Have you talked to any witnesses who have said

8 that they've had communications with Judge Hamre

9 regarding this TRO?

10 A. No.

11 Q. Have you, and again I think you answered this

12 before, you haven't -- you have not had any

13 communications with Judge Hamre about the signing of

14 this TRO, correct?

15 A. That's correct.

16 Q. Okay. You mentioned the show cause hearing said

17 that they were two of them and that those are also

18 grounds for your name being included on the initial

19 disclosures. Let's talk about the first show cause

20 hearing when was that?

21 A. I don't recall.

22 Q. I understand. Okay what was --

23 A. Maybe a month, a month and a half before the

24 second show cause.

25 Q. Okay. When was the second show cause?

1 A. A week before the status call.

2 Q. The May 10th status conference?

3 A. May 10 so it probably would have been...

4 Q. So the first show cause we're talking about maybe

5 in March?

6 A. March or so yep.

7 Q. What was the basis for that show cause hearing?

8 Who was being ordered to show cause?

9 A. Well we were asking for, I don't remember if the

10 judge issued a show cause or not on that. Maybe I

11 misspoke but we were asking to have the ELC held in

12 contempt.

13 Q. On what grounds?

14 A. Basically relative to the -- I'm going to

15 probably confuse the two. I know that throughout this

16 process we had trouble with turning over records; we had

17 trouble with hiding and changing assets, and that became

18 more pronounced at the -- before the May hearing.

19 Q. Okay. So the first show cause hearing that we're

20 talking about that occurred in approximately March did

21 you appear at that?

22 A. I believe I did.

23 Q. And your firm was asking on behalf of HLV to hold

24 ELC in contempt relative --

25 A. Correct.

1 Q. -- to what?

2 A. Their failure to perform on the stipulated

3 settlement.

4 Q. What specifically were you claiming that they

5 were failing to do?

6 A. I'd have to look at the pleading to find out.

7 Q. Okay. And what was the result of that hearing?

8 A. Kind of the same as the second one. Judge Hamre

9 started basically tried to negotiate a new deal for the

10 Defendants, for ELC.

11 Q. And I understand that that's your position but

12 you're also aware the other side is saying that Hamre

13 wasn't negotiating a new deal or the Defendants weren't

14 trying to negotiate a new deal but just put HLV back

15 into the position that it was relative to the loan?

16 You're aware that that was the let's just say the other

17 side of the coin, the other argument?

18 A. I know there was an argument being made but it

19 was clear that Judge Hamre was trying to negotiate a new

20 deal.

21 Q. In your opinion, true?

22 A. It's the only one that counts, right? If I

23 thought differently, it wouldn't be my opinion anymore.

24 Q. Fair enough. Fair enough. And then the second

25 show cause hearing you said that happened about a week

18 (Pages 66 - 69)

Page 70

1 before the May 10th?
2 A. Exactly a week before.
3 Q. I'm sorry?
4 A. Exactly one week before, yes.
5 Q. And what was that show cause hearing on?
6 A. That had to do with a great deal more including
7 the incident at ELC and their refusal to allow access to
8 the records and so forth.
9 Q. And is it correct for me to state that your take
10 away from that show cause hearing was the same as the
11 first that you believe that Judge Hamre was attempting
12 to negotiate a new deal separate from the stipulated
13 settlement that was entered back in 2012?
14 A. Not only that it was more pronounced and he was
15 dragging out the contempt issue so he did not have to
16 address them.
17 Q. Were you the only attorney appearing on behalf of
18 HLV at the second show cause hearing?
19 A. I am not sure of that but I believe so.
20 Q. Okay. Were you the only attorney appearing at
21 the first show cause hearing?
22 A. Same thing I don't specifically recall but I
23 believe so.
24 Q. Any other events that form the basis for your
25 inclusion on the initial disclosures other than ones

Page 71

1 we've already talked about?
2 A. I was present when Judge Dodge made his ruling.
3 Q. Are you referring to the ruling where he set
4 aside Judge Hamre's orders?
5 A. Correct. I was present there. Present also when
6 Judge Westra made his ruling.
7 Q. I'm sorry judge who?
8 A. Westra.
9 Q. That was -- it was in the criminal matters?
10 A. That was in the criminal matter.
11 Q. Specifically whose criminal matter?
12 A. That was Donovan Visser's criminal matter.
13 Q. Did you represent your son in the criminal case?
14 A. I did not.
15 Q. Who represented him?
16 A. David Dodge.
17 Q. And who paid for Donovan's representation?
18 A. HLV.
19 Q. Do you have invoices from Attorney Dodge for that
20 representation?
21 A. I do not know that I do.
22 Q. Does HLV?
23 A. I don't know.
24 Q. Okay. Do you know how much it was?
25 A. Not off the top of my head, no.

Page 72

1 Q. And you said you were there when the judge made a
2 ruling?
3 A. Correct.
4 Q. And what ruling was that?
5 A. To confirming that the orders entered by in the
6 case gave Donovan Visser and HLV an absolute right to be
7 on the premises and granting a direct verdict on
8 trespass. I was also present when Mr. Bedford assaulted
9 Baker.
10 Q. When did that happen?
11 A. Well the jury was out on the assault claim
12 against Donovan Visser. Mr. Bedford was -- came down
13 and decided he needed to apparently do his victory lap.
14 I don't know.
15 Q. Mr. Bedford was the prosecutor, correct?
16 A. That's correct. Was not prosecuting the case and
17 said he had nothing to do with the case but.
18 Q. Who was prosecuting the case?
19 A. Mike McKay.
20 Q. And that was prosecuting Donovan's case, correct?
21 A. Correct.
22 Q. And you're talking about an interaction between
23 Mr. Bedford and Mr. Baker?
24 A. Correct.
25 Q. During the trial of Donovan Visser?

Page 73

1 A. Correct.
2 Q. You say that Mr. Bedford had then come into the
3 courtroom?
4 A. When the case was over Mr. Bedford showed up and
5 the jury was out quite a lengthy time period before a
6 mistrial was declared and there was after an hour and a
7 half or so Bedford was sitting there laughing and so
8 forth and proclaimed something to the effect of who
9 would have thought we could get this much entertainment
10 oh a misdemeanor case.
11 Q. And who was Mr. Bedford speaking to when he made
12 that comment?
13 A. To Michael McKay and his entourage. Two other
14 assistants, interns or whatever that were assisting him.
15 Q. Then what happened?
16 A. And Mr. Baker was sitting in the back row and
17 Donovan apparently made, well, apparently he made a quip
18 something to the effect I don't think it's funny,
19 Mr. Bedford. I don't think it's entertainment at all;
20 you're screwing around with me or something to that
21 effect and Bob Baker said something to the effect of
22 just wait, Mr. Bedford, you'll get your chance or
23 whatever. And Bedford got red in the face, vein popped
24 out, and he came charging toward the back: Are you
25 threatening a public or elected official? Are you

19 (Pages 70 - 73)

Page 74

1 threatening -- somebody else one of the witnesses had to
2 step in between before he got there and stop him.
3   Q.  Who was one of the witnesses that had to step in
4 between?
5   A.  Rusty Rictor (sic).
6   Q.  Okay.  Was there any physical contact between --
7   A.  There was not.
8   Q.  Hold on.  Between Mr. Bedford and Mr. Baker?
9   A.  There was no physical contact because Mr. Rictor
10 stopped him before he got there.
11   Q.  Was Mr. Bedford attempting to though I guess push
12 through Mr. Rictor to get to Mr. Baker?
13   A.  Yes.  I was afraid that we were going to have
14 physical violence in the back of the courtroom.
15   Q.  Were the bailiffs involved?
16   A.  No.  The bailiffs were not in the room at the
17 time.
18   Q.  Then what happened?
19   A.  Then somebody said something to Mr. Bedford and I
20 heard well I guess I ought to leave and he left.
21   Q.  Okay.  Do you have any personal knowledge of any
22 communications between Kelly Page and Mr. Bedford
23 concerning the criminal charges of Donovan?
24   A.  Nothing that I have not except what I've learned
25 as counsel.

Page 75

1   Q.  Okay.  Did you witness any conversations between
2 Mr. Page and Mr. Bedford concerning the criminal charges
3 filed against Donovan?
4   A.  No.
5   Q.  Did you witness, the same question but as to the
6 criminal charges filed against Mr. Baker?
7   A.  No.
8   Q.  Did you ever see any documents between Mr. Page
9 and Mr. Bedford relative to the criminal charges filed
10 against Mr. Baker?
11   A.  The only thing would have been the result of
12 attorney work product.
13   Q.  Same question with regards to Mr. McKay did you
14 ever see any communications between Mr. Page and
15 Mr. McKay relative to the criminal charges filed against
16 Donovan?
17   A.  No.
18   Q.  Did you see any communications between Mr. Page
19 and Mr. McKay relative to the criminal charges filed
20 against Mr. Baker?
21   A.  No.
22   Q.  Did you ever see any meeting or conversation
23 between Mr. Page and Mr. McKay concerning the criminal
24 charges filed against Mr. Visser, your son?
25   A.  Say that again I'm sorry.

Page 76

1   Q.  Did you ever witness any communication -- any
2 conversation between Mr. Page and Mr. McKay relative to
3 the criminal charges filed against Donovan Visser?
4   A.  No.
5   Q.  Same question as to the criminal charges as to
6 Mr. Baker?
7   A.  No.
8   Q.  Okay.  Did you ever -- put a nice bow on it --
9 did you ever see any written communications between
10 Mr. Stewart and Mr. Bedford concerning the criminal
11 charges filed against either Mr. Visser or Mr. Baker?
12   A.  No.
13   Q.  Did you ever witness any conversations between
14 Mr. Stewart and Mr. McKay I'm sorry Mr. Stewart and
15 Mr. Bedford relative to the criminal charges filed
16 against Mr. Donovan Visser or Mr. Baker?
17   A.  No.
18   Q.  Did you ever see any conversations between
19 Mr. Stewart and Mr. McKay relative to the criminal
20 charges filed against Mr. Donovan Visser or Mr. Baker?
21   A.  No.
22   Q.  Have we now talked about all of the instances
23 that brought your name on Plaintiff's initial disclosure
24 list?
25   A.  I think so.  I'm trying to go over that entire

Page 77

1 time period where I would have had personal knowledge of
2 anything.  And I believe that is -- that covers it.
3   Q.  Okay.
4     MS. BURKE:  Then that concludes my
5 questioning at this time.
6     MR. CALLAHAN:  And I'm going to reserve the
7 right to ask questions.  I've got some things to review
8 here and we still have I think a few lingering legal
9 things we've got to take care of.
10     THE WITNESS:  There's a lot of lingering
11 legal things that have to be taken care of.
12     MR. CALLAHAN:  I know.  A couple arose here
13 during the deposition.
14     THE WITNESS:  A few might be one of your
15 better understatements at least of this week.
16     MR. CALLAHAN:  We attorneys work good at
17 self-qualifying our comments.  So with that...
18     MS. BURKE:  Thank you for your time.
19     (Deposition concluded at 1:20 p.m.)
20
21
22
23
24
25

20 (Pages 74 - 77)

Page 78

1  STATE OF MICHIGAN       )
2                          )
3  COUNTY OF WASHTENAW     )
4
5  CERTIFICATE OF NOTARY PUBLIC AND COURT REPORTER
6    I, Caitlyn Mancini, do hereby certify that the
7  witness, DONALD VISSER, whose attached deposition was
8  taken before me in the above-entitled matter, was by me
9  first duly sworn to testify to the truth, the whole
10 truth, and nothing but the truth; that the foregoing
11 answers made by the witness, which were duly recorded by
12 me stenographically and by me later reduced to
13 typewritten form by means of computer-aided
14 transcription; and I certify that this is a true and
15 correct transcript of my stenographic notes so taken.
16   I further certify that I am neither of counsel to
17 either party nor interested in the event of this cause.
18
19
20          _____
21          Caitlyn Mancini, RPR, CSR-8887
22          Notary Public,
23          Washtenaw County, Michigan
24          My Commission expires:  August 15, 2021
25

Veritext Legal Solutions
800-567-8658                                          973-410-4040

Page 78

```
 1   STATE OF MICHIGAN         )

 2                             )

 3   COUNTY OF WASHTENAW       )

 4

 5   CERTIFICATE OF NOTARY PUBLIC AND COURT REPORTER

 6      I, Caitlyn Mancini, do hereby certify that the

 7   witness, DONALD VISSER, whose attached deposition was

 8   taken before me in the above-entitled matter, was by me

 9   first duly sworn to testify to the truth, the whole

10   truth, and nothing but the truth; that the foregoing

11   answers made by the witness, which were duly recorded by

12   me stenographically and by me later reduced to

13   typewritten form by means of computer-aided

14   transcription; and I certify that this is a true and

15   correct transcript of my stenographic notes so taken.

16      I further certify that I am neither of counsel to

17   either party nor interested in the event of this cause.

18

19

20   _____

21   Caitlyn Mancini, RPR, CSR-8887

22   Notary Public,

23   Washtenaw County, Michigan

24   My Commission expires:  August 15, 2021

25
```

| & | | |
|---|---|---|
| **&**   1:12 3:24 55:20 | | |

**1**

**1**   1:19 3:13 5:7
13:9
**1,800**   45:4,22
**10**   68:3
**10:00**   1:23 5:3
**10th**   14:14 25:18
27:15 28:12,16
31:10 42:3 44:8
59:25 68:2 70:1
**11**   42:1 43:16 45:2
45:6
**11-51-558**   39:20
**11th**   40:1
**12**   46:1,1,5 49:7
51:18
**12:19**   55:17
**12:44**   55:18
**12th**   38:18,23 39:1
39:3
**1366**   1:9
**13th**   56:15 57:25
**15**   52:15 53:23
78:24
**150**   1:21 2:4
**16th**   56:18
**18**   1:24 5:2 34:23
35:17,17 46:9,16
46:25
**19**   47:7,17 48:8
49:4
**1977**   12:9
**1:13**   1:9
**1:20**   77:19

**2**

**2**   3:15 20:6,10
**20**   3:15 47:22 48:4
48:14,23

**2009**   56:15 57:25
58:6
**2011**   58:6
**2012**   22:18 70:13
**2013**   14:14 22:18
25:18 28:16 31:10
38:4,18,23 39:1,3
39:18 40:1,4,16
41:15 42:3 44:8
57:2,24 58:1
59:12,25 62:10
**2016**   56:18
**2017**   1:24 5:2
59:14
**2021**   78:24
**22**   62:9 63:13
**22nd**   40:15,20
41:15,19
**24**   14:20 53:12,14
**248**   2:14
**2480**   1:21 2:4
**26**   59:21
**269**   2:22

**3**

**3**   3:17 30:11 33:24
34:4 47:13 53:9
**30**   62:15 63:4,18
**30th**   59:12
**310**   2:20
**33**   3:17
**355-4141**   2:14
**37**   3:19
**38**   3:21
**382-5935**   2:22

**4**

**4**   3:8,19 37:19,25
**400**   15:21
**4000**   2:12 14:17
**44th**   1:21 2:4

**48075**   2:13
**49002**   2:21
**49512**   2:5

**5**

**5**   3:13,21 38:10,15
**5000**   14:11
**531-9860**   2:6
**55**   3:23 4:2
**59**   4:4

**6**

**6**   3:23 55:19 56:1
**6/18/13-1/31/17**
4:5
**616**   2:6
**6th**   39:18 40:3

**7**

**7**   4:2 55:19 58:13
**7/9/09-6/24/16**
3:24 55:21
**78**   1:19

**8**

**8**   4:4 59:3,8
**8.109**   27:19
**8887**   1:25 78:21

**9**

**9**   2:12
**9/30/13-1/31/17**
59:4
**950**   2:20

**a**

**a.m.**   1:23 5:3
**able**   7:6 18:6
51:16
**absence**   60:21
**absolute**   72:6
**absolutely**   23:20
**access**   70:7
**accuracy**   35:10

**acknowledge**
51:10
**acknowledged**
38:25
**action**   1:8
**activated**   31:15
**actual**   23:11 28:2
**ad**   1:12
**adb**   12:17
**addition**   31:17
**additional**   43:9,11
43:11
**address**   70:16
**admission**   62:19
**admitted**   12:6,8
**advocated**   43:3,12
**advocating**   42:11
**affidavit**   3:22
38:11,15 39:14
49:7,13,21 52:25
**affidavits**   30:24
39:10
**afraid**   74:13
**afternoon**   64:5
**agc**   50:9,14,16
**ago**   11:19 21:17,17
**agree**   32:21 35:1,3
45:17 54:18 57:4
**agreement**   5:16
15:3,12,16 16:4
39:22,24 54:25
**agreements**   58:12
**ahead**   35:21
**aided**   78:13
**aids**   49:18,22
**al**   6:3
**allegations**   61:11
61:14
**alleged**   8:3 52:23
**allegedly**   53:2

allow  70:7
allows  11:24
amended  61:12
amounts  56:12
announced  27:5
answer  8:15 29:2
  32:24 40:23 55:3
answered  67:11
answering  28:25
  54:20
answers  78:11
anybody  23:23
  29:7 32:16 37:8
  37:10 62:20
anybody's  32:17
anymore  44:4
  69:23
apologies  16:25
apparent  38:9
apparently  47:3
  72:13 73:17,17
appear  32:9 36:16
  68:21
appearance  26:2
appearances  2:1
  61:21
appearing  2:8,16
  2:24 23:1 70:17
  70:20
appears  38:20
  56:16,17
appreciate  60:6
approximately
  68:20
april  1:24 5:2
  22:18
area  13:5
argument  69:17
  69:18
arose  77:12

arrival  23:11
  25:12,15,16
arrived  24:7,22,24
  25:9
aside  71:4
asked  13:11,13
  14:6 16:11,12,13
  17:24 18:1 58:19
asking  27:15,15
  46:22,22 68:9,11
  68:23
assault  72:11
assaulted  72:8
assets  45:5 68:17
assistance  34:13
assistant  58:25
assistants  73:14
assisting  73:14
associated  58:11
associates  2:3 3:24
  55:20
assume  32:9 52:6
  53:19 58:21,22
assumed  67:1
assumes  29:1
  32:24
assuming  18:23
  32:21 33:4
assumption  18:22
attached  4:8 78:7
attempting  70:11
  74:11
attending  32:3
attested  36:24
  37:3
attorney  6:1,7,12
  6:16 11:21 15:9
  20:24 21:14 26:9
  29:14,14 39:19
  40:17 41:11,16
  42:7,24 43:1

45:24 49:9,9 50:4
  51:20 52:16,17,25
  53:24 54:5,11,13
  54:17 57:3,16
  66:10 70:17,20
  71:19 75:12
attorney's  29:16
attorneys  77:16
audience  65:5
audio  13:13 28:3,9
august  38:4 56:15
  56:18 57:25 78:24
available  54:23
aware  9:1 27:18
  28:1,8,10 30:17
  31:10,14,17 44:25
  54:21 69:12,16

## b

b  3:11
back  24:14 25:9
  35:9 38:3 45:2
  48:20 49:2 51:18
  55:18 57:2 62:22
  69:14 70:13 73:16
  73:24 74:14
bailiffs  74:15,16
baker  1:5 2:25 6:2
  7:21 8:17 11:22
  15:10 20:12 21:4
  21:8,15,19 22:8
  25:22,23 26:3,6,8
  26:9,9,12,13 29:13
  31:11,18 72:9,23
  73:16,21 74:8,12
  75:6,10,20 76:6,11
  76:16,20
baker's  21:8,20
  26:25 27:4 31:12
  31:18
banks  16:22

bar  12:7,8 20:21
based  30:24 37:12
  40:14,17 41:21
  52:9 61:17
basically  10:8,12
  24:12 62:19 68:14
  69:9
basis  15:18,19
  39:15 68:7 70:24
bburke  2:7
bedford  1:16 72:8
  72:12,15,23 73:2,4
  73:7,11,19,22,23
  74:8,11,19,22 75:2
  75:9 76:10,15
bedford's  8:3
began  26:15 59:12
beginning  57:13
behalf  2:8,16,24
  44:23 45:15 51:16
  68:23 70:17
behavior  37:9
belief  7:4 49:3,4,6
believe  7:2,24 9:17
  10:25 15:5,15
  25:2 26:8 29:24
  30:1,19 31:8,23
  34:11 36:10,10,20
  38:22 40:13 47:5
  48:1,24 49:1
  50:18,22 51:4,5
  52:19 60:24 61:4
  68:22 70:11,19,23
  77:2
believed  35:25
  36:2,4 52:24
belong  45:5
benefit  54:5
best  56:6
better  7:12 62:12
  77:15

**billing** 16:20 56:9 56:17

**billings** 57:25

**bit** 28:21 36:3 61:3 65:7

**blend** 23:13

**blue** 36:17

**board** 54:18

**bob** 2:25 73:21

**bond** 64:7

**book** 22:7

**bottom** 35:17,19 47:16

**bow** 76:8

**break** 16:2 20:12 41:12 55:15

**briefing** 54:17

**bring** 13:11,17 14:7

**bringing** 42:10

**brittany** 2:2

**broaden** 61:3

**brought** 17:12 59:20 76:23

**bunch** 15:25

**buren** 1:11 6:9,25 8:8 10:22,24 13:16 16:5,9,17 30:14

**burke** 2:2,10 3:8 5:10 9:9,11 12:20 17:8,11 20:9 34:2 34:19 37:23 38:13 55:24 59:6 77:4 77:18

**business** 10:1,3,4 10:7,9,10 12:12

**businesses** 10:1

**busy** 36:14

**c**

**c** 27:19 28:5

**caitlyn** 1:25 78:6 78:21

**calendar** 36:15

**call** 13:14,23 14:2 14:3,14 25:19,24 26:3,7 27:15 28:14,23 29:4 31:19 32:10 45:12 55:11 57:22 63:5 63:19 65:10,14 68:1

**callahan** 2:18 9:7 12:18 17:6,10 77:6,12,16

**called** 9:17 29:15 29:22 63:14,24 64:8,13,24 66:3

**calling** 62:15 63:2 63:17,18 64:2

**capacity** 20:15 21:11

**cards** 19:15

**care** 77:9,11

**case** 6:8 7:22 8:17 11:17 12:13 17:18 17:18,19 20:1,2 29:12,17 31:9 39:20 61:12 71:13 72:6,16,17,18,20 73:4,10

**cases** 10:24 18:8,9

**catch** 17:4,4

**cause** 60:9,11 61:21 67:16,19,24 67:25 68:4,7,8,10 68:19 69:25 70:5 70:10,18,21 78:17

**cd** 13:21

**ceflawyers.com** 2:15

**cells** 18:8

**center** 2:12

**centre** 2:20

**certain** 14:15 33:7 35:5 55:9

**certainly** 24:8

**certificate** 78:5

**certification** 38:3

**certify** 78:6,14,16

**ch** 39:20

**chair** 32:17

**chance** 15:12 65:5 73:22

**change** 20:19

**changing** 68:17

**channel** 30:11

**charges** 74:23 75:2,6,9,15,19,24 76:3,5,11,15,20

**charging** 73:24

**check** 59:2

**checks** 16:21

**circuit** 6:9,25 13:17 16:5,10,17 39:25

**circulated** 24:16

**civil** 1:8

**claim** 72:11

**claiming** 69:4

**classify** 28:17,24

**clear** 42:6,22 65:4 65:18,23 66:11,14 69:19

**clearly** 66:8

**clerk** 20:17,18 21:13

**click** 35:18 36:20 37:3 46:17 47:1

**client** 7:13,16 29:13 41:1 51:17

**clients** 39:23

**coin** 69:17

**colleen** 2:10 3:8

**colleen.burke** 2:15

**collins** 2:11

**colors** 37:9

**come** 9:23 10:23 18:9 39:12 44:13 73:2

**coming** 43:20 44:10 63:11

**commencing** 1:23

**comment** 48:3 73:12

**comments** 8:4 33:13,14,19 40:3 47:25 48:7,14,22 48:23 49:3 54:10 77:17

**commission** 29:15 54:14 78:24

**communicating** 23:4

**communication** 24:23,25 25:8 45:10,18 63:12 65:3,10 76:1

**communications** 24:12,21 25:5,11 25:14 40:16,18,21 41:11,16,19 42:6,8 42:23,25 43:15 44:1,4,7 45:24 52:16,23 53:24 60:15,18,25 61:5 62:21 67:8,13 74:22 75:14,18 76:9

**companies** 9:4,13
9:15 10:20
**company** 11:23
15:11 17:15 23:1
24:6
**compare** 34:20
**comparison** 61:23
**complaint** 50:21
51:11 54:23,24
55:12 61:12,14
**completed** 10:5
**complex** 30:10
40:23
**computer** 18:12
58:15 78:13
**computers** 15:1
18:1,16,16 23:17
23:22
**concept** 66:21
**concerned** 51:1,1
51:3,17
**concerning** 56:7
60:22 74:23 75:2
75:23 76:10
**concluded** 77:19
**concludes** 77:4
**conclusions** 43:21
61:17
**conference** 3:20
13:23 14:3,14
25:19,24 26:7
27:15 28:18,23
29:4 37:20 38:19
42:2,3,5,14 44:8
44:15,22 45:12,15
46:3 54:7,10 60:9
61:20 64:25 66:4
68:2
**conference's** 54:1
**confidentiality**
50:20 51:4

**confirming** 72:5
**confuse** 68:15
**consultation** 7:18
9:14
**consulting** 7:11
**contact** 22:25 23:6
24:3 67:4 74:6,9
**contacted** 17:17
**container** 1:4 8:24
11:22 15:10
**contempt** 68:12,24
70:15
**contentious** 6:14
**contents** 3:1
**contest** 29:11
**contested** 57:19,23
**continued** 4:1 49:8
51:19
**continuing** 49:7
**continuously** 6:25
**contradict** 33:10
**conversation**
24:10 35:22 59:24
75:22 76:2
**conversations**
25:3 75:1 76:13
76:18
**cookies** 10:8,13
**cooney** 2:19
**copied** 56:2
**copier** 16:10
**copies** 56:3
**copy** 13:20 16:1
16:22 30:2,3,6
34:4
**corp** 15:1
**corporation** 1:3,5
1:11,12
**correct** 6:5,6,9
7:20 12:4,25 13:1
13:12 14:13 17:18

20:13 21:9,10
22:5,16,17,18,19
22:20 25:25 26:4
26:16,17 28:13
29:20,21 31:11,15
31:16,20 32:8,15
32:18,20 33:3,11
35:6,7,11,16,20
36:1,6,25 38:16,19
38:24 39:1 40:2
41:13 42:3 43:2
43:16,18,25 44:12
44:15,25 45:10,13
45:18,20 46:7,10
46:18 48:10 49:5
50:5 51:22 52:18
53:18 54:2,3,7,11
56:10,13,14,25
57:4,6,15 58:3,4
58:16,18 59:10,11
60:1 61:12 63:7
64:1 66:20 67:14
67:15 68:25 70:9
71:5 72:3,15,16,20
72:21,24 73:1
78:15
**correctly** 23:9
30:23 40:1
**correspond** 47:15
**correspondence**
14:23 54:13
**corresponds** 46:25
**cost** 16:22
**counsel** 5:16 19:25
20:2,4 74:25
78:16
**counts** 69:22
**county** 1:11 6:9,25
8:8 10:22,24
13:16 30:14 78:3
78:23

**couple** 13:7 19:18
30:16 77:12
**course** 26:16
66:22
**court** 1:1 3:20
5:17,18 6:4,9 11:8
11:11 13:17 16:5
16:10,18 27:14,18
27:19,22 28:1,2,6
28:8,10,11,15,19
28:22 29:3 30:2
32:4,12 37:20
38:2,7 39:15,25
45:3,16,22 54:21
61:20 62:21 63:23
64:2,2,8,10 78:5
**courtroom** 73:3
74:14
**covered** 51:4,6
**covers** 77:2
**crackers** 10:8,14
**crazy** 31:1
**created** 31:25
**criminal** 71:9,10
71:11,12,13 74:23
75:2,6,9,15,19,23
76:3,5,10,15,19
**crowd** 17:8
**csr** 1:25 78:21
**current** 49:6 59:1
59:16
**currently** 15:20
**cut** 48:18
**cv** 1:9

| d |
|---|

**d** 34:17
**dare** 37:10
**date** 59:13
**dated** 38:18 56:15
**daughter** 21:8

**david** 71:16
**day** 22:16 24:3,13
  24:25 25:5,12,15
  42:14 49:24 50:1
  60:7,7 62:15 63:3
  63:4,18 64:16,19
  64:24 65:1,3,19
  66:5,12,13,18
**days** 38:19 47:18
  47:21,23
**deal** 12:11,12 69:9
  69:13,14,20 70:6
  70:12
**decided** 35:12
  72:13
**declared** 73:6
**default** 6:15
**defendant** 2:16,24
  8:18
**defendant's** 8:20
**defendants** 1:17
  39:22 51:21,24
  69:10,13
**defense** 12:14
**degree** 11:25
**depend** 20:16
**depicted** 35:22
**deposition** 1:20
  3:13,14,15,17,19
  3:21,23 4:2,4 5:7
  5:8,15,22,24 13:9
  13:10 20:6,10
  26:25 27:4 33:24
  34:3 37:19,24
  38:10,14 55:19
  56:1 58:13 59:3,8
  77:13,19 78:7
**derek** 29:15
**describe** 55:10
**description** 7:12

**descriptions** 56:9
**desktop** 19:16
**despite** 39:23
  50:21 53:1
**details** 18:6 52:2
**development**
  10:16,18
**device** 26:21 27:2
  27:7 31:18
**devices** 14:6 18:19
  19:3,7,10,14,18
  31:15 58:17
**dictaphone** 14:10
  14:11
**differences** 38:9
**different** 10:1,2
  18:18 19:18 28:21
  30:16 36:3 65:8
**differently** 69:23
**difficult** 23:13
**difficulty** 50:5
  53:18
**dig** 58:20
**digital** 13:21 14:16
  14:18,19
**direct** 41:19 72:7
**directly** 33:19
**directory** 14:20
**disciplinary** 12:13
  12:23
**discipline** 29:14
  54:18
**disclosing** 51:2
**disclosure** 59:21
  76:23
**disclosures** 59:16
  67:19 70:25
**disconnect** 35:18
  36:20 37:3 46:17
  47:1

**disconnected** 36:1
  36:6 46:10
**discuss** 49:8 50:16
  51:19 52:5 55:7
  64:6,7,7
**discussing** 54:6
**discussion** 66:10
  66:14
**discussions** 56:7
**dismissed** 8:12,13
**disposition** 8:20
**dispute** 13:16
**disqualification**
  39:16
**distinction** 44:17
**distribute** 29:7,9
**district** 1:1,2 6:4,4
  11:7
**docket** 62:2,5
**document** 35:13
  38:23 40:7,9 41:1
  41:21 43:23
**documents** 13:19
  14:22 16:15,16
  17:12 18:25 19:1
  23:16 43:13 50:7
  50:10 58:9 60:15
  60:19,21 75:8
**dodge** 29:10,19
  30:7 71:2,16,19
**doing** 27:8 58:15
  63:21
**dollar** 56:12
**donald** 1:20 3:3,22
  5:4,13,15 38:11
  78:7
**donovan** 6:20,21
  22:14,22 23:1
  24:6 25:4 26:14
  57:17 71:12 72:6
  72:12,25 73:17

74:23 75:3,16
  76:3,16,20
**donovan's** 71:17
  72:20
**downloaded** 14:20
**drafting** 7:11,18
  9:14 58:8
**drag** 24:1
**dragging** 70:15
**driving** 31:1,1
**ds** 14:11
**due** 18:11 55:9
**duly** 5:5 78:9,11
**duplicative** 16:24

**e**

**e** 3:6,11,16 14:23
  19:12,20 20:7
  24:12,15 34:17
  43:23 55:14
**earlier** 13:22
  57:12 64:18
**earliest** 15:13
**early** 15:13 57:2
  57:24
**ears** 48:21
**east** 1:21
**effect** 24:15,17
  27:9 50:10,12,15
  73:8,18,21,21
**effort** 16:21
**eight** 16:15
**einhorn** 2:11
**either** 11:21 16:7
  19:22 22:25 23:6
  34:25 42:13 43:5
  50:2 60:15 64:4
  76:11 78:17
**elc** 6:8 11:1 13:16
  14:3 15:1 16:9
  17:21 18:13,16
  19:2,5,6 22:15,22

[elc - forensic]                                                                                           Page 6

23:2,7,16 24:22
39:22 44:23 45:5
45:15 50:13 51:21
51:24 58:18,24
60:3,4,12 68:11,24
69:10 70:7
**elc's** 18:1,14
**elected** 73:25
**elijah** 4:3 17:15
19:4,20,22,24
55:22 58:14
**elijah.com** 14:25
17:14 18:17
**elijah.com.** 18:25
**else's** 41:6
**employ** 21:15
**employed** 20:15
21:25 22:9,12
**employee** 6:22
20:12
**employment** 21:16
**ended** 13:4
**enforcement** 6:15
**enforcing** 39:21
**engaging** 37:8
**engle** 62:15 63:2
63:18
**enjoined** 39:21
**enjoining** 40:19
**entered** 6:17 39:24
62:5 70:13 72:5
**entertainment**
73:9,19
**entire** 33:18 47:6
56:22 76:25
**entirely** 7:2
**entities** 9:25
**entitled** 78:8
**entity** 9:17 10:6,11
11:10,10 15:11
58:14

**entourage** 73:13
**entry** 56:9
**episode** 30:23
**especially** 30:11
**estate** 10:16,18
12:11
**et** 6:3
**evasive** 51:14
**event** 13:15 54:19
78:17
**events** 14:7 55:9
59:19 60:10,11
70:24
**eventually** 20:21
66:23
**everybody** 48:19
48:20
**everything's** 52:13
**evidence** 5:19
44:18,18,21
**ex** 39:18 40:4,16
40:18,19,21 41:4
41:11,15 42:6,23
44:4,7 45:10,17,20
45:23 52:15,23
53:23 57:1,19
60:17,25 61:5
63:22 66:9
**exact** 66:15
**exactly** 6:13 7:2
18:24 25:6 65:20
65:22 66:7 70:2,4
**examination** 3:8
5:10 19:4
**examined** 5:5
**example** 32:6 45:3
45:11,13
**examples** 45:21
**exhibit** 3:12,13,15
3:17,19,21,23 4:2
4:4 5:7 13:9 20:6

20:10 33:24 34:4
37:19,24 38:10,14
47:13 53:9 55:19
56:1,2 58:13 59:3
59:8
**exhibits** 4:1,8
**existence** 60:17
**expert** 61:24
**expires** 78:24
**explanation** 62:14
62:16
**expressed** 42:11
**extended** 64:7
**extension** 62:11
**extent** 35:10
**extra** 34:4

**f**

**face** 37:11 73:23
**facetious** 5:25
17:7
**fact** 31:5 32:1 37:6
39:23 41:21 42:25
42:25 43:14 47:19
47:21,23 50:21
51:2,8 53:1 62:18
**factor** 40:11
**factual** 39:15
**failing** 69:5
**failure** 69:2
**fair** 50:2 69:24,24
**family** 22:11
**far** 18:24
**farrell** 2:11
**fashion** 7:15
**fax** 43:23
**february** 58:1
**federal** 5:18,18
11:8,11
**fee** 15:17
**female** 64:15

**fence** 24:1
**figure** 18:23 66:24
**figuring** 20:22
**file** 11:4 15:13
16:7 27:14 28:11
58:22,23
**filed** 6:3,9 8:7
10:21,24 11:10,17
12:18,24 28:2
39:10 50:22 51:3
58:7 61:18,18
75:3,6,9,15,19,24
76:3,11,15,20
**files** 15:13 58:20
**filing** 13:6 27:20
**find** 31:25 69:6
**finish** 7:1
**firm** 6:23,24,24
7:5,14,16 8:23
15:3,23 16:5,9,17
17:16 20:12 57:15
57:16 58:2,14
59:9 68:23
**first** 5:5 13:13
23:6,9 46:4 56:15
57:1 59:13,13
60:2 67:19 68:4
68:19 70:11,21
78:9
**five** 15:22
**flat** 15:17
**floor** 2:12
**folks** 24:21,22
**follow** 24:13
**following** 36:18,19
39:10
**follows** 5:6
**food** 10:9
**foregoing** 78:10
**forensic** 17:16
19:4

**forget** 17:9,10
**form** 32:22 70:24
  78:13
**formal** 50:21
  51:11 54:23,24
  55:11
**format** 32:15
**formed** 7:8 29:1
**forth** 19:13 30:25
  57:19 61:19 62:18
  70:8 73:8
**forward** 37:10
**found** 40:24 41:5
  64:8 67:2
**four** 39:17
**frankly** 26:11,22
**front** 30:7 60:13
**full** 5:11 19:12
**funny** 73:18
**further** 24:23
  78:16

**g**

**gained** 61:10
**gary** 1:14 24:14
  25:14 29:13 42:20
  43:6 47:3 49:11
  61:2 62:13 63:1,9
  63:10,13,15,19,24
  64:1 67:1
**general** 60:14
**generated** 15:22
**getting** 31:1 58:10
**give** 28:5 51:16,25
  62:17
**giving** 62:20
**go** 5:24 23:16
  27:23 33:13 34:16
  35:9,21 39:11
  46:3 50:3 76:25
**going** 13:2 20:20
  22:22 23:7 24:18

27:6 30:18 32:9
34:3 37:25 40:8
43:19 45:2 46:1
48:18 50:2,16
51:10,18 52:4,6
53:16 59:7 60:7
64:1,3,3,6 65:5
68:14 74:13 77:6
**good** 5:19,20,25
  12:11,12 31:13
  77:16
**gotten** 24:14 39:11
  43:10 63:22
**graduated** 12:6
**grand** 1:22 5:1
  12:2
**granting** 72:7
**great** 70:6
**grievance** 12:18
  29:14 54:14
**grievances** 12:24
  13:6
**grinder** 44:19
**grote** 1:15 33:19
**grounds** 67:18
  68:13
**guess** 7:7,15 13:5
  28:25 37:15,15
  43:4 56:19 61:3
  62:12 74:11,20
**guidance** 55:8
**guy** 63:17,17

**h**

**h** 2:10 3:11
**half** 21:2,17 67:23
  73:7
**hamre** 1:14 12:24
  13:24 25:19 30:16
  30:20 31:4 32:7
  32:14 33:20 35:23
  35:25 36:16,21

37:4 39:16,18,25
40:16,18,20 41:4
41:10,15,19,22,23
42:7,9,24 43:1,3
43:15 44:2,7
45:24 46:5,14,24
47:6,9,10,12,23
48:1,12 49:8
51:19,24 53:24
54:6 60:13,16,23
61:2,18 64:9
66:18 67:2,5,8,13
69:8,12,19 70:11
**hamre's** 41:6,8
  54:9 67:3 71:4
**hand** 60:2
**handed** 55:25
**handled** 57:17
**happen** 65:23
  72:10
**happened** 7:3
  45:12 69:25 73:15
  74:18
**happening** 30:14
  57:10
**happy** 27:23
**harold** 9:7,9,10
  21:21
**haywood** 57:16
**head** 11:18 18:7
  29:18 57:23 71:25
**hear** 51:23 53:16
**heard** 25:22 33:12
  52:9,11,12 53:5
  74:20
**hearing** 3:18
  12:17,21 30:2,7
  33:25 36:21 37:5
  46:6,15,20,25
  47:12,24 48:2,13
  48:17 49:12,13,18

49:22 50:5 52:24
53:18 60:8,10,12
67:16,20 68:7,18
68:19 69:7,25
70:5,10,18,21
**hearings** 60:12
  61:21
**heavens** 64:11
**heavily** 16:1
**held** 68:11
**hell** 63:21 65:23
  66:21
**help** 46:13 51:21
  51:24
**hey** 63:20
**hiding** 68:17
**highlighted** 28:6
  46:4,4
**highly** 15:14
**hired** 21:3
**hlc** 7:5
**hlv** 1:3 3:24 4:5
  6:2,2,8,8,12 7:5,7
  7:8,10,12,17,19
  9:15,21,23 10:15
  10:17 11:1,22
  14:3 15:10 16:5,9
  19:2 22:15 23:15
  24:22 39:21 40:19
  45:5 55:20 56:4
  59:4 60:2 68:23
  69:14 70:18 71:18
  71:22 72:6
**hoc** 1:13
**hold** 62:22 68:23
  74:8
**holland** 9:23 10:17
**hon** 1:10
**honestly** 32:24
**hopefully** 58:23

**hot** 30:11,13
**hour** 15:21 73:6
**hourly** 15:18,19
  15:20
**hours** 14:21 53:12
  53:14
**howard** 9:2
**hung** 66:20

**i**

**idea** 31:12,13
  32:16 33:16 36:2
  42:9 46:20 47:8,9
  49:23 50:6 59:22
**identification** 5:9
  20:8 34:1 37:22
  38:12 55:23 59:5
**identified** 14:7
  31:19
**identify** 35:8
  62:23
**illinois** 10:22 11:3
  11:4,11
**imagine** 37:8
**immediate** 66:9
**impact** 65:18
**impetus** 66:23
**important** 51:15
**importantly** 49:8
  51:19
**impression** 35:24
  37:12
**inaudible** 34:25
**inception** 7:7,19
**incident** 22:14
  60:2 61:19 70:7
**incidents** 59:20
**included** 58:1
  67:18
**includes** 56:24
**including** 14:23
  61:21 70:6

**inclusion** 59:20
  70:25
**incorrectly** 52:12
**incurred** 16:22
**indicated** 48:16
  53:24
**indication** 64:17
  64:20 65:2,12,17
**individual** 1:6,13
  1:14,15,15,16,16
  7:21
**individuals** 13:8
**inform** 29:3
**information** 14:22
  18:18 23:22 24:18
  33:10 43:3,9,10
**informed** 32:11
**initial** 17:20 50:19
  59:16,21 67:18
  70:25 76:23
**initially** 29:23
  58:8
**input** 35:12
**instance** 19:12
  59:23 60:8
**instances** 61:16
  76:22
**intended** 5:16
  28:19 51:20,24
**intention** 48:17
**interaction** 72:22
**interested** 60:5
  78:17
**interfered** 39:20
**intern** 20:20
**interns** 73:14
**interpretation**
  23:24
**interview** 13:15
  14:2

**investigation** 
  50:19 51:3 54:15
  54:22
**invite** 52:6
**inviting** 52:7
**invoice** 56:15,17
  59:13,13
**invoices** 3:24 4:3,5
  14:24 15:22 16:8
  16:12,13 20:11
  55:14,20,22 56:4
  58:14 59:1,4,9
  71:19
**involved** 7:3 8:5
  10:19 11:21 12:13
  12:15 49:12 57:8
  57:9,12,18,20 58:2
  58:3 60:7,8,11
  74:15
**involvement** 20:3
  57:8,10
**involving** 13:15
  22:14 31:4
**irol** 9:17,19 10:3,4
  10:10 11:12,14
**issue** 30:12,13
  44:14 70:15
**issued** 39:18 40:18
  66:9 68:10
**items** 13:11 30:17

**j**

**jeremy** 21:7,11,18
  21:25
**joan** 34:13
**jr** 1:14
**judge** 13:23 25:19
  29:10,19 30:7,15
  30:20 31:4 32:7
  32:14 33:20 35:23
  35:25 36:16,21
  37:4 39:16,18,25

  40:16,18,20 41:4,5
  41:8,10,15,19,22
  41:23 42:7,9,24,25
  43:3,9,15 44:1,7
  44:23 45:9,24
  46:5,14,24 47:5,8
  47:9,10,11,21,23
  48:1,12 49:8
  51:19,24 53:24
  54:6,9 59:24
  60:13,16,23 61:2
  61:18 62:17 64:4
  64:9 65:24 66:5
  66:10,18 67:2,3,5
  67:8,13 68:10
  69:8,19 70:11
  71:2,4,6,7 72:1
**jumped** 17:1
**jury** 72:11 73:5

**k**

**k** 34:17
**keep** 52:16
**kelly** 1:13 2:16 6:3
  25:1,11 39:19,23
  40:5,6,12,17,21
  41:1,8,11,16,20
  42:19 43:6,15
  44:1 47:3 49:12
  49:13,14,18,21
  60:23 62:6,7
  74:22
**kentwood** 2:5
**kind** 17:14 43:17
  57:7 63:10 69:8
**knew** 49:1
**know** 6:13 8:16
  9:18 11:18 17:3
  18:22 19:10,15
  23:13 25:5,8
  26:14,15,22 27:11
  30:1,8 31:3,5,21

31:22 32:5,12,15
32:19,23 33:1,5,21
36:11 39:9 42:24
44:5,9 46:13 49:4
49:18,20,23 50:1,4
51:15 53:10,11,14
53:22 54:5,9
55:11 56:3 60:4,5
60:10 61:22,25
62:1,4 64:3 66:7
66:11,11,15 68:15
69:18 71:21,23,24
72:14 77:12
**knowing** 48:8,9
61:25 62:1
**knowingly** 62:20
**knowledge** 35:10
40:5,12,20 41:14
41:18 56:6 59:23
59:23 60:1,2
61:10,13 62:2,6,13
62:18 74:21 77:1
**known** 10:6 45:9
**knows** 64:11

**l**

**l** 1:10 9:17 34:17
**lack** 7:12
**landworthy** 1:4
6:2 8:24 11:22
15:10
**lap** 72:13
**lara** 7:9
**laughed** 17:8 27:7
27:10 52:5
**laughing** 27:12
73:7
**law** 6:21 11:25
12:2,10 20:17,18
21:13
**lawsuit** 8:5,7 58:6
59:10,17

**learned** 74:24
**leasing** 13:16 15:1
**leave** 18:8 21:15
22:2,6 74:20
**led** 60:1
**left** 15:25 25:8
32:20 33:2,4,7,11
47:3 54:5 64:21
74:20
**legal** 16:16 77:8,11
**lengthy** 73:5
**letter** 43:22
**letterhead** 63:11
**letting** 64:3
**liability** 1:3,5
**limb** 50:3
**limited** 1:3,4 14:23
17:15
**limiting** 23:8
**line** 35:18 36:1,6
36:12,20 37:3,13
46:9,17 47:1,6,16
48:25
**lingering** 77:8,10
**list** 76:24
**listed** 59:15
**listen** 31:21 51:25
**listened** 37:7
**listening** 48:9 49:1
49:5
**litigated** 10:21
57:4,13,14,14
**litigation** 6:14
7:11,18 9:14
10:20 11:20 12:12
50:9,9,12,13 56:20
56:21,24,25 58:2
**little** 13:3 28:21
36:3 61:3 65:7
**llc** 1:3,4 9:18,19
10:3 11:15,16

39:21 40:19
**loan** 58:8,12 69:15
**logistics** 9:19
10:10 11:15 32:5
32:15
**long** 7:5 12:5 21:1
33:15
**longer** 37:13
**look** 15:6 17:9
18:1 24:18 36:15
47:13 48:20 49:2
49:11 55:13 57:22
58:19 61:22,24
66:23 69:6
**looked** 62:4,4
**looking** 7:8
**looks** 16:24
**lost** 17:1
**lot** 13:4 31:2 62:22
77:10
**lots** 23:3
**lynn** 34:11,11,15
38:21 39:7 53:15
53:17

**m**

**m** 3:6 34:17
**ma'am** 13:25 15:2
28:10 38:17 50:6
**mail** 24:12,15
43:23
**mails** 3:16 14:23
19:12,20 20:7
55:14
**majority** 9:4
**making** 33:19
36:22 56:3
**maloney** 1:10
**mancini** 1:25 78:6
78:21
**manner** 28:22

**march** 22:3 39:17
40:3,15,20 41:14
41:18 57:2,2,24
59:14 62:8 63:13
68:5,6,20
**marked** 5:9 13:2,9
20:8 34:1,3 37:22
37:24 38:12,14
55:23,25 58:13
59:5,7
**marks** 35:2
**materials** 42:6,23
**matter** 6:3 7:1 8:2
8:9,24 9:3,5 13:17
14:3 15:4,24 16:6
16:10,12,13,18
17:21,25 25:20
29:20 49:9 50:10
50:14,16 51:20
56:5 57:4 58:24
59:1 71:10,11,12
78:8
**matters** 10:21
15:9,14,16 58:9
71:9
**mckay** 1:15 72:19
73:13 75:13,15,19
75:23 76:2,14,19
**mcr** 27:19
**mcr8.109** 28:5
**mean** 17:21 34:16
37:15 44:20 51:14
60:3,7
**means** 78:13
**media** 29:23,25
30:1,6,8,11,19
31:3
**meeting** 52:5
62:17 75:22
**meetings** 13:14
14:1

**memorized** 27:22
**memory** 11:24
    19:15 45:11
**memos** 14:24
**mentioned** 10:19
    13:17 20:11 29:19
    67:16
**met** 44:3
**michael** 1:15,16
    73:13
**michigan** 1:2,3,4
    1:22 2:5,13,21 5:1
    5:17 6:4 78:1,23
**mid** 22:3
**middle** 11:7
**mike** 72:19
**mind** 9:24 10:23
**mine** 42:18,21
**minute** 31:13
**misdemeanor**
    73:10
**missing** 19:11
**misspoke** 68:11
**misstated** 57:7
**mistrial** 73:6
**mocked** 27:7,11
**moment** 26:11
    38:1
**monday** 36:18
    39:10
**month** 23:10,10
    67:23,23
**months** 53:11
**morning** 5:19,20
    24:14 36:18
**motion** 8:14,16,21
    27:14,20 28:1,11
    30:9 39:9
**motions** 30:25
**motivated** 46:21

**motivation** 46:22
**mulder** 34:13,17
**mumbling** 34:25
**municipal** 1:11,12

**n**

**n** 3:6,6
**name** 5:11 34:14
    59:20 67:18 76:23
**need** 5:21 55:4
    66:9
**needed** 72:13
**negotiate** 69:9,14
    69:19 70:12
**negotiating** 69:13
**neither** 33:8 78:16
**nephew** 21:20
**never** 7:15 36:24
    37:3 42:18 43:13
    43:22 62:5
**new** 9:22 18:9
    39:23 69:9,13,14
    69:19 70:12
**news** 29:15,22
    30:6,11,16
**nice** 76:8
**nine** 16:24 17:2,5
**nope** 20:5 64:19
**nos** 55:19
**notary** 78:5,22
**notes** 14:24 26:24
    36:15,22 53:1
    58:12 78:15
**notice** 3:14 5:8,15
    13:10 24:13 62:17
    62:20
**notification** 27:19
**notified** 29:25
**notify** 28:15,22
    29:23
**notifying** 63:23

**number** 13:11
    14:7,15 15:22
    16:8,15,24,25 17:4
    17:4 39:9,20 63:2
    63:4
**numbers** 43:11

**o**

**o** 3:6 9:17
**oath** 5:6
**obtain** 11:25 23:16
**obtained** 18:18
    30:2 41:2,3 57:20
    62:19
**obviously** 42:11
    43:9
**occasionally** 12:13
    12:15
**occasions** 34:6
**occur** 31:22
**occurred** 25:6
    68:20
**occurring** 60:25
    61:5
**october** 39:25
**offer** 45:3,22
**office** 12:2 19:20
    19:22,23 21:25
    22:8,12,23 23:2
    24:22,22 25:10,22
    25:23 26:2,19,20
    31:7 34:4,12,25
    40:17,22 41:2,9,12
    41:20 45:16 47:4
    63:14 65:13
**offices** 22:15 23:7
    23:16 29:16
**official** 73:25
**oh** 11:16 23:8 37:6
    47:20 49:2,15
    55:5 64:11 73:10

**okay** 6:1,11 7:17
    10:3 11:25 14:22
    16:15,24 18:15,21
    19:19 21:6 22:20
    23:8,19 24:20
    25:3,11 26:6,12,25
    28:21 29:22 30:8
    33:23 34:23 35:14
    36:24 37:18 39:4
    39:13,17 42:1,17
    46:1 48:5 50:2,25
    51:7,9,13,18 53:8
    53:21 54:9 55:5
    57:11 58:13,25
    59:12,15 62:3
    64:10,17,20 65:12
    67:16,22,25 68:19
    69:7 70:20 71:24
    74:6,21 75:1 76:8
    77:3
**old** 16:23 18:8
**olympus** 14:11,16
**once** 29:6 54:23,24
**ones** 10:23 70:25
**opinion** 43:1 44:11
    45:23 46:2 69:21
    69:23
**opportunity** 55:13
**opposed** 7:13 52:6
**order** 8:15 39:19
    39:25 40:4,19
    41:4,24 57:1
    61:22,22 62:5,7,7
    62:10 63:13,22
**ordered** 68:8
**ordering** 36:16
**orders** 57:19 71:4
    72:5
**original** 57:3
**ought** 74:20

**outside**  42:12
**overstating**  23:18
**owned**  11:23 12:5
**owner**  9:5,16

**p**

**p.m.**  55:17,18
    77:19
**p47600**  2:18
**p63857**  2:10
**p81438**  2:2
**package**  39:11
**page**  1:12,13,19
    2:16 3:2,7,12 6:3
    12:25 23:1,5,6
    25:1,12 32:4,6,11
    32:12 33:6,14
    34:23 35:17,17,23
    35:24 39:19 40:5
    40:17,21 41:1,9,11
    41:16 42:7,19,24
    43:1,4,6,15 44:1,7
    45:24 46:9,16,25
    47:3,7,17,22 48:3
    48:8,14,23 49:4,9
    49:9,12,13,14,18
    49:21 50:4 51:20
    52:16,17,25 53:24
    54:5,11,14 57:2,3
    57:9,20 60:16,24
    62:6,7 63:12,16
    74:22 75:2,8,14,18
    75:23 76:2
**page's**  39:23 41:20
    63:11
**paid**  71:17
**panels**  12:17,21
**pants**  49:24 50:1
**paragraph**  39:17
    40:15 42:1 43:16
    45:2,6 46:1,1,5
    47:17 49:7 51:18

**52:15 53:23**
**paren**  39:22,23
**parking**  31:2
**part**  19:9 28:3
    56:20
**parte**  39:18 40:4
    40:16,18,19,21
    41:4,11,15 42:6,23
    44:4,7 45:10,17,20
    45:23 52:15,23
    53:23 57:1,19
    60:17,25 61:5
    63:22 66:9
**participant**  31:19
**particular**  13:7
    36:23 38:1 43:6
**parties**  42:13
**partner**  6:21
**partnership**  1:13
**party**  38:8 45:4,22
    78:17
**passed**  20:21
**paul**  1:10,14
**paw**  1:12,12
**payment**  14:24
    16:16,20
**payments**  16:23
**pc**  2:11
**peggy**  1:15 33:19
    64:14
**pending**  30:9
    55:10
**people**  5:23 29:15
    29:22 32:19 33:2
    48:7 61:11
**perform**  69:2
**period**  6:11 53:3
    73:5 77:1
**permission**  27:16
**permit**  28:3

**person**  35:8 64:4
    65:21,25 66:3
**personal**  40:5,19
    41:14,18 61:13
    62:1 74:21 77:1
**personnel**  18:14
    19:6
**phone**  66:1,4
**physical**  13:19
    74:6,9,14
**pin**  7:8
**place**  26:21
**places**  34:24 35:1
**plaintiff**  8:17,19
**plaintiff's**  15:4
    59:16 76:23
**plaintiffs**  1:7 2:8
    6:25 13:15
**pleading**  69:6
**please**  5:11
**pledges**  58:11
**pllc**  2:3
**plm**  1:9
**plunkett**  2:19
**plunkettcooney....**
    2:23
**point**  6:10,11 18:7
    33:1,7,8 35:21,24
    36:5,23 37:5 43:6
    46:9,16,23 47:2,14
    48:13,20 51:11
    53:18 54:16,17
    55:4 56:11 65:10
    65:13
**points**  35:5
**police**  25:4,7,12,15
    25:17
**popped**  73:23
**portage**  2:21
**portion**  57:17

**portions**  56:8
**position**  23:15,18
    23:24,25 33:10
    43:14,23 44:6
    49:10 60:17 63:24
    69:11,15
**positions**  43:3,12
**possible**  31:8
    52:12,13
**posted**  58:22
**potentially**  55:8
**practice**  12:5,10
    12:11,11 13:5
**pre**  44:22
**predecessor**  6:19
**premises**  72:7
**preparation**  35:13
**prepared**  34:7,7
    34:10 35:7,11,14
    38:2,4,8 46:11
    53:4,8
**preparing**  39:13
**presence**  54:11
**present**  2:25 15:4
    15:24 16:12 25:23
    26:14,15 59:10
    71:2,5,5 72:8
**presume**  64:11,13
**pretty**  30:11,17
    40:10 49:15,16
**previously**  9:18
    10:6
**primarily**  23:14
**primary**  40:11
**printer**  20:11
**prior**  20:2 23:1
    24:13 27:14 28:12
    43:7,7,12 60:9,11
    65:10
**probabilities**
    52:14

**probably** 12:6 14:20 23:9 44:3 47:16 51:25 62:12 68:3,15

**problem** 13:7 28:25

**proceeding** 27:16 27:25 28:2,12,14 28:16,20,23 31:11 48:17

**proceedings** 13:14 14:1 27:20

**process** 52:17 68:16

**proclaimed** 73:8

**produced** 18:12 19:2 31:25 56:11

**product** 75:12

**production** 29:19

**professional** 1:13

**promissory** 58:12

**pronounced** 68:18 70:14

**pronouns** 62:23

**proof** 14:24 44:12

**prosecuting** 72:16 72:18,20

**prosecutor** 72:15

**provide** 55:8

**provided** 9:12 13:22 15:23 16:17 19:19 30:3,6 58:6

**provision** 51:16

**public** 54:22,23 73:25 78:5,22

**publicly** 50:24

**pull** 58:19,20

**purchase** 45:4

**purportedly** 41:9

**purpose** 39:13

**purposes** 5:17

**pursuant** 5:15

**push** 74:11

**put** 5:21 27:1 33:22 39:9 44:19 44:20 46:13 50:11 52:25 59:22 66:7 69:14 76:8

**q**

**qualifications** 44:4

**qualifying** 77:17

**quasi** 54:22

**question** 8:15 28:21,25 29:3 32:22,24 36:3 41:10 48:5 75:5 75:13 76:5

**questionable** 15:14

**questioned** 30:24

**questioning** 77:5

**questions** 35:2 53:15 55:5 60:14 77:7

**quip** 73:17

**quite** 14:15 24:16 30:10 73:5

**r**

**r** 5:13 9:17 34:16 34:17,17

**rapids** 1:22 5:1 12:3

**rate** 15:20

**rcallahan** 2:23

**reach** 48:21

**read** 36:15 40:1 52:2,10

**reading** 17:9

**real** 10:16,18 12:11 62:7

**really** 5:21 32:24 57:22,23 61:22

**reason** 50:17

**reasons** 18:12 49:21

**rebecca** 20:12 21:4,8,15 26:8,9

**recall** 7:24 14:5 18:9 19:9 23:9 25:2,13,16 26:11 26:22,25 27:3,4,12 27:13 29:17 30:23 40:11 53:6 59:17 67:21 70:22

**recalled** 53:5

**receipt** 16:20

**receive** 42:20

**received** 34:5 42:7 42:18,23 66:6

**recollection** 46:2 52:4

**record** 5:12,14,22 6:1,12,16,17 11:21 14:1,4,7,12 17:6 19:25 27:16 28:20 37:25 42:10,12 54:20 55:7,17,18 56:2,7

**recorded** 3:18 27:21,25 33:25 66:16 78:11

**recorder** 14:18

**recorders** 14:16

**recording** 13:21 13:21 14:6 26:21 27:1,7 28:3,9,12 28:16,23 29:4,6 30:9 31:11,14,18 31:22 32:2 33:7 34:7,21 35:4 38:8 46:23 53:11,12,13

**recordings** 13:14

**records** 15:1 23:21 68:16 70:8

**recovered** 6:7

**red** 73:23

**redacted** 16:1 56:8 56:12 59:9

**reduced** 78:12

**reference** 45:8 52:22

**referenced** 45:3 45:22

**referred** 46:16

**referring** 12:23 42:2 46:8 48:3,13 52:16 62:8 63:8 71:3

**refers** 47:2

**reflect** 5:14 17:6

**refusal** 70:7

**refusing** 55:3

**regarding** 17:17 67:9

**regards** 30:15 75:13

**related** 10:12,13 12:12 21:3,18,21 58:9,23,24

**relates** 14:25

**relation** 29:20 32:6,7,7,13,13,14

**relative** 8:3 15:4 16:5,9 25:6 40:3 43:16 58:17 59:9 60:12 61:11 68:14 68:24 69:15 75:9 75:15,19 76:2,15 76:19

**relatives** 22:8,11

**rely** 31:24 32:2

**remember** 19:16
19:17 24:8 27:9
49:12,13 52:24
65:22 68:9
**reported** 18:19
**reporter** 3:20
34:14,18 37:21
38:2,7 78:5
**represent** 6:24
8:23 71:13
**representation**
62:6 65:9 71:17
71:20
**representations**
9:12
**represented** 7:5
7:21 8:24 9:2,3,16
40:25,25 56:4
71:15
**request** 34:8 35:14
50:19 51:2 54:15
54:22
**requested** 39:19
40:4,6
**required** 28:1
**requirement** 29:2
51:5
**requires** 27:19
64:2
**reserve** 77:6
**resolved** 8:9,11
**responded** 11:4
**response** 50:20
51:5 54:15 63:19
**responsive** 13:18
**result** 69:7 75:11
**resurrection** 62:11
62:12 63:13
**retainer** 15:3,8,16
16:4

**retraining** 39:19
40:4 62:10
**retrieve** 16:21
27:6
**retrieved** 58:18
**retrieving** 59:1
**review** 14:25
23:21,22 53:25
77:7
**reviewed** 18:17
53:7
**rictor** 74:5,9,12
**ride** 24:1
**right** 9:24 10:23
11:18,24 15:2
23:15,20,21,21
25:21 27:2 29:17
62:10 64:2 69:22
72:6 77:7
**robert** 1:5 2:18
21:8
**room** 16:1 26:3,7
26:8 27:5,12
32:20 33:2,11
50:4 54:6 74:16
**row** 73:16
**rpr** 1:25 78:21
**rule** 28:1,8,10
54:21 59:21 63:23
64:2
**rules** 5:17,18,18
5:21 27:18,22
28:6
**ruling** 71:2,3,6
72:2,4
**run** 30:15,16,23
45:1
**rusty** 74:5
**rwswyk** 34:11
38:21

**s**

**s** 3:6,11 34:17
**sam** 63:21 65:23
66:21
**sausage** 43:17
44:10,18
**saved** 14:20
**saw** 44:13
**saying** 18:24 19:1
35:5 45:8 46:19
63:20 69:12
**says** 34:24 42:1
46:5,9,17,25 48:12
**scheduled** 36:17
**school** 20:21
**science** 18:12
**screwing** 73:20
**se** 2:4
**seated** 26:18
**second** 47:16
63:22 67:24,25
69:8,24 70:18
**security** 58:10
**see** 17:12 33:3
35:18 43:19,19
44:19 45:5 46:6
55:9 75:8,14,18,22
76:9,18
**seen** 24:16 38:4
43:13,22 50:7,10
50:12,14,18,23,23
60:15,19 61:6
**self** 77:17
**send** 66:23
**sending** 63:12
**sent** 14:25 44:22
44:23 45:15,16,19
62:7
**sentence** 46:4,8
48:11

**separate** 70:12
**september** 59:12
**serv** 9:18 10:6
**serve** 12:17
**served** 15:9
**services** 15:23
16:16 58:5
**set** 39:11 62:16
63:1,9 64:4 66:9
71:3
**setting** 60:24
**settlement** 6:17
39:22,24 57:14
69:3 70:13
**seven** 16:8 56:19
**shareholder** 9:5
**shipping** 10:13
**short** 21:13
**shortly** 42:14
53:13
**show** 13:2,9 16:16
16:19 24:19 25:7
33:8 34:3 36:18
37:24 38:14 59:7
60:9,11 61:21
67:16,19,24,25
68:4,7,8,10,19
69:25 70:5,10,18
70:21
**showed** 25:4,7
30:25 73:4
**showing** 16:20
37:10
**shown** 56:13
**sic** 39:22 62:15
74:5
**side** 69:12,17
**sides** 56:2
**signature** 40:8,14
41:6,8,24 61:23

**signature's** 40:7
**signed** 38:3,15,23
  38:25 41:7,22
  66:5,22,24
**signing** 67:13
**similar** 9:25 10:14
**simply** 18:10,13
  46:19
**singular** 11:5
**sir** 5:11 11:25
  12:10 41:3 60:20
  61:7
**sit** 12:21 44:25
  45:25 53:6
**site** 23:11
**sitting** 32:6,12,13
  73:7,16
**situated** 50:4
**situation** 31:4 61:4
  61:6
**six** 16:25 17:4
  40:15
**slanderous** 8:4
**smile** 13:3
**social** 60:24
**somebody** 7:13
  32:22,23,25 33:4
  41:6 43:11 44:19
  74:1,19
**someplace** 26:23
  36:17 67:2
**son** 6:21,22 21:24
  22:14 48:1,8 52:7
  52:7 57:17 71:13
  75:24
**soon** 63:14
**sorry** 9:9 11:16
  16:11 17:23 29:14
  47:20,20 49:25
  55:6 70:3 71:7
  75:25 76:14

**sort** 7:10 43:13
  61:9 65:2,8,12
**sounds** 22:19
**southfield** 2:13
**speak** 64:10
**speaker** 35:2
**speaking** 23:12
  42:8 65:25 73:11
**special** 30:15
**specifically** 27:18
  69:4 70:22 71:11
**speculate** 47:8
**speculating** 48:19
**spell** 34:14
**spoke** 15:9
**stack** 19:19
**staff** 64:12,13 67:3
  67:4
**stages** 6:14
**standing** 32:17
**start** 7:1 48:7,22
**started** 48:14 49:4
  57:1 69:9
**starting** 47:7
**state** 5:11 39:17
  40:15 70:9 78:1
**stated** 27:1 50:8
**statement** 36:19
  43:16 47:14 51:23
  53:20
**statements** 15:22
  16:8,20 53:2
  58:11
**states** 1:1 6:3
**stating** 19:7
**status** 28:18 29:4
  42:1,3,5,14 44:8
  44:15,22 45:14
  46:2 53:25 54:6
  54:10 60:9 61:19
  68:1,2

**stayed** 33:15
**steart** 1:12
**stenographic**
  78:15
**stenographically**
  78:12
**step** 74:2,3
**steward** 35:25
**stewart** 1:14 2:24
  12:25 22:25 23:5
  23:7,14 24:3,10,21
  25:14 29:13 32:4
  32:8,11,13 33:6,14
  35:23 42:20 43:5
  47:3 49:11 52:19
  52:22 53:2 60:16
  61:3 63:1,6,25
  76:10,14,14,19
**stewart's** 23:24,25
  62:13 63:19
**stipulated** 69:2
  70:12
**stop** 74:2
**stopped** 74:10
**storage** 18:8
**strange** 63:10
**street** 1:21 2:4
**stuff** 60:7
**subject** 50:20
**submission** 44:22
  45:15 54:1,7,10
**submissions** 42:15
**submit** 42:13 43:8
  54:13
**submitted** 42:18
  54:14
**submitting** 39:15
**subsequent** 50:18
**success** 9:18 10:6
**suggest** 24:19

**suite** 1:21 2:4,20
**summaries** 14:24
**summary** 8:20
**sunday** 39:3,5,7
  39:12
**sundays** 38:21
**supplemental**
  40:12
**supply** 10:9
**support** 44:6
  60:17
**supports** 43:14,23
  45:23 51:23
**supposed** 42:13
  43:8
**sure** 7:2 10:5
  17:13 19:11 25:6
  28:5 40:10 45:2
  49:15,16,17 70:19
**surmised** 37:6,14
**surprise** 48:6
**sworn** 5:5 78:9

**t**

**t** 3:6,11
**table** 3:1
**take** 18:1 23:23
  26:24 51:11 54:16
  55:14 66:17,17
  70:9 77:9
**taken** 1:21 5:15
  18:16 77:11 78:8
  78:15
**talk** 24:20 25:18
  35:21 47:18 67:19
**talked** 11:20 25:9
  41:23 54:4 59:19
  61:20 67:7 71:1
  76:22
**talking** 18:17
  20:16 44:14 47:10
  47:11 59:25 68:4

68:20 72:22
**tape**  14:19 33:13
  33:16 51:25
**technical**  18:11
**telephone**  3:20
  13:14 14:2 25:9
  28:19 29:4 31:19
  32:3,7,9,14 37:20
  38:19 63:5 64:5
**tell**  5:24 7:6 17:14
  18:6 22:22 23:19
  35:4 47:14 53:6
  65:20 66:3
**telling**  36:19 47:25
  48:11 61:11
**temporary**  39:18
  40:4
**ten**  15:15
**tend**  18:8
**term**  62:12
**terms**  39:21
**testified**  5:5 48:6
**testify**  33:6 44:6
  78:9
**testimony**  27:1,4
**thank**  33:17 34:18
  77:18
**thing**  16:19 33:12
  36:16 37:7 56:22
  66:22 70:22 75:11
**things**  10:14 18:10
  24:1 42:10,11
  57:7 62:18 64:6,8
  77:7,9,11
**think**  5:22 11:7
  14:16 19:15,16
  22:19 23:14,18,22
  24:17,23 26:5
  29:13,16 30:12,15
  30:16,25 36:7
  37:10 38:6 40:7

47:2 48:19,20
  50:11 51:14 54:18
  55:4 57:17 59:14
  60:21 64:25 67:2
  67:11 73:18,19
  76:25 77:8
**thinking**  36:14
  37:16,17 57:23
**third**  14:22 38:8
  45:4,22
**thought**  7:15 17:1
  28:7 31:12 36:4,5
  36:11,21 37:4,12
  37:15 41:8 46:5
  46:15,19,24 47:6,9
  47:11,12,24 48:2
  48:12,18,19,20
  49:14 56:23 69:23
  73:9
**thoughts**  36:7,13
  36:22 37:1,7
**threatening**  73:25
  74:1
**three**  21:2
**threw**  54:1
**thrown**  42:21
**time**  5:24 6:11,16
  13:4 14:17 17:10
  20:1,13 21:14
  23:10 24:17 26:10
  26:18 27:25 30:10
  31:15 32:4 33:18
  33:21 37:1,2,7,8
  37:14 40:11,23
  41:5,7 43:12
  45:12 46:16,23
  47:6 48:13 49:20
  53:3,6 57:9 63:14
  63:22 64:10,23
  66:15 67:1 73:5
  74:17 77:1,5,18

**timeline**  46:14
**times**  20:16 34:20
  62:15 63:2,4,18
**tipped**  30:8 31:3
**titles**  58:10
**today**  7:23 8:25
  9:6 13:10 44:25
  65:5
**told**  64:23 65:16
  66:13
**top**  11:18 18:7
  29:17 47:22 48:3
  71:25
**total**  19:17
**town**  2:12
**tr**  62:11
**trade**  2:20
**trailers**  45:4
**transaction**  58:12
**transcribed**  3:20
  37:20 38:9
**transcribing**  35:3
  35:4 53:17
**transcript**  3:18
  4:8 33:25 34:5,6
  34:10,20 35:11
  38:2 46:9,11,13,17
  47:7,13,14 48:24
  49:11 52:1,3,10
  53:1,5,7,8,9 78:15
**transcription**
  78:14
**transcripts**  31:24
  33:8
**transferred**  58:10
**transmitted**  41:1,9
**trespass**  72:8
**trial**  72:25
**tried**  23:23 69:9
**trip**  17:3

**tro**  40:6 62:10,11
  62:13 63:20 66:5
  66:8 67:5,9,14
**trouble**  54:20
  68:16,17
**troubled**  55:1,2
**truck**  27:6,10
**trucking**  10:12
**true**  14:14 19:2,21
  23:17 32:1 37:9
  37:13 40:24,25
  50:22 52:20 54:8
  54:12 57:6 69:21
  78:14
**truth**  19:16 78:9
  78:10,10
**try**  64:3,4
**trying**  17:3 18:23
  26:23 36:14 44:16
  69:14,19 76:25
**tuesday**  1:24
**turned**  18:3,4,10
  18:11,13,19 19:3,7
  19:10,14,17
**turning**  68:16
**twenty**  48:16
**two**  21:2,17 23:10
  24:13 31:14 38:18
  44:14 47:18,21,23
  60:12 61:21 67:17
  68:15 73:13
**type**  8:2 10:3,7,10
  12:10 37:9 42:14
  43:22 61:4
**typewritten**  78:13

**u**

**u**  9:18 10:6 34:17
**ucc**  58:11
**unable**  35:8
**underlying**  6:8
  16:13 17:17,19,24

25:19 29:11,20
50:9,13 56:5
**undersigned** 46:6
46:15,24 47:12,24
48:12
**undersigned's**
53:25
**understand** 43:21
43:21 44:11,16
46:12,12 53:4
65:7 67:22 69:11
**understanding**
18:15 36:5 42:2
47:5 59:8 61:9
**understatements**
77:15
**unidentified** 35:2
**uninterested** 38:7
**united** 1:1 6:3
**university** 12:1
**uses** 49:18

**v**

**valparaiso** 12:1
**van** 1:11 6:9,25
8:8 10:22,24
13:16 16:5,9,17
30:14
**variations** 52:3
**various** 49:21
**vein** 73:23
**veracity** 61:14
**verdict** 72:7
**verification** 34:12
**verify** 33:21 35:9
**versus** 6:2,8 11:1
14:3 16:9
**victory** 72:13
**video** 13:13
**view** 19:12
**village** 1:11

**violation** 63:23
**violence** 74:14
**visit** 24:4,14 64:4
64:5
**visser** 1:20 2:3 3:3
3:22,24 5:4,13,15
5:19 6:1,20,21
19:19 26:14 38:11
52:8 55:20,25
57:17 59:7,15
72:6,12,25 75:24
76:3,11,16,20 78:7
**visser's** 3:18 33:25
71:12
**visserlegal.com**
2:7
**voice** 26:1
**voices** 33:15,22
**voluminous** 56:1
**voluntarily** 8:13
24:19
**voorhees** 9:2,3,8
9:10,13,16 11:10
11:22,23 15:10,11
15:17 21:7,11,18
21:21,21,25 22:11
**voorhees's** 10:20
15:16
**vs** 1:8

**w**

**w** 2:2 34:16,16,17
34:17
**wait** 73:22
**waiver** 51:15
**walked** 66:20
**want** 25:18 27:23
28:17,24 44:17
46:3 47:13,18
54:15 55:13 64:5
64:7,7

**wanted** 20:23 24:1
56:23 66:4
**wants** 22:7
**washtenaw** 78:3
78:23
**way** 2:20 18:18
26:23 28:15 29:1
29:3 31:2 42:21
48:22 50:11 56:16
61:13
**we've** 54:4 61:20
71:1 77:9
**week** 43:7 60:9
68:1 69:25 70:2,4
77:15
**weird** 66:21
**went** 27:10 46:3
**western** 1:2 6:4
**westra** 71:6,8
**willing** 55:10
**wind** 10:4,5
**wish** 13:20 66:16
**withheld** 18:5,25
**witness** 3:2,7 9:10
12:19 34:16 75:1
75:5 76:1,13
77:10,14 78:7,11
**witnessed** 60:23
61:2
**witnesses** 44:5,13
67:7 74:1,3
**witte** 19:25 29:15
**witte's** 19:23
**woman** 65:21
**word** 51:12
**words** 66:8,15
**wore** 49:23 50:1
**work** 7:10,17
12:14,23 15:17
21:1,12 38:21
58:15 75:12 77:16

**worked** 20:18,21
20:24 21:13
**working** 39:5,7
**world** 52:13
**write** 22:7
**written** 76:9
**wrong** 5:25 31:1,2
67:2
**wrote** 49:13
**wry** 13:3

**x**

**x** 3:6,11

**y**

**y** 34:16,17
**yeah** 6:22 17:8
31:2 55:7
**year** 8:1 12:8,16
13:4 21:17 22:4
**years** 7:6 11:19
15:15 21:2,17
56:19
**yep** 16:3 55:16
56:19 68:6

**z**

**zealand** 9:22
**zeeland** 9:21,23
10:15

Michigan Court Rules

Chapter 2: Civil Procedure

Subchapter 2.300 Discovery Rule 2.306

(f) Certification and Transcription; Filing;
Copies.

(1) If transcription is requested by a party, the
person conducting the examination or the
stenographer must certify on the deposition that
the witness was duly sworn and that the deposition
is a true record of the testimony given by the
witness. A deposition transcribed and certified in
accordance with sub-rule (F) need not be submitted
to the witness for examination and signature.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.